**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| IN RE INSPIRE MEDICAL SYSTEMS, INC. SECURITIES LITIGATION | Civil Action No. 0:26-cv-02790-NEB-DJF<br><br>CLASS ACTION<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

# TABLE OF CONTENTS


I. INTRODUCTION .......... 2

II. JURISDICTION AND VENUE .......... 8

III. PARTIES .......... 8

A. Lead Plaintiff .......... 8

B. Defendants .......... 9

IV. SUMMARY OF THE FRAUD .......... 12

A. The Company's Hypoglossal Nerve Stimulation Devices .......... 12

B. Defendants Rushed the Launch of Inspire V Because Its Predecessor, the Inspire IV, Suffered from Multiple Problems That Threatened the Company's Business and Inspire Wanted to Beat Its Competitors to Market .......... 14

C. SleepSync and Reimbursement Were the Two Keys to the Inspire V Launch .......... 17

1. Leading Up to the Inspire V Launch, the Company Positioned Its SleepSync Integrated Platform as a Key Strategic Objective .......... 17

2. Defendants Bundled SleepSync With Inspire V .......... 18

3. Reimbursement Was the Key Driver of Demand and Pricing .......... 18

D. Defendants Made False and Misleading Statements Concerning Providers' Adoption of the SleepSync Software Necessary for Inspire V .......... 22

1. At the Start of the Class Period Defendant Herbert Touts Positive "Feedback" for the SleepSync Programmer .......... 23

2. In 2025, Defendant Herbert Continues to Tout Positive "Feedback" .......... 25

E. In Truth, SleepSync Was Defective, and Providers Were Hesitant to Adopt It, Which Were Significant Headwinds to the Inspire V Launch .......... 28

1. From the Start of the Class Period, SleepSync Was Riddled with Deficiencies and Security Vulnerabilities .......... 28

2. Providers Were Slow and Hesitant to Adopt SleepSync .......... 29

F. Defendants Made False and Misleading Statements Concerning Inspire V's Eligibility for Reimbursement from Medicare and Private Insurance .......... 34

1. At the Start of the Class Period, Defendants Tout Inspire V's Insurance Coverage and Coding, and Represent that MACs Were Being Made "Fully Aware" and Given a "Fair Shake" ............................ 36

2. On January 13, 2025, Defendant Herbert Represents that "the Insurance Companies Are on Board" to Use CPT Code 64568 for Inspire V........................................................................................ 38

3. On February 10, 2025, Defendants Claim to Have Secured Positive Coverage from "All" Large National Commercial Insurers, and Defendant Herbert Represents that CPT Code 64568 "Accurately Describes" and "Appropriately Reflects" the Inspire V Procedure .......... 39

4. By April 2025, Inspire States on Its Publicly-Available Website that CPT Code 64568 Is the Code for Inspire V ...................................... 41

5. In May 2025, Defendants Claim to Have Secured Positive Coverage Policies for "More Than 300 Million Lives" and that the Company Is Ready for a "Full Launch" with CPT Code 64568............... 42

6. In June 2025, Defendant Herbert Falsely Assures an Analyst that the Company's Use of CPT Code 64568 Is "Above [Herbert's] Paygrade" and "Determined by Certified Coders," and Defendants Continue to Reiterate "Positive Coverage Policies" ................................. 43

7. In August 2025, the Company Reveals that the Adoption of CPT Code 64568 Had Been a Headwind, But Then Reassures Investors It "Cleared Up in July" and Was "No Longer a Headwind" .................... 44

8. By October 2025 Defendants Publish an Online Billing Guide for Providers Stating that CPT Code 64568 Is the Code for Inspire V .......... 46

9. In November 2025, CMS Increases Reimbursement for CPT Code 64568, Driving Inspire's Stock Price Up 40%......................................... 47

G. In Truth, Defendants' Statements Regarding Reimbursement and Coding for Inspire V Were Materially False and Misleading .......................................... 50

1. "All Seven" MACs Did Not "Provide Coverage" for Inspire V on a "Fully Aware" and "Fair Shake" Basis.................................................... 50

2. "All" (or "Virtually All") "Large National Commercial Insurers" Did Not Have "Positive Coverage Policies" and Were Not "On Board" ........................................................................................... 57

3. 64568 Was Not the Correct CPT Code for Inspire V ............................... 63

4. Defendants' Statements Referencing the Company's Prior Use of CPT Code 64568 as Support for Its Current Use Were Misleading ......... 71

5. The Use of CPT Code 64568 for Inspire V Was Directed by the Company's Senior Management, Not Professional Coders ...................... 72

6. CMS Identifies Inspire V as a Source of "Fraud, Waste, and Abuse" ........................................................................................ 74

H. Defendants Issued and Reaffirmed Baseless and Unrealistic Guidance that They Attributed to SleepSync Adoption and Inspire V's Coding ........................ 75

I. The Company's Stock Price Declined in Response to Revelations Regarding the Adoption of SleepSync and CPT Code 64568 .............................. 81

1. August 4, 2025: Inspire Reveals that the Adoption of the SleepSync Programmer and CPT Code 64568 Are the Two "Predominant" "Headwinds" to the Launch of Inspire V ......................... 83

2. September 3, 2025: Defendant Weatherby Reveals that SleepSync Continued to be a Headwind ................................................................... 86

3. December 15, 2025: *The Capitol Forum* Reveals that the Use of CPT Code 64568 for Inspire V Is Not Settled But Rather Under "Review" by the MACs. ............................................................... 87

4. December 18, 2025: Three MACs (Noridian, CGS, and Palmetto) Remove CPT Code 64568 from Their Billing and Coding Articles for Hypoglossal Nerve Stimulation for Obstructive Sleep Apnea ............ 88

5. January 22, 2026: CMS Reveals that CPT Code 64568 Was "Incorrectly Added" as a Covered Indication for Obstructive Sleep Apnea and that MACs "Will Adjust Affected Claims" ............................ 90

6. February 11, 2026: Inspire Reveals that Providers Must Use CPT Code 64582 with Downward Modifier -52 for Inspire V and that Creating a New CPT Code Will Take Until 2028 ................................... 92

7. March 17, 2026: Inspire Reveals Continued "Challenges" with Reimbursement and WISeR that Are "Impacting Our Business" ............ 94

8. May 4, 2026: Inspire Reveals that the American Hospital Association Recommends CPT Code 64999 for Inspire V and that Coding and Reimbursement Adversely Affected Inspire's Q1 2026 Revenue and Would Continue to Adversely Affect Revenue Through 2026 ........................................................................................ 96

V. POST-CLASS PERIOD DEVELOPMENTS ................................................................ 98

VI. THE RULES GOVERNING CPT CODING THAT APPLY TO INSPIRE'S INCORRECT USE OF CPT CODE 64568 FOR INSPIRE V ........ 99

A. Background on Medicare ........ 99

1. Medicare Administrative Contractors (MACs) ........ 99

2. CMS and MAC Coding Guidance ........ 101

3. Medicare Claim Forms ........ 102

4. Processing of Medicare Claims ........ 103

B. CPT Codes 64568 and 64582, Modifier -52, and "Unlisted" CPT Codes Such as 64999 ........ 104

1. 64568 (Vagus or Other Cranial Nerve Stimulator) ........ 104

2. 64582 (Hypoglossal Nerve Stimulator) ........ 107

3. Modifier -52 (Reduced Services) ........ 109

4. Unlisted CPT Codes Such as 64999 (Under Other Procedures of the Nervous System) ........ 110

VII. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ........ 111

A. False and Misleading Statements About the SleepSync Programmer ........ 111

1. November 4, 2024 Earnings Call ........ 112

2. December 3, 2024 Piper Sandler Healthcare Conference ........ 112

3. January 13, 2025 J.P. Morgan Healthcare Conference ........ 113

4. May 5, 2025 Earnings Call ........ 113

5. June 13, 2025 Wells Fargo MedTech Innovation Spotlight Conference ........ 114

6. June 17, 2025 Truist Securities MedTech Conference ........ 115

B. False and Misleading Statements About Reimbursement and Coding for Inspire V from Medicare and Private Health Insurers ........ 116

1. November 4, 2024 10-Q and Earnings Call ........ 117

2. January 13, 2025 J.P. Morgan Healthcare Conference ........ 119

3. February 10, 2025 10-K and Earnings Call ........ 121

4. March 18, 2025 KeyBanc Healthcare Forum ........................................ 124

5. Statements on the Company's Website from at Least April 19, 2025 until the End of the Class Period.................................................. 126

6. May 5, 2025 10-Q and Earnings Call ................................................... 128

7. June 13, 2025 Wells Fargo MedTech Innovation Spotlight Conference ................................................................................ 131

8. August 4, 2025 10-Q and Earnings Call ............................................... 133

9. September 3, 2025 Wells Fargo MedTech Innovation Spotlight Conference ................................................................................ 136

10. Statements in the Billing Guide on the Company's Website by October 2025 until the End of the Class Period..................................... 137

11. November 3, 2025 10-Q and Earnings Call.......................................... 139

12. November 10, 2025 UBS Healthcare Conference ................................. 141

13. December 2, 2025 Piper Sandler Healthcare Conference....................... 143

14. January 12, 2026 J.P. Morgan Healthcare Conference........................... 145

C. False and Misleading Guidance ........................................................... 146

1. January 13, 2025 Revenue Guidance.................................................... 146

2. February 10, 2025 Reaffirmed Revenue Guidance and New Diluted Earnings Per Share Guidance.................................................... 148

3. May 5, 2025 Reaffirmed Revenue Guidance and Increased Diluted Net Income Per Share Guidance .......................................................... 149

VIII. ADDITIONAL LOSS CAUSATION ALLEGATIONS .............................................. 151

IX. ADDITIONAL SCIENTER ALLEGATIONS............................................................ 154

A. Multiple Facts Support a Strong Inference of Scienter for Defendants' Misstatements about SleepSync............................................................ 155

B. Multiple Facts Support a Strong Inference of Scienter for Defendants' Statements about Insurance Coverage and CPT Coding .................................... 163

C. Additional Indicia of Scienter that Apply to All Misstatements......................... 182

D. Corporate Scienter ........................................................................... 187

X. INAPPLICABILITY OF STATUTORY SAFE HARBOR .......... 188

XI. THE PRESUMPTION OF RELIANCE .......... 189

XII. CLASS ACTION ALLEGATIONS .......... 190

XIII. CLAIMS FOR RELIEF .......... 192

COUNT I: SECTION 10(b) AND RULE 10B-5(b) AGAINST ALL DEFENDANTS .......... 192

COUNT II: SECTION 10(b) AND RULE 10B-5(a), (c) AGAINST ALL DEFENDANTS .......... 194

COUNT III: SECTION 20(a) AGAINST THE INDIVIDUAL DEFENDANTS .......... 197

XIV. PRAYER FOR RELIEF .......... 197

Lead Plaintiff Indiana Public Retirement System ("INPRS" or "Lead Plaintiff"), by and through its counsel, brings this action for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, against Defendants Inspire Medical Systems, Inc. ("Inspire" or the "Company"), Timothy P. Herbert ("Herbert"), Richard J. Buchholz ("Buchholz"), and Carlton W. Weatherby ("Weatherby") (collectively "Defendants"). Lead Plaintiff brings these claims on behalf of all persons and entities that purchased Inspire common stock between November 4, 2024 and May 4, 2026, inclusive (the "Class Period") and were damaged thereby.

Lead Plaintiff alleges the following based upon personal knowledge as to itself and its own acts and upon information and belief as to all other matters. Lead Plaintiff's information and belief is based on, among other things, the investigation of Lead Counsel, which includes, but is not limited to, a review and analysis of: (a) Inspire's public filings with the SEC; (b) transcripts of Inspire management's conference calls and other conferences with investors and analysts; (c) press releases disseminated by Inspire; (d) analyst and press reports about Inspire; (e) other public information and data regarding the Company; (f) interviews of former Inspire employees; (g) consultation with relevant experts and consultants; and (h) other sources cited herein. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. INTRODUCTION

1. This is a securities fraud class action brought on behalf of purchasers of Inspire's publicly traded common stock during the Class Period. Lead Plaintiff asserts these claims under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder against Inspire and certain of its current and former senior executives, namely Chief Executive Officer Timothy P. Herbert, former Chief Financial Officer Richard J. Buchholz, and former Chief Strategy Officer Carlton W. Weatherby (the "Individual Defendants," and together with the Company, "Defendants").

2. Inspire is a medical device company that derives primarily all of its revenue from the sale of a single product: a surgically-implanted device that treats obstructive sleep apnea by stimulating the hypoglossal nerve to prevent the patient's tongue from blocking the airway during sleep.

3. During the Class Period, Inspire undertook what Defendant Herbert described as "the largest launch in the history of the company"—the commercial rollout of the fifth generation of that device, Inspire V.

4. Two things were critical to the success of that launch: (1) the adoption by healthcare providers of SleepSync, a software platform that Inspire bundled with Inspire V, and that providers were required to install before they could activate the new device; and (2) the availability of insurance reimbursement under a Current Procedural Terminology ("CPT") code that would compensate providers at rates sufficient to incentivize rapid adoption. Defendants deceived investors about both.

5. As Inspire rushed toward a full commercial launch of Inspire V in May 2025, Defendants repeatedly misrepresented the status of providers' adoption of SleepSync. On earnings calls and at conferences, Defendants told investors that "feedback" from providers regarding the

SleepSync programmer was "promising," "very, very strong," and "very good"; that the transition to SleepSync "should not be that difficult" and was "a standard process"; and that SleepSync adoption was "not really the key challenge" to the Inspire V launch. Analysts credited these assurances, concluding that SleepSync adoption was "on track" and that Inspire was "well-positioned to be a beat-and-raise story."

6. Defendants' statements, however, were materially false and misleading. In truth, as Defendants later revealed, and as detailed by several former Inspire employees, the SleepSync software was riddled with deficiencies and security vulnerabilities. Healthcare providers were hesitant to install SleepSync on their systems and were delaying its adoption by many months due to widespread concerns about information security and the risk of noncompliance with the Health Insurance Portability and Accountability Act ("HIPAA").

7. Because providers were delaying the adoption of SleepSync, the adoption of Inspire V was correspondingly delayed—a critical fact that Defendants concealed from investors.

8. Defendants simultaneously misled investors about reimbursement and coding for Inspire V. Defendants told investors that Inspire had "secured positive coverage policies" from "all" (or "virtually all") "large national commercial insurers" and obtained coverage from "all seven" Medicare Administrative Contractors ("MACs"). Defendant Herbert further stated that CPT code 64568 "accurately describes" and "appropriately reflects" the Inspire V implantation procedure, that "the insurance companies are on board" with 64568, and that the Company was "ready to throw the switch" for a full launch with that code. Defendants also assured investors that they were making the MACs "fully aware" of the relevant facts and giving them a "fair shake at all the information."

9. In truth, CPT code 64568 was not the correct code for Inspire V. The most

appropriate coding was the "unlisted" code 64999 for facilities and 64582-52 for physicians—with 64582 being a code that Inspire and Defendant Herbert had personally played a key role in creating just a few years earlier.

10. But 64582-52 and 64999 were far less lucrative than 64568: for facilities, the unlisted code 64999 had no guaranteed reimbursement level and increased the administrative burden of submitting claims; for physicians, the modifier -52 for "reduced services" could have decreased reimbursement by 10 to 50 percent.

11. Defendants selected 64568 because it maximized reimbursement rates, accelerated provider adoption, and positioned Inspire V to defend against imminent competition from rival hypoglossal nerve stimulation devices manufactured by Nyxoah and LivaNova—even though Defendants knew that the code was incorrect.

12. Defendants' coding scheme worked: when CMS announced on November 21, 2025, that CPT code 64568's reimbursement rate would increase by 48% and 58% for hospitals and ambulatory surgical centers, respectively, Inspire's stock price increased by over 40%.

13. Defendants Herbert, Buchholz, and Weatherby knew, or at minimum were severely reckless in disregarding, the false and misleading nature of their statements.

14. Regarding SleepSync, the software deficiencies and security vulnerabilities at issue were escalated to management-level executives, including Inspire's Chief Technology Officer ("CTO") and its Vice President of Quality. The Vice President of Quality, in turn, was required to report these serious issues to Defendants Herbert, Buchholz, and Weatherby. Under both the ISO 13485 standard that Inspire said it followed, and the FDA's Quality System Regulation ("QSR") then in effect, these were quality issues that Defendants, as members of "top management" and "management with executive responsibility," had a duty to monitor.

15. Moreover, there were widespread, documented reports within Inspire of concerns from providers about SleepSync that were escalated to leadership, reflected in internal reports, and available in databases to which Defendants Herbert, Buchholz, and Weatherby had access.

16. Regarding reimbursement and coding, the Individual Defendants were personally involved in the decision to select CPT code 64568.

17. To start, Defendant Herbert himself lobbied to create CPT code 64582—during which time Inspire represented to CMS that 64568 would be used exclusively for vagus nerve devices, which are fundamentally different from the Inspire V.

18. Former employees confirmed that providers and payors objected to Inspire's use of 64568 for Inspire V, and those objections were widespread, documented internally, and escalated to management-level executives.

19. Notably, Inspire's predecessor company, Medtronic Inc. ("Medtronic"), paid the United States millions of dollars to settle an action involving the same species of misconduct at issue here, which occurred while Defendant Herbert was a medical device executive at Medtronic: causing physicians to submit false claims by identifying the wrong CPT code for billing purposes.

20. Moreover, since January 17, 2025, the Department of Justice U.S. Attorney's Office for the District of Minnesota has been investigating Inspire for allegations of false claims related to its reimbursement practices.

21. By no later than June 2025, Defendants learned that CMS, through its new Wasteful and Inappropriate Service Reduction Model ("WISeR"), was going to identify Inspire (and Inspire V) as a provider who "abuses Medicare" and has "been a source of fraud, waste and abuse"—the only such provider (and device) to be identified by name.

22. Defendants Herbert, Buchholz, and Weatherby had concrete personal financial incentives to perpetuate the fraud: their cash bonuses were tied to revenue, operating income, and patient-flow metrics that were inflated by the alleged misstatements.

23. Further, at a time when Inspire's stock price was inflated by both the SleepSync and CPT coding misstatements, Defendant Buchholz sold more than $1 million in shares not pursuant to a Rule 10b5-1 plan and Defendant Herbert took steps that would allow undisclosed sales of tens of millions of dollars in Inspire shares by his heirs.

24. Defendants' misrepresentations allowed Inspire to make sales generating ***hundreds of millions of dollars*** in reimbursements and incentivized providers to adopt Inspire V who otherwise would not have done so.

25. The concealed truth was gradually revealed through a series of partial disclosures, each of which was followed by a statistically significant stock price decline.

26. On August 4, 2025, Inspire surprised the market by disclosing that providers' hesitancy to adopt SleepSync and concerns about the availability of CPT code 64568 were the two "predominant" "headwinds" to the Inspire V launch, and that those headwinds prevented Inspire from achieving its guidance for 2025. Inspire slashed its 2025 diluted net income per share guidance by 78.2% to 81.8%. Inspire's stock price plummeted more than 40% over the next two trading days.

27. In the months that followed, additional disclosures further exposed the depth of Defendants' fraud. On September 3, 2025, Defendant Weatherby acknowledged that SleepSync adoption continued to be a headwind, causing Inspire's stock to fall another 9.4%.

28. Then, in December 2025 and January 2026, a series of revelations from third parties demolished Defendants' claims about CPT coding. On December 15, 2025, *The Capitol Forum*

reported that Inspire's use of CPT code 64568 was under "review" by at least three MACs, causing Inspire's stock price to fall another 8.73%. On December 17, 2025 (after the close of trading), two MACs updated their Billing and Coding Articles to remove code 64568 for hypoglossal nerve stimulation, with one MAC explaining that 64568 had been "added in error," and on December 18, 2025, a third MAC stated to *The Capitol Forum* that it would do the same. On December 18, 2025, Inspire's stock price dropped another 19.4% on the second-highest trading volume day since the Company's initial public offering ("IPO").

29. Defendants initially accused the MACs of defying CMS's national reimbursement policies, but on January 22, 2026, CMS itself confirmed that 64568 was "incorrectly added" for obstructive sleep apnea. Inspire's stock price dropped another 15.99%.

30. On February 11, 2026, Defendants were forced to acknowledge that Medicare claims for Inspire V must use CPT code 64582 with modifier -52—coding with significantly lower reimbursement—and that private insurers were likely to require the same less-lucrative coding. Inspire's stock price declined by another 12.55%.

31. On March 17, 2026, Defendants revealed continued "challenges" with reimbursement and with CMS's WISeR pilot program, including "confusion" about coding, "slowed or delayed procedures," and prior authorization denials, all of which was "impacting our business." Inspire's stock price dropped another 6.32%.

32. Finally, on May 4, 2026, Defendants revealed that the American Hospital Association had advised its members to use the "unlisted" CPT code, 64999, to bill private insurance for Inspire V procedures, and that reimbursement challenges were expected to continue to depress revenue through the rest of 2026. In response, Inspire's stock price declined by 12.01%.

33. In the aggregate, in response to these partial disclosures, Inspire's stock price declined 77.6% from its Class Period high of $215.42 per share, representing a total decline of more than $4 billion in Inspire's market capitalization, and causing devastating losses to the Class.

## II. JURISDICTION AND VENUE

34. This action arises under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), and Securities and Exchange Commission Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

35. This Court has subject-matter and personal jurisdiction over these claims pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

36. Venue is proper in this District pursuant to 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b). Substantial acts in furtherance of the fraud and substantial effects of the fraud have occurred in this District.

37. In connection with the acts, transactions, and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the U.S. Mail, interstate wire communications, and the facilities of a national securities exchange.

## III. PARTIES

### A. Lead Plaintiff

38. Lead Plaintiff Indiana Public Retirement System is a public pension fund organized for the benefit of public employees throughout the state of Indiana who are not covered by another state or local retirement system. Lead Plaintiff purchased Inspire common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein. *See* Exhibit A attached hereto.

**B. Defendants**

39. Defendant Inspire Medical Systems, Inc. manufactures and sells surgically-implanted medical device systems to treat obstructive sleep apnea with hypoglossal nerve stimulation. Inspire is incorporated in Delaware and headquartered in Minnesota. Inspire was spun out of Medtronic—a large medical device company—in 2007 and conducted its initial public offering in 2018.

40. Defendant Timothy P. Herbert has been Inspire's founder, President, and Chief Executive Officer ("CEO") from May 2007 to the present and he has served as Chairman of the Board of Directors from May 2024 to the present.

41. As CEO and Chairman, Herbert had ultimate authority and responsibility for the Company's operations and strategic objectives, including the launch of Inspire V, which Herbert described as "the largest launch in the history of the company."

42. Herbert was the primary spokesperson for the Company during the Class Period and made multiple false and misleading statements concerning the Inspire V launch, SleepSync, reimbursement and CPT coding, and the Company's guidance.

43. Herbert signed many of Inspire's SEC filings, including certain filings containing the misstatements at issue, during the Class Period, as identified herein.

44. Prior to joining Inspire, from 1996 to 2007, Defendant Herbert had more than a decade of experience as a medical device executive at Medtronic, including management positions in Medtronic's product development, clinical research, sales, marketing, and healthcare reimbursement departments.

45. Starting no later than January 1, 2007, during Herbert's tenure, Medtronic caused physicians to submit false claims to Medicare (and TRICARE) for subcutaneous stimulation

procedures using spinal cord stimulation devices, which were part of Herbert's Neurological division.

46. The United States intervened in a *qui tam* action in part in January 2015, and Medtronic agreed to pay the United States $2.8 million to settle the action. *United States ex rel. Nickel v. Medtronic, Inc.*, No. 09-cv-0203 (W.D.N.Y.). One of the allegations as to which the United States intervened was that:

> In discussions with healthcare providers, Medtronic personnel incorrectly identified CPT code 64555 as an appropriate billing code for "SubQ" even though an outside coding expert engaged by Medtronic had warned "Medtronic reps should not be going around saying that [CPT code] 64555 is correct for subq leads." Following this comment, Medtronic representatives continued to identify CPT code 64555 as an appropriate code for submitting claims for "SubQ" procedures.[1]

47. Defendant Richard J. Buchholz was Inspire's Chief Financial Officer ("CFO") from May 2014 until his resignation on August 26, 2025 (effective December 31, 2025).

48. As CFO, Buchholz shared responsibility with Herbert for the Company's operations and strategic objectives, including the launch of Inspire V.

49. Buchholz was a spokesperson for Inspire during the Class Period and made multiple false and misleading statements concerning the Inspire V launch, reimbursement, and the Company's guidance.

50. Buchholz signed many of Inspire's SEC filings, including certain filings containing the misstatements at issue, during the Class Period, as identified herein.

51. Defendant Carlton W. Weatherby is Inspire's Chief Strategy and Growth Officer and has held that position since January 2025. Previously, Weatherby was Inspire's Chief Strategy Officer ("CSO") from July 2023 to January 2025.

[1] United States' Notice of Intervention in Part for Purposes of Settlement and Declination in Part, *United States ex rel. Nickel v. Medtronic, Inc.*, No. 09-cv-0203, Dkt. No. 60 (W.D.N.Y. Jan. 23, 2015).

52. In those roles, Weatherby shared responsibility with Herbert and Buchholz for overseeing the Company's operations and strategic objectives, including the launch of Inspire V, which Weatherby described as "our biggest product launch in the company's history."

53. As CSO, Inspire's Patient Access and Reimbursement division reported to Weatherby.

54. Weatherby was a spokesperson for Inspire during the Class Period and made false and misleading statements to investors concerning Inspire V and reimbursement and CPT coding, as identified herein.

55. Weatherby also reviewed and approved the Company's guidance for 2025.

56. Prior to joining Inspire, Weatherby was a medical device executive for more than a decade at Medtronic.

57. Defendants Herbert, Buchholz, and Weatherby are collectively referred to herein as the "Individual Defendants."

58. The Individual Defendants each possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to investors and securities analysts. Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations they made were then materially false and/or misleading.

## IV. SUMMARY OF THE FRAUD

### A. The Company's Hypoglossal Nerve Stimulation Devices

59. Inspire derives primarily all its revenue from the sale of surgically-implanted hypoglossal nerve stimulation devices to treat obstructive sleep apnea. On its Form 10-K filed on February 13, 2026, Inspire stated that "[s]ales of our Inspire system accounted for primarily all of our revenue for the years ended December 31, 2025, 2024, and 2023."

60. Obstructive sleep apnea is a sleep-related breathing disorder characterized by the repeated obstruction of the upper airway during sleep. An "apnea" is a cessation of breathing lasting at least 10 seconds, and a "hypopnea" is a period where airflow is reduced by 30% or more for at least 10 seconds (resulting in insufficient oxygen levels). Along with other anatomical factors, the relaxation of the tongue muscles during sleep can cause the base of the tongue to block the throat in whole or part, causing an apnea or hypopnea. The reduction in blood oxygen levels causes the brain to reawaken, contract the muscles, and reopen the airway. The pattern repeats.

61. The first-line treatment for moderate to severe obstructive sleep apnea is positive airway pressure ("PAP"), including continuous PAP ("CPAP") or auto-adjusting PAP ("APAP"). Hypoglossal nerve stimulation is a second-line treatment for some patients who cannot tolerate PAP or have persistent symptoms despite PAP.

62. The hypoglossal nerve controls the muscles in the tongue, including the genioglossus muscle that moves the tongue forward. Hypoglossal nerve stimulation uses electrical stimulation to the hypoglossal nerve to control the genioglossus muscle, without awakening the patient.

63. Between 1996 and 2007, Medtronic engaged in engineering and preclinical development, conducted a human feasibility study, and then designed a hypoglossal nerve stimulation device to be surgically implanted. Inspire was spun out of Medtronic in 2007.

64. The Company published the results of Phase I, Phase II, and Phase III clinical trials in 2011, 2012, and 2014, respectively, and obtained FDA premarket approval in 2014 based on the Phase III trial ("Stimulation Therapy for Apnea Reduction," or STAR).

65. "Inspire I" refers to the Medtronic-era prototype, and "Inspire II" to the device used in the Phase I, II, and III clinical trials and launched commercially in the United States in 2014. "Inspire III" never launched.

66. "Inspire IV" (or Model 3028) received FDA approval in 2017 and launched commercially in 2018.

67. From the Company's initial public offering in May 2018 to the start of the Class Period, Inspire's only commercial product was Inspire IV.

68. The Company applied for FDA premarket approval of Inspire V on July 31, 2023, which the FDA granted on August 2, 2024.

69. The Inspire IV device consists of an electrical pulse generator, a stimulation lead connecting the generator to the hypoglossal nerve, and a respiratory sensing lead that detects respiratory effort.

70. The primary difference between the Inspire IV and Inspire V is that the Inspire IV has a "distal" respiratory sensing lead (branching away from the main body of the device), while the respiratory sensor for the Inspire V is fixed directly to the pulse generator.

71. The following Company-created graphics depict the components of Inspire IV and V:

<table>
<tr><th>Inspire IV</th><th>Inspire V</th></tr>
<tr><td>
</td><td>
</td></tr>
</table>

**B. Defendants Rushed the Launch of Inspire V Because Its Predecessor, the Inspire IV, Suffered from Multiple Problems That Threatened the Company's Business and Inspire Wanted to Beat Its Competitors to Market**

72. By 2024, and escalating through the start of the Class Period (November 4, 2024), Inspire IV had multiple problems that threatened the Company's profitability, including dangerous manufacturing defects and imminent competition. These headwinds provided Defendants with a powerful incentive to rush forward, prematurely and notwithstanding the problems known internally, with the Inspire V launch.

73. In 2024, the number of serious patient injuries and malfunctions for Inspire IV skyrocketed.

74. The Company was required to report these serious patient injuries and malfunctions to the FDA within 30 days pursuant to the FDA's Medical Device Reporting ("MDR") rule, 21 C.F.R. Part 803. Once reported to the FDA, the serious patient injuries and malfunctions (with redactions for patient privacy) became public through the FDA's online Manufacturer and User Facility Device Experience ("MAUDE") database.

75. As members of the Company's "management with executive responsibility," the Individual Defendants were responsible for ensuring the implementation of Inspire's quality

policy, including its compliance with the FDA's MDR rule. The main rule providing for management responsibility is the FDA's then in effect QSR rule, 21 C.F.R. Part 820.

76. In addition to the increasing quantity of serious patient injuries and malfunctions reported for the Inspire IV, the incidents were also qualitatively severe.

77. According to MAUDE reports, patients and doctors reported injuries such as:

- "tongue weakness and dysphagia [difficulty swallowing] . . . with a permanently misshapen tongue, causing choking on food, difficulty swallowing, and voice changes";
- "stroke-like symptoms . . . [and] pain in region of [my] neck nerve implant area";
- "the [Inspire device] stimulation had perforated the patient's thyroid"; and
- "on two successive nights . . . the shock forced my tongue out of my mouth, wrenched my neck and caused me to scream out in pain."

78. One of the recurring issues with Inspire IV, contributing to the increase in MAUDE reports, was a manufacturing defect that caused electrical leakage. The electrical leakage painfully shocked patients and depleted the device's battery.

79. On June 17, 2024, the Company announced a Class I recall and published an "URGENT Medical Device Correction." A Class I recall is the most serious and urgent action that can be taken with respect to a medical device, reserved for situations where there is a "reasonable probability" that use of the device "will cause serious adverse health consequences or death."

80. The spike in Inspire IV injuries coincided with the Company's imminent loss of its monopoly in the United States for hypoglossal nerve stimulation devices that treat obstructive sleep apnea.

81. Faced with imminent threats from competitors, Defendants were under pressure to expedite the launch of Inspire V and to convince investors that Inspire's flagship product was a commercial success.

82. Inspire had two main incoming competitors. First, the Genio device, manufactured by Nyxoah Inc., is an established competitor of Inspire in Europe. Genio has several potential advantages over Inspire, including: the use of "bilateral" stimulation, or the stimulation of both sides of the hypoglossal nerve, which may be more effective; an external battery, which eliminates the need for surgery to change the battery; and a less invasive implantation procedure, with only a single incision. Nyxoah announced that it had applied for FDA premarket approval for Genio on July 1, 2024 (before the Class Period) and received FDA approval for Genio on August 8, 2025 (during the Class Period).

83. Second, another competitor, LivaNova, applied for FDA premarket approval for its aura6000 device on April 25, 2025 and received FDA approval for aura6000 on March 19, 2026 (both during the Class Period). The aura6000 device also has potential advantages over Inspire, including, for example, that its FDA label contains no contraindication for complete concentric collapse (unlike Inspire). The clinical trial data indicating that aura6000 can treat complete concentric collapse was published on November 11, 2024, just a few days into the Class Period, and preliminary data was published before the Class Period.

84. With market entry by Nyxoah's Genio and LivaNova's aura6000 imminent, the Individual Defendants were all the more motivated to rush the Inspire V launch.

85. The adoption of a new device (such as the Genio or aura6000) or a new version of an old device (such as Inspire V) imposes certain costs on providers, including the time required to train the physicians and other supporting personnel on the new device. Some providers may be unwilling or unable to offer multiple devices for the same indication, which would increase their costs for training and inventory. The costs imposed by the transition from Inspire IV to Inspire V

would provide a natural decision point for providers to consider alternative devices; before incurring the costs of adopting Inspire V, providers might instead switch to a competing device.

86. By launching Inspire V before market entry by Genio or aura6000, Defendants preempted those competitors, avoided the point when providers would consider alternative devices, and established Inspire V as the incumbent device for hypoglossal nerve stimulation.

### C. SleepSync and Reimbursement Were the Two Keys to the Inspire V Launch

87. Once Inspire secured FDA approval for Inspire V on August 2, 2024, Defendants prepared for a commercial launch.

88. To launch successfully, the Company had to (1) ensure adoption of Inspire's SleepSync software, which the Company had made a prerequisite to the adoption of Inspire V; and (2) arrange for reimbursement from Medicare and private insurance at levels that would sufficiently incentivize providers to use the device.

#### 1. Leading Up to the Inspire V Launch, the Company Positioned Its SleepSync Integrated Platform as a Key Strategic Objective

89. SleepSync is a brand name that the Company uses for a coordinated cloud data platform, hardware, and software.

90. Defendants told investors that SleepSync was an important strategic objective and that it was important to clinical outcomes and thus to Inspire's long term growth and success. For example, a presentation delivered for each of the first, second, and third quarters of 2024 highlighted the Company's objective to "[m]aximize adoption of SleepSync™" as the first of two steps that the Company would take to achieve "[s]trong [c]linical [o]utcomes." In turn, the presentation stated that achieving strong clinical outcomes was one of "[t]hree [k]ey [a]reas" that would "[d]rive [o]ur Success in 2024 & [b]eyond."

**2. Defendants Bundled SleepSync With Inspire V**

91. Prior to the launch of Inspire V, providers were not required to adopt SleepSync in order to perform implantation procedures of Inspire devices. With the Inspire V launch, the Company adopted a policy requiring providers to use the SleepSync programmer to activate the Inspire V device. The Company also required providers to install SleepSync's full features in order to use the SleepSync programmer.

92. In other words, Defendants chose to bundle Inspire V with the SleepSync programmer and to bundle the SleepSync programmer with the rest of SleepSync.

93. Providers' adoption of SleepSync thus became an essential prerequisite to the Inspire V launch.

**3. Reimbursement Was the Key Driver of Demand and Pricing**

94. A successful reimbursement program was also critical to the success of the Inspire V launch. Reimbursement is the key driver for the demand for and pricing of implantable medical devices such as Inspire V. Inspire sells the device to providers, and then providers are reimbursed by Medicare or private insurers for the surgical procedure of implanting the device in a patient.

95. In order for the procedure to be economical for providers, reimbursement levels for the procedure must exceed the price of the device and the other costs of the implantation procedure.

96. For example, in a June 2017 report to Congress, the Medicare Payment Advisory Commission explained that "[h]ealth care providers are much more likely to use new forms of medical technology that are eligible for reimbursement, so ensuring coverage and payment are key considerations for device companies."

97. According to the National Institutes of Health's "Reimbursement Knowledge Guide for Medical Devices," when deciding whether to cover an FDA-approved device, commercial payors will focus on the cost of the devices, as captured in its coding, and will look to

ensure the billing codes for the procedure are sufficient to cover the cost associated with the device's use.

98. Implantable medical devices are generally priced as a percentage of reimbursement levels for the implantation procedure. Because the Inspire IV and V devices were patented and because, at the start of the Class Period and until August 8, 2025, there was no FDA-approved competing device, Inspire priced these devices as a high percentage of reimbursement levels.

99. According to Defendants' public statements and analyst reports, the average sales price of the Inspire IV devices was $24,400 in 2022 and about $25,000 from 2023 to present; and Inspire V, after its launch, had the same average sales price as Inspire IV.

100. From 2022 to 2025, those average sales prices were approximately 81% to 85% of the hospital outpatient reimbursement rates and 97% to 101% of the ambulatory surgical center reimbursement rate for CPT code 64582:

| **Date** | **Average Sales Price in U.S. (ASP)** | **Hospital Outpatient Reimbursement for CPT Code 64582** | **ASP as % of Reimbursement (Hospital Outpatient)** | **Ambulatory Surgical Center Reimbursement for CPT Code 64582** | **ASP as % of Reimbursement (Ambulatory Surgical Center)** |
|---|---|---|---|---|---|
| 2022 | $24,400 | $30,063 | 81% | $24,828 | 98% |
| 2023 | $25,000 | $29,358 | 85% | $25,180 | 99% |
| 2024 | $25,000 | $29,586 | 84% | $24,847 | 101% |
| 2025 | $25,000 | $30,474 | 82% | $25,832 | 97% |

101. All else being equal, if reimbursement levels declined, demand would fall and Inspire would have to lower its average sale price. Conversely, if reimbursement levels increased, demand would rise and Inspire could increase its average sale price.

102. In 2025, for example, hospital reimbursement rates exceeded Inspire's average sales price by only $5,474. For ambulatory surgical centers, with CPT code 64582, reimbursement was *less* than the Company's average sales price in 2024, and only $832 more in 2025.

103. Inspire's Market Access and Reimbursement division was responsible for coordinating with Medicare and private health insurance companies for reimbursement for procedures involving the Company's devices. Between August 2, 2024 (the date that Inspire V received FDA approval) and January 13, 2025 (the date that Herbert first revealed the choice of CPT code 64568 for Inspire V to investors), the highest ranking member of that department was Kimberly Konopa, Inspire's Vice President of Market Access and Reimbursement, and Konopa's supervisor and the executive responsible for that division was Defendant Weatherby. Konopa departed Inspire in May 2026, following a series of revelations regarding the incorrect use of CPT code 64568 for Inspire V. *Infra* § IV.I.

104. Defendant Herbert was also familiar with the work of the Market Access and Reimbursement division, having held a management position with responsibility for reimbursement at Medtronic, the medical device company from which Inspire was spun out.

105. The existence (or purported existence) of positive coverage policies at payors was essential to providers' decisions to adopt the Company's devices and/or to increase their implantation activity.

106. At the Jefferies London Healthcare Conference on November 20, 2024, Defendant Herbert touted the Company's existing reimbursement arrangements as a competitive advantage over future competing devices, explaining:

> [W]hen new products come into the market again, there's no shortcuts. … [T]hey're going to have to convince all the payers to be able to provide coverage. . . . They need to really show that the therapies that that they're presenting are going to be

> able to warrant the same level of coverage from the insurance companies and that takes time.

107. As is customary for manufacturers of implantable medical devices, the Company published publicly available Billing Guides to providers, both for facilities (hospitals or ambulatory surgical facilities) and physicians. The Billing Guides addressed in detail how to submit reimbursement claims to Medicare and private insurers, including by identifying the "code" used to describe the implantation procedure. *See infra* § VI (background on codes).

108. When launching the Inspire V, Defendants had an important decision to make regarding the applicable code. The Company could: (1) request the creation of a new CPT code by the American Medical Association ("AMA"), with a procedural description tailored to the implantation of Inspire V specifically; or (2) identify an existing CPT code that was supposed to accurately describe the implantation procedure.

109. As discussed in further detail below, Defendants had a powerful motive to select an existing CPT code, rather than waiting for a new code to be created, and further, to select an existing code with the highest possible levels of reimbursement.

110. It is common for medical device companies to submit a code change application to the AMA's CPT Editorial Panel for a change to an existing code or for the creation of a new one. At the time Inspire V received FDA approval on August 2, 2024, the submission deadline for the AMA's September 19-21, 2024 CPT Editorial Panel meeting had already passed. Accordingly, an application for a new CPT code first could have been heard at the February 6-8, 2025 meeting (if submitted by November 1, 2024). If approved at that meeting, a new Category I CPT code would have become effective on January 1, 2027. The Company also could have requested a Category III CPT code–a temporary code without an assigned reimbursement level–at the same meeting, and if approved, it would have become available on July 1, 2025.

111. Waiting for the creation of a new CPT code would have substantially delayed the launch of Inspire V, and crucially, would have delayed that launch until after FDA approval and/or market entry of two competing devices (Nyxoah's Genio and LivaNova's aura6000). Defendants thus had a motive to push forward with an existing CPT code—even if Defendants knew there was a substantial risk that the code would eventually be revealed to be incorrect. By that time, the launch of Inspire V would already be accomplished.

112. And importantly, providers, not Inspire, carried the reimbursement risk. Under Inspire's contracts with providers, all sales of Inspire V were final at a fixed purchase price. The providers had no contractual right to return the device to Inspire, or to adjust the purchase price, because Medicare or a private health insurer reimbursed the provider for the implantation procedure at a lesser rate than expected.

113. The Company did not submit a new CPT code application for Inspire V by November 1, 2024, and therefore, on the first day of the Class Period, Defendants had already decided to launch Inspire V using an existing CPT code. As Defendant Herbert stated on August 6, 2024, in response to an analyst question, "there's no new codes that we have to go after."

### D. Defendants Made False and Misleading Statements Concerning Providers' Adoption of the SleepSync Software Necessary for Inspire V

114. Defendants made a series of materially false and misleading statements about Inspire's SleepSync and the SleepSync programmer, which are bundled products that each provider had to adopt before it could adopt Inspire V.

115. Specifically, Defendants made statements that: (i) "***feedback***" on the SleepSync programmer was "***promising***," "***very, very strong***," and "***very good***"; (ii) the "***majority***" of the "***top***" and "***high-volume***" centers had adopted SleepSync by May and June 2025; (iii) "***the transition***" to the SleepSync programmer "***should not be that difficult***"; and (iv) providers

obtaining IT approval to install SleepSync was a "***standard process***" and ***not*** "***the key challenge***" to the Inspire V launch or a reason to question the Company's aggressive guidance.

116. These statements were false and misleading because, as Defendants knew (or at a minimum were severely reckless in disregarding), the required software for SleepSync was plagued by deficiencies and security vulnerabilities, which delayed providers' IT approvals to install it. Those issues posed major obstacles to Inspire V's full launch and to the Company's guidance.

### 1. At the Start of the Class Period Defendant Herbert Touts Positive "Feedback" for the SleepSync Programmer

117. The SleepSync programmer and Inspire V pilot and soft launch began before November 4, 2024. In mid-2024, the Company began pre-launch testing and a study in Singapore of the SleepSync programmer, and in late 2024, the Company began the soft launches of both Inspire V and the SleepSync programmer. The Singapore study was conducted at two hospitals (Singapore General Hospital and National University Hospital) starting in July 2024. As Defendant Herbert explained before the Class Period on August 6, 2024, the purpose of the soft launch was to introduce Inspire V and the SleepSync programmer to "just a handful of centers" and "make sure" that it was operating correctly, or complying with "operating norms," in advance of the full launch scheduled for 2025.

118. The results of the pre-launch testing, Singapore study, and soft launches were important to investors because they were the first indication of whether both Inspire V and SleepSync were technically and operationally ready to launch and whether the full Inspire V launch could occur as scheduled.

119. Defendant Herbert provided investors with only good news about the Singapore study and soft launches and did not disclose any deficiencies, vulnerabilities, problems, or

headwinds that had been identified. For example, on the Company's November 4, 2024 earnings call on the first day of the Class Period, Defendant Herbert touted positive "***early feedback***" for the SleepSync programmer:

> We have begun the soft launch of our new SleepSync programming system designed to increase the efficiency of Inspire patient management with greater accessibility and a comprehensive view of therapy history. ***Early feedback is promising*** and we expect full US availability this year, enhancing capacity for patient follow-ups and improving experiences for patients and providers.

120. Analysts credited Herbert's representations about the "feedback" for the SleepSync programmer. For example, RBC wrote on November 4, 2024, that "[m]anagement indicated that early feedback, thus far, is promising and that it expects full U.S. availability this year[.]" Jefferies wrote on November 22, 2024 that Inspire V was "On Track" and that the Company was "increasing the utility of SleepSync[.]"

121. Analysts also viewed the day's news as value-positive. For example, on November 4, 2024, and the day after, Baird increased its price target to $252 per share (from $240). Piper Sandler increased its price target to $260 per share (from $255). RBC began rating Inspire for the first time—with an initial rating of Outperform and a price target of $260 per share. Truist Securities increased its price target to $250 per share (from $240), and Wells Fargo increased its price target to $198 per share (from $187).

122. Defendants Herbert and Buchholz also discussed the Inspire V launch with Piper Sandler analyst Adam Maeder at the Piper Sandler Healthcare Conference on December 3, 2024. In response to a question from Maeder about "where are we in terms of [the Inspire V] launch at this point?" Herbert responded:

> The good news is we will be doing our soft launch yet here in 2024. We're very excited about that and we'll be able to talk about that more in the very near future. So ***everything looks good***. We're gearing up for Inspire V. It's going to be a game changer when it comes to market and it really brings a new platform, a technology

> to allow us to springboard into Inspire VI and Inspire VII and Inspire VIII beyond that. So, pretty exciting and more to come in the near future.

123. In its next report published after the conference on December 9, 2024, Piper Sandler reaffirmed its Overweight rating of the Company and its price target of $260 per share, which represented a substantial premium to the trading price. Piper Sandler cited management's comments about the "gen 5 launch" and wrote: "Altogether, we believe the company is well-positioned to be a beat-and-raise story again in '25. Reiterate OW / $260 PT."

### 2. In 2025, Defendant Herbert Continues to Tout Positive "Feedback"

124. Defendants continued to make false and misleading misrepresentations about the progress of the Inspire V rollout, specifically with respect to providers' adoption of the SleepSync programmer. At the J.P. Morgan Healthcare Conference on January 13, 2025, Defendant Herbert again touted positive "feedback" for SleepSync:

> [T]he SleepSync connectivity is really going to have great benefits for patients down the road where we can start doing remote monitoring. … We started with our good friends in Singapore at the Singapore General Hospital, which is a very, very impressive hospital, one of the largest in the world. We also worked over at the National University Hospital. We're doing a group of 44 patients. We've implanted 44 to date. …
>
> ***The feedback has been very, very strong***. … [W]e've put other features into it to help with the intraoperative testing and the device programming as we do the device activation. So, ***feedback so far is very good***.

125. Analysts reacted positively to Herbert's statement. For example, RBC wrote in a report on the same day as the conference that, with respect to the "Inspire V . . . full launch," "final feedback has been all positive" and that "feedback has been tremendous."

126. Similarly, on Inspire's May 5, 2025, earnings call, Defendant Herbert announced that "we will begin the full launch of the Inspire V system in the US this month." In response to an analyst question about SleepSync, Herbert stated:

> [W]e'll start talking about SleepSync. As we increase the number of patients treated, SleepSync provides an opportunity for the sleep physicians to manage a greater number of patients on a longitudinal basis. ***The majority of the high volume centers already have SleepSync*** as part of their practice, and they can leverage that to streamline patient flow and how they manage their patient[s].

127. On the same earnings call, in response to an analyst's question regarding SleepSync adoption, Defendant Herbert stated: "[T]he new physician programmer, which was launched last year, most centers are ready to take on the new physician programmer. So the transition should ***not*** be that ***difficult***."

128. Analysts again reacted positively. For example, on May 5, 2025, the same day as the earnings call, RBC wrote: "Today, [Inspire] noted that the majority of the high volume centers already have SleepSync as part of their practice, and INSP can leverage that to streamline patient flow and how physicians manage their patient[s]."

129. At the Bank of America Global Healthcare Conference on May 13, 2025, Defendant Herbert stated that Inspire V had "fully launched" "yesterday," *i.e.*, on May 12, 2025.

130. Defendants continued to tout the performance of SleepSync at Wells Fargo's MedTech Conference on June 13, 2025. Specifically, a Wells Fargo analyst asked Defendant Herbert if the Company: "still expect[s] to complete the transition to Inspire V by the end of the year[,]" and Herbert responded:

> ***[T]he majority of the top centers have already been on SleepSync***. And then, new programmer was approved by the FDA last year. So it's been in place for quite some time. But we need to make sure all the centers adapting to Inspire V are on SleepSync, so that can take a little bit longer, up to 30 days or longer if you're a sophisticated site, working with the IT departments. But we're quite experienced incorporating that. We don't see that as long-term showstopper.

131. Then, on June 17, 2025, at Truist Securities' MedTech Conference, Defendant Herbert described SleepSync adoption as one of the three steps of the Inspire V launch, with the other two steps being physician training and provider contracting. Herbert had the following

exchange with an analyst where, in response to a direct question, he denied that SleepSync was an "unanticipated" "friction[] or bottleneck[]," "***the key challenge***," or an unexpected "challenge" to the Inspire V launch:

> [Analyst]: Any unanticipated either frictions or bottlenecks that have emerged since you went full launch [of the Inspire V]?
>
> Herbert: Well, I think that, one, the obvious question that people ask us is SleepSync is so difficult to do and whereas, today, we had meetings with a lot of great investors and thank you for that, ***it's just, think about if you're going to add software to your computer at your firm and you got to call in the IT to make sure it's clear to be able to put that software on to your computer. And that's really what it's all about***. And we don't tie into the electronic medical records of a facility today, that's long term. … Today, it's just about putting new software on the computer and making sure we interface with IT to make sure we're comfortable with that. But we don't interface into their servers or into their networks. … So, ***it's a standard process, it's not really the key challenge. It's just one of the three steps***.
>
> [Analyst]: I guess it's something we, as investors, have just heard a little bit more about in the last two weeks from you. So, is this something that incrementally is potentially something you have to contend with as a challenge that you weren't expecting when you...
>
> Herbert: ***No***, I mean...
>
> [Analyst]: Is this something you've always been expecting, you're just highlighting it as something that...
>
> Herbert: It's a step in the process is what we're highlighting. I think that as new programmer was actually approved a year ago, right? And ***many of the top centers are already at SleepSync, right***? And so, the key is going to be just getting everybody else on SleepSync. And we're highlighting is one of the three steps that you go through in a transition to V.
>
> [Analyst]: But nothing that would have altered the outlook you provided previously? I think this is something new and incremental to that.
>
> Herbert: We knew all of this when we set out the guide at the last earnings call.

132. Analysts again credited Defendant Herbert's June 2025 statements regarding SleepSync. For example, JPMorgan wrote that: "converting sites over to the next-gen system [*i.e.*, SleepSync] has been a straightforward process" and that, while "[n]ot every center has SleepSync,

. . . the integration of it alongside hospital IT is generally a process that takes under 30 days. Our sense was this was incorporated" into the Company's guidance.

### E. In Truth, SleepSync Was Defective, and Providers Were Hesitant to Adopt It, Which Were Significant Headwinds to the Inspire V Launch

#### 1. From the Start of the Class Period, SleepSync Was Riddled with Deficiencies and Security Vulnerabilities

133. Contrary to Defendant Herbert's statements in November 2024 that "feedback" on the latest version of SleepSync, including the SleepSync programmer, was "promising," "very, very strong," and "very good," and his statements in December 2024 that "everything looks good," Defendants knew (or at a minimum were severely reckless in disregarding) that the SleepSync software suffered from multiple deficiencies and security vulnerabilities, which were an obstacle to the Inspire V launch.

134. The Individual Defendants knew about (or were severely reckless in disregarding) these problems before Herbert's statements; they were escalated up to Inspire's CTO, John Rondoni, and Inspire's Vice President of Quality, Andrea Rasmussen; and Rasmussen had a duty to inform Herbert of these issues (and Herbert, to monitor them).

135. It was materially false and misleading to tout positive "feedback" and a "full[]" launch without disclosing these known problems.

136. For example, Former Employee ("FE") 1[2] was a sales territory manager at the Company, covering cities in South Dakota, Wyoming, and Nebraska, from years before the Class Period to May 2025. FE 1 stated that Inspire ran into security vulnerabilities and HIPAA issues with SleepSync's cloud-based technology during the Inspire V pilot or soft launch. FE 1 added

[2] The terms "Former Employees" and "FE" refer to the former employees of Inspire whose reports are discussed in this Complaint. To preserve the Former Employees' anonymity while maintaining readability, the Complaint uses the pronouns "he," "his," and "him" in connection with all the Former Employees, regardless of their gender.

that IT was a big issue and IT was very concerned with running cloud-based software and downloading it into their system. FE 1 confirmed that the Company ran into this issue across the country: the providers did not want to do it, and they were told that they cannot implant Inspire V without it. According to FE 1, the Company had done a pilot of the Inspire V and ran into these same issues with the technology.

137. FE 1 further confirmed that IT was a big issue for the Company and they knew it was going to be a huge problem. During the national sales meeting in January 2025 in Orlando, Florida, Inspire's salespersons had breakout sessions every day, and one of the breakout sessions was dedicated to IT and these known problems. This is how FE 1 learned about it.

138. Likewise, FE 2 was a principal software design assurance engineer at the Company from October 2024 to February 2025. FE 2 reported to Mitch Finne, Director of Product Risk Management, who reported to Rasmussen. FE 2 worked on the software for the SleepSync programmer. FE 2 explained that when he left the Company in February 2025, the software was not ready for release, and it had a lot of quality issues that his team highlighted. FE 2 confirmed that there were bugs, deficiencies, and software anomalies which are a roadblock to release, and that as of February 2025, the SleepSync software was not fully validated. According to FE 2, due to some of these deficiencies, the SleepSync software would not work appropriately.

139. FE 2 confirmed that these problems were reported to Company's VP of Quality (Rasmussen), the VP of R&D, and ultimately the CTO (Rondoni).

### 2. Providers Were Slow and Hesitant to Adopt SleepSync

140. As confirmed by the Company's revelations on August 4, 2025 and by multiple former employees interviewed in Lead Counsel's investigation discussed directly below, Defendant Herbert's statements in May and June 2025, including that "***transition should not be that difficult***," that it was "***a standard process***," "***not really the key challenge***," and "***just one of***

***the three steps***," were also materially false and/or misleading because, as he knew (or at a minimum was severely reckless in disregarding), the transition to the SleepSync programmer was "difficult," not "standard," and "the key challenge" to the Inspire V launch.

141. Herbert's statements that "***[t]he majority of the high-volume centers already have SleepSync as part of their practice***," that "***the majority of the top centers have already been on SleepSync***," and that "***most centers are ready to take on the new physician programmer***" were misleading because they failed to disclose widespread hesitancy by providers to install SleepSync.

142. Inspire partially revealed the misleading nature of these statements on an August 4, 2025 earnings call and then at an analyst event on September 3, 2025.

143. On the August 4, 2025 call, Defendant Herbert disclosed that the most "predominant" "headwind" to the SleepSync launch was providers' slow adoption of the SleepSync programmer, which Herbert described as "the most challenging step to accomplish" with respect to Inspire V adoption. That disclosure stunned analysts, who raised issues with management credibility, and at least nine analysts downgraded their ratings and/or lowered their price targets for Inspire. For example, Morgan Stanley wrote on that same day that "the impact to trust [was] not inconsiderable (given at least some of these issues were perhaps notable ahead of time)." *See infra* ¶¶376-77.

144. Multiple former employees (and a former contractor) confirmed that providers were hesitant to adopt the SleepSync programmer due to concerns with the SleepSync software and that Inspire routinely tracked providers' non-adoption of SleepSync in internal databases to which the Individual Defendants had access.

145. Specifically, FE 1, a sales territory manager from before the Class Period to May 2025, confirmed that the SleepSync application, which was required in order to use Inspire V, was

running into IT approval issues both in his sales territory and across the country. FE 1 confirmed that hospitals had to install an application in order to use the Inspire V. FE 1 confirmed that they had to get approvals from IT to install an external application and go through a vetting process for safety vulnerabilities and hacking issues.

146. According to FE 1, IT departments were very concerned with running cloud-based software and downloading it onto their systems. FE 1 started talks with his accounts in December 2024, prior to the national sales meeting in January 2025. By the time FE 1 left the Company in May 2025, none of his accounts had installed SleepSync or signed an IT agreement.

147. FE 1 further explained that an internal company system routinely tracked whether each provider had signed an IT agreement. If a provider he covered had not signed, the system would keep sending reminders.

148. Similarly, FE 3 was a territory manager in the southeastern United States for years before the Class Period until January 2026. FE 3 reported to Akella Lane, a Regional Sales Manager. FE 3 left the Company in part because the Company was not forthright about the Inspire V launch.

149. FE 3 explained that the SleepSync software involves HIPAA protected information that required IT department approval, and that this was difficult. FE 3 described how IT and patient data issues were the biggest hurdle to installing the SleepSync software.

150. For example, FE 3 explained that Atrium Health had not adopted the SleepSync software and thus had not purchased Inspire V as of his departure in January 2026 after experiencing ongoing IT issues. FE 3 confirmed that the main issue was with the “dongle,” which allows the software to connect via Bluetooth to a provider’s desktop.

151. FE 3 spoke to his Regional Sales Manager about the SleepSync IT issues by March or April 2025. FE 3's Regional Sales Manager told FE 3 that she spoke to Cherie Wright, the Area Vice President of Sales, and that the SleepSync IT issues were broad from the get-go.

152. FE 3 confirmed that the territory managers were all having the same issues and were all frustrated, that there was a long buildup of frustration, that there was a massive delay, and that senior leadership was aware.

153. As FE 3 explained, by March or April 2025, everyone at Inspire knew it was going to be a lengthy process with IT at healthcare systems. FE 3 confirmed that by late March or early April 2025, it was clear that the IT component was a heavy lift.

154. FE 4, a security analyst for Inspire who was contracted through Dexian LLC from February to June 2025, further detailed information security concerns raised by providers regarding SleepSync. FE 4 reported to Thomas Presser, Inspire's Information Security Manager, who reported to John Verplank, Inspire's Senior Director, Information Security and Systems.

155. FE 4 explained that facilities pushed back on downloading the SleepSync software. Before installing SleepSync, new facilities would send Inspire questionnaires forms to assess the Company's cybersecurity requirements. For example, FE 4 confirmed that the Mayo Clinic's questionnaire had 74 comprehensive questions, and they pushed back on the SleepSync software. FE 4 described how there were some delays in completing the questionnaires, due in significant part to security issues with the SleepSync software.

156. According to FE 4, the push back on downloading the SleepSync software was a big problem because the SleepSync software did not meet security guidelines and had many vulnerabilities. FE 4 confirmed that over half of the hospitals had an issue downloading the SleepSync software, including Kaiser Permanente, the Mayo Clinic and UCI Health Irvine. FE 4

further confirmed that the hospitals raised valid concerns, and it was time consuming and would delay the release.

157. FE 4 explained that the Company would have to go through another audit process to gain security certifications and if the Company did not have the requirements the health system required, they would have to wait another year to complete the next certification to fit those guidelines. FE 4 confirmed that most of these certifications take a year to complete. FE 4 reiterated that the Company was lacking with higher-level security certifications.

158. FE 4 further described that there were security issues with SleepSync's Bluetooth connectivity to download software. This was an ongoing discussion for the information security operations team on FE 4's second day at Inspire (in February 2025).

159. As an example, FE 4 personally raised an issue about insecure Bluetooth connections where someone could tamper with the medical device, but this went nowhere.

160. According to FE 4, there was real worry and pressure on FE 4's direct and indirect supervisors—Verplank and Steve Teichman, Inspire's Vice President of Information Services, who oversaw Walker—and there seemed to be a panic with onboarding of facilities and that things were not moving as quickly as they wanted.

161. FE 5 confirmed FE 3's account that many large providers were not installing SleepSync. FE 5 was a sales territory manager in the southeastern United States at the Company for more than one year before the Class Period to May 2025. FE 5 reported to Trevor Boozer, a Sales Regional Manager. FE 5 started to have conversations with providers about SleepSync in the winter of 2025, either February or March 2025. FE 5 managed five accounts, including Mayo.

162. Prior to FE 5's departure in May 2025, no one had installed the SleepSync software. FE 5 recently learned, after another former Inspire employee joined FE 5's current employer, that

some accounts were still going through the IT process.

163. FE 5 confirmed that without the new SleepSync programming system software, providers could not handle any Inspire V patients.

**F. Defendants Made False and Misleading Statements Concerning Inspire V's Eligibility for Reimbursement from Medicare and Private Insurance**

164. In addition to their misstatements about SleepSync, discussed above, beginning on the first day of the Class Period, November 4, 2024, Defendants made false and misleading statements about the correct CPT coding for the surgical procedure of implanting the Inspire V device and the arrangements the Company supposedly had made and was continuing to make with Medicare and private insurers for reimbursement.

165. By falsely stating that the implantation procedure for Inspire V was entitled to reimbursement under a lucrative CPT code, Defendants accelerated the launch of Inspire V, persuaded existing centers to transition from Inspire IV to Inspire V, and positioned the Company to defend against imminent competition from Nyxoah and LivaNova.

166. In contrast, accurate coding for Inspire V would have disincentivized the transition from Inspire IV to V by reducing reimbursement, slowed the launch, and created an opening for Nyxoah and LivaNova.

167. Defendants chose false coding and made misstatements to investors about both the coverage and coding for Inspire V.

168. As detailed below, Inspire's senior management (including Defendants Herbert and Weatherby and Randy Ban, Executive Vice President, Patient Access and Therapy Development) made the decision to use CPT code 64568 for Inspire V. That decision fell within the purview of a division (Market Access and Reimbursement) supervised by Weatherby then Ban, and with

which Herbert was familiar given his experience at Medtronic in a management position with responsibility for reimbursement.

169. 64568 did not accurately describe the implantation of Inspire V and was objectively incorrect under the rules applicable to CPT coding. The correct coding was the "unlisted" CPT code 64999 for facilities and 64582-52 (CPT code 64582 with downward modifier -52) for physicians.

170. Even though CPT code 64568 was inaccurate and incorrect, Defendants had a powerful motive to adopt it because it avoided the delays of a new code and was much more lucrative than either 64999 or 64582-52.

171. Specifically, for facilities, 64568 had a guaranteed reimbursement rate of approximately $30,000 for claims year 2025 (increased to approximately $45,000 for claims year 2026), while 64999 had no guaranteed reimbursement rate at all. Reimbursement for 64999 was required to be determined ad hoc, increasing administrative burdens and imposing delay and uncertainty.

172. Further, for claims year 2025, CPT code 64568 offered additional payments of at least $1,000 for ambulatory surgical centers, which were not available under 64999 (or 64582, the code for Inspire IV).

173. For physicians, 64568 (as compared to 64582-52) offered a narrower (and thus less uncertain) range of possible reimbursement, with higher reimbursement at the low end of the range.

174. Throughout the Class Period, Defendants made a series of false and misleading statements about Inspire V's eligibility for reimbursement using CPT code 64568, including statements (i) that Inspire had "***secured positive coverage policies***" from "***all***" (or "***virtually all***")

"***large national commercial insurers***" and coverage from "***all seven***" MACs; (ii) that the Company had made all MACs "***fully aware***" of the coding-relevant facts and given them a "***fair shake at all the information***"; (iii) that 64568 was the correct CPT code for Inspire V and "***accurately describes***" and "***appropriately reflects***" the implantation procedure; (iv) that the Company could "***revert[] right back***" to 64568 because it had previously used the code before 2022 (for Inspire IV); and (v) that the Company's decision to use CPT code 64568 for Inspire V had been "determined by certified coders" and not by Defendant Herbert.

### 1. At the Start of the Class Period, Defendants Tout Inspire V's Insurance Coverage and Coding, and Represent that MACs Were Being Made "Fully Aware" and Given a "Fair Shake"

175. On November 4, 2024, the first day of the Class Period, Inspire filed its Quarterly Report on Form 10-Q for the third quarter of 2024, signed by Defendants Herbert and Buchholz, which stated:

> As of November 4, 2024, ***we have secured positive coverage policies*** with many U.S. commercial payors, including ***virtually all large national commercial insurers, covering approximately 260 million lives in the U.S***. In addition, ***all seven Medicare Administrative Contractors provide coverage of Inspire therapy*** when certain coverage criteria are met.

176. In the context of health insurance, "positive coverage" means that a health insurance policy expressly covers a specific service. In contrast, "negative coverage" refers to a general grant of coverage and the absence of an express exclusion for a specific service.

177. On the Company's earnings call that same day, Defendant Herbert discussed the coding for Inspire V in prepared remarks. He stated: "***We continue to validate the coding scenarios with payers and Medicare contractors*** to help ensure we are prepared for the full launch in 2025. We expect to provide more color on our coding strategy in early 2025 once we finalize discussions with the payers."

178. On the same call, an analyst asked about "the Inspire V coding strategy." Defendant Herbert responded that Inspire was "***already making good progress***" on getting "***the direct feedback from the MACs***," and that the coding would "be ready to go when we launch."

179. Another analyst asked Defendant Herbert to be "more specific" about the "coding strategy," and Herbert responded: "[W]e're making sure that we have this worked through with the MACs and the payers first before we really kind of lay this out. We want to make sure that they have a ***fair shake at all the information*** to be able to come back and weigh in."

180. Another analyst asked about the "coding strategies for Inspire V," and Defendant Herbert responded: "[W]e have really one action that we're working with the payers and we want to make sure that the Medicare or the MACs, as well as the payer are ***fully aware*** of this."

181. In reports published November 4 and 5, 2024, analysts widely recognized the importance of reimbursement to the Inspire V launch and credited Defendants' above statements that Inspire was validating the coding with the MACs and other payors and that Inspire was making the MACs and other payors "fully aware" and giving them a "fair shake at all the information."

182. For example, Baird wrote: "our sense is that the team internally has a handle on this and already is in the process of ensuring payors/MAC's have updated guidelines/software-coding in place ahead of the full launch." JPMorgan wrote that with "positive coverage policies from all major private insurers, which simplify the process for both physicians and patients to adopt Inspire therapy, we expect to see continued penetration into both new and existing accounts." UBS wrote: "As it relates to Inspire V, the company remains on track for a late 2024 soft launch, with full launch expected in 2025. From a pricing perspective, management notes that it has set pricing for the next gen system to be consistent with current Inspire IV pricing and continues to work with payers."

183. Investors and analysts were intensely focused on reimbursement levels for the Inspire V procedure and thus the CPT code for the Inspire V procedure. For example, a UBS report dated November 13, 2024 noted that: "A key concern amongst investors in the past few months has been uncertainty in Inspire V reimbursement given the removal of the sensing lead."

184. Speaking at the Piper Sandler Healthcare Conference on December 3, 2024, Defendant Herbert reassured investors that reimbursement discussions with payors were "coming to a head pretty soon," that reimbursement would not have a "real material impact[,]" and that the Company would "vet" the CPT code with payors "before we kind of come through and release that with all the investment community."

### 2. On January 13, 2025, Defendant Herbert Represents that "the Insurance Companies Are on Board" to Use CPT Code 64568 for Inspire V

185. As Defendants primed investors and analysts for the launch of Inspire V in the first half of 2025, investors and analysts continued to focus on Inspire V's billing code. Following months of investor concern and anticipation about the applicable CPT code for Inspire V, at the J.P. Morgan Healthcare Conference on January 13, 2025, Defendant Herbert announced that the CPT code for the implantation of Inspire V was 64568, claiming that the procedure matched the description for that code and that "the insurance companies are ***on board***" with the use of the code for Inspire V. Herbert represented:

> ***64568 is a code for a neurostimulator and a stimulation lead*** … eventually we created a new code, 64582, which was for the Inspire that included the sensor. Now that we go to Inspire V, it has us in a transition period where ***we can do 64568 with Inspire V***, but we can't change the other code yet because Inspire IV is still available. … But in the meantime, ***the insurance companies are on board***, they prior authorized those cases, and so, we're going with 64568 to start with V. 64582 is still available for the Inspire IV units.

186. In reports published that day and over the next few days, analysts greeted Defendant Herbert's announcement of CPT code 64568 as a positive development and credited his claim that

the insurance companies were "on board." On January 13, 2025, Jefferies cited the "successful use of an alternative CPT code" as "[posit]ive." That same day, RBC similarly wrote that "the insurance companies are on board with prior authorization." On January 17, 2025, Piper Sandler wrote that ambulatory surgical center facility reimbursement was "roughly $1,000 higher" for 64568 compared to 64582, while the hospital outpatient facility reimbursement rate for 64568 was "at parity" with the rate of 64582.

### 3. On February 10, 2025, Defendants Claim to Have Secured Positive Coverage from "All" Large National Commercial Insurers, and Defendant Herbert Represents that CPT Code 64568 "Accurately Describes" and "Appropriately Reflects" the Inspire V Procedure

187. In Inspire's Annual Report on Form 10-K for the fiscal year ended December 31, 2024, filed on February 10, 2025, and signed by Defendants Herbert and Buchholz, the Company claimed to have "secured positive coverage policies" with "***all*** large national commercial insurers" (no longer just "nearly all," as the Company had claimed on November 4, 2024) and coverage from "***all seven***" MACs.

188. On Inspire's earnings call that day, Defendant Herbert further stated that CPT code 64568 was the code that Inspire had "***originally used***" for "eight years" (for Inspire IV from 2014 to 2021) and that the code "***accurately describes***" and "***appropriately reflects***" the implantation procedure for Inspire V. He stated:

> ***CPT code 64568 was originally used by Inspire for the first eight years since our approval in 2014 and accurately describes Inspire V procedure, namely one neurostimulator and one stimulation lead***. The current CPT code 64582 was only incorporated a few years ago and will continue to be used with all Inspire IV cases. We want to emphasize that ***the professional fee in CPT code 64568 appropriately reflects the reduced work of implanting the Inspire V system, specifically the elimination of implanting the pressure sensing lead***.

189. In response to an analyst question on that call, Defendant Herbert dismissed concerns about the approximately $220 reduction in the Medicare physician reimbursement rate

for Inspire V (using CPT code 64568) relative to Inspire IV (using CPT code 64582). Herbert stressed that "reimbursement for ambulatory surgical centers is actually higher. So, for those surgeons who are – have a stake in their [ambulatory surgical center], there's a benefit to be able to bring more Inspire cases to the [ambulatory surgical center]."

190. In response to another question about CPT code 64568 from another analyst, Defendant Herbert stated that the Company's use of 64568 for Inspire V was justified by the Company's prior experience using that code (for Inspire IV, from 2014 to 2021) and that Inspire was "***transitioning right back***." Herbert said:

> I think three years ago, we transitioned from 64568 to 64582. And here we are ***by eliminating the pressure sensor, we're transitioning right back***. And so, we've done this and we work with the payers and lot of them still have the old – the 64568 still in their system.

191. Defendant Herbert's statements were important to investors because Inspire's prior experience using CPT code 64568 from 2014 to 2021 for Inspire IV, and the correct description of the implantation procedure for Inspire V, were matters peculiarly within Inspire's knowledge. A reasonable investor would have credited Herbert's claims that Inspire's prior experience with 64568 and that the implantation procedure for Inspire V supported the use of 64568 for Inspire V.

192. In reports published on February 10, 2025 and February 11, 2025, analysts again credited Defendants' statements. For example, Mizuho wrote: "INSP expressed confidence that reverting [back] to its older 64568 code (from its exclusive 64582 code for Inspire IV cases) should cause minimal disruption." Truist Securities wrote: "Management plans to keep both codes available for each device during 2025, and the company does not anticipate meaningful reimbursement 'frictions' during the transition period given: (1) the company has switched between these 2 codes already several years ago with minimal disruption, and (2) mgmt is working

with payors to ensure that all code updates to insurer systems on the backend are in place by the time a full Inspire V launch is materializing."

193. In Inspire's February 10, 2025 Annual Report on Form 10-K, the Company also disclosed that, on January 17, 2025, it had received a civil investigative demand (CID) from the U.S. Attorney's Office of the District of Minnesota investigating "allegations of false claims … submitted to government payors in connection with our implant" and that the "CID requests information relating to the marketing, promotion and reimbursement practices associated with our products."

194. At the KeyBanc Healthcare Forum on March 18, 2025, Defendant Herbert again stated that the Company's use of CPT code 64568 for Inspire V was justified by Inspire's prior use of that code: "***Now that the pressure sensing lead isn't there, it reverts right back to the original code, 64568***."

195. Herbert also touted again the increased reimbursement for ambulatory surgical centers, stating that: "if that surgeon happens to be owner of an ambulatory surgical center, the reimbursement of the new code 64568 is $1,000 higher."

#### 4. By April 2025, Inspire States on Its Publicly-Available Website that CPT Code 64568 Is the Code for Inspire V

196. Throughout much of the Class Period, the Company published statements on its website that CPT code 64568 was the correct code for Inspire V. The website was publicly available to investors as well as patients, providers, and insurers. For example, on its "Cost and Insurance" page, from at least April 19, 2025 until at least August 7, 2025, the Company stated: "***[t]he code for the procedure is … 64568*** (Inspire V (five) implant)."

### 5. In May 2025, Defendants Claim to Have Secured Positive Coverage Policies for "More Than 300 Million Lives" and that the Company Is Ready for a "Full Launch" with CPT Code 64568

197. On May 5, 2025, Inspire filed its Quarterly Report on Form 10-Q for the first quarter of 2025, which was signed by Defendants Herbert and Buchholz. In that Form 10-Q, Defendants again claimed to have "***secured positive coverage policies***" from "***all large national commercial insurers***" and coverage from "***all seven***" MACs.

198. Further, Defendants stated that the number of lives in the United States covered by policies with positive coverage for the Company's devices had increased to "***more than 300 million lives***" (up from 260 million lives in the Quarterly Report on Form 10-Q for the third quarter of 2024 and the February 10, 2025 Annual Report on Form 10-K).

199. On Inspire's earnings call held on the same day, May 5, 2025, Defendant Herbert further connected the Company's statement about "positive coverage" to CPT code 64568. Herbert stated: "Regarding reimbursement of the Inspire V system, on our last call, we detailed the transition to CPT code 64568. We are happy to announce that this ***code [64568] has been incorporated into policies covering approximately 80% of our over 300 million covered lives. This includes commercial payers, Medicare*** and the VA system."

200. In response to an analyst question, Herbert added: "***with the new CPT code 64568 … we're ready to throw the switch and be able to move into full launc***h."

201. In reports published on May 5, 2025, and May 6, 2025, analysts credited Defendants' claims about payors' acceptance of CPT code 64568, as set forth below.

- Jefferies wrote: "Mgmt noted this CPT code [64568] has now been incorporated into medical coverage policies covering 80% of the >300MM covered [lives] across commercial, Medicare, and VA plans. … Mgmt also reiterated CPT code 64568 comes with a higher [ambulatory surgical center] facility fee."
- Keybanc wrote: "INSP indicated new CPT codes for the device have already been incorporated into policies covering ~80% of the TAM [total addressable market]."

- Mizuho wrote: "the co. is confident now to move into full launch this month supported by secured reimbursement (CPT 64568)."
- Truist Securities wrote that "it seems the majority of high-volume centers are adapting to the code change with ease, with mgmt. expecting the transition to the new CPT code to be a seamless process for most centers. … More notably, for Medicare, the VA and commercial payers, the Inspire V CPT code has now been incorporated into policies covering ~80% of +300 million covered lives."
- Wells Fargo wrote: "Encouragingly, INSP noted that payor coverage is updated using the new 64568 CPT code for 80% of the 3M+ covered lives."

### 6. In June 2025, Defendant Herbert Falsely Assures an Analyst that the Company's Use of CPT Code 64568 Is "Above [Herbert's] Paygrade" and "Determined by Certified Coders," and Defendants Continue to Reiterate "Positive Coverage Policies"

202. Even after the May 2025 earning call, Defendant Herbert continued to tout Inspire V's eligibility for CPT code 64568 and its higher reimbursement rates. At investor meetings hosted by Jefferies on June 11, 2025, Defendant Herbert again "called out code 64568 $1k higher ASP facility reimbursement as a catalyst for [ambulatory surgical center] penetration, which has potential to be a nice growth driver."

203. Defendant Herbert also falsely reassured investors that the use of CPT code 64568 had been "determined by professional coders," and not by Herbert himself, because it was "***above***" Herbert's "***paygrade***." At the Wells Fargo MedTech Innovation Spotlight Conference held on June 13, 2025, in response to a question about CPT code 64568, Herbert responded:

> Well, I think, Larry, ***this is above you and I's paygrade. And this is all determined by certified coders.*** These are people that go to training. They take their test, they're qualified and certified to look at procedures and to determine the proper CPT code. And if a proper procedure is applicable and ***the certified coders looked at Inspire, and that's why we're using 64568 versus our previous 64582*** because we don't have the pressure sensing lead anymore.

204. Defendant Herbert's statement was important to investors because a reasonable investor would understand that a CPT code "***determined by certified coders***," who possess a credential that is widely recognized in the industry and by CMS, is the correct CPT code and would

enjoy sustained acceptance by CMS, MACs, and private payors. Notably, the analyst's question did not ask about, or indeed make any mention of, certified coders. Herbert, at his own initiative, decided to invoke certified coders in his response—because he understood that investors would place importance on that credential.

205. On August 4, 2025, and November 3, 2025, respectively, Inspire filed its Quarterly Reports on Form 10-Q for the second and third quarters of 2025, which was signed by Defendants Herbert and Buchholz. Defendants again repeated that the Company had "***secured positive coverage policies***" from "***all large national commercial insurers***" and from "***all seven***" MACs, covering "***more than 300 million lives***."

206. On Inspire's November 3, 2025 third quarter of 2025 earnings call, Herbert reiterated that claim, and its connection to CPT code 64568, stating that: "***for Inspire V, centers bill CPT code 64568, which has been accepted for plans covering over 90% of our 300 million covered lives, including Medicare***."

### 7. In August 2025, the Company Reveals that the Adoption of CPT Code 64568 Had Been a Headwind, But Then Reassures Investors It "Cleared Up in July" and Was "No Longer a Headwind"

207. In contrast to Defendants' prior statements about the broad adoption of CPT code 64568 for Inspire V, on Inspire's August 4, 2025 earnings call, Defendant Herbert acknowledged that the "adoption of CPT code 64568 for Inspire V" was the second of the two "predominant" "headwinds" to the launch of Inspire V (the first being the adoption of SleepSync). In response to this disclosure, as discussed *infra* §§ IV.I, VIII—on the next two trading days, Inspire's stock price dropped by $42.04 (32.35%) and $9.46 (10.7%).

208. Nevertheless, Defendant Herbert's partial disclosure that the adoption of CPT code 64568 was the second of two headwinds did not fully correct Defendants' false and misleading statements regarding CPT code 64568. To the contrary, even on the same call, Herbert claimed

that "***Medicare is now approved and centers are able to bill 64568 for Inspire V***" and that "***we already have the payers in place***, as we mentioned, ***with the CPT coding. We have Medicare now in place*** …."

209. Despite the Company's massive stock price drop on August 5 and 6, 2025 (discussed *infra* § IV.I.1), in reports published on August 4 to 6, 2025, analysts credited Defendant Herbert's reassurance that the headwind related to the adoption of CPT code 64568 had passed. JPMorgan wrote: "reimbursement coverage went into effect on July 1st as well. These dynamics will lead to a slightly more 4Q weighted cadence than usual, with sales of $221M in 3Q25 and $265M in 4Q25." Mizuho wrote: "Despite this, INSP continues to express confidence that reverting to its older 64568 code"; and "[m]ore near-term, we see the July 1 go-live for CPT 64568 to drive a rebound in volumes into the back-end of year." Further, on August 6, 2025, RBC wrote: "We believe this issue is already behind Inspire as of 7/1, and with the software update now complete, centers should be able to ramp up their efforts to transition to the Inspire V device."

210. Similarly, at the Wells Fargo Healthcare Conference on September 3, 2025, in response to an analyst question about whether the "coding issue" was "basically behind you," Defendant Weatherby stated:

> ***Correct. Yeah***. The coding, as we've described, was tied to Medicare and ultimately a software update that they put in place in July, but approval we got in April that was retroactively applied to January. And so there may have been some confusion around that. But it wasn't until July 1 when I'll call it, there was full clearance for submissions to be run through the process and the software with Medicare. So, ***that's behind us and no longer a headwind*** for us.

211. Similarly, at the UBS Healthcare Conference held on November 10, 2025, Defendant Herbert stated: "***we have coverage by all the major players and Medicare and military and VAs …. The transition with Inspire V going to the new code 64568 … has gotten really well. … [T]hat was cleaned up on July 1, and has since it's really been streamlined*** …."

212. The Wells Fargo and UBS analysts who interviewed Defendants Weatherby and Herbert credited Weatherby and Herbert's statements. The Wells Fargo analyst wrote that the Medicare coding issue was "fully resolved by early July." The UBS analyst wrote that Inspire's "Coverage now includes all major payers, Medicaid, and VA…CPT 64568 transition has improved, and CMS system updates have streamlined reimbursement."

### 8. By October 2025 Defendants Publish an Online Billing Guide for Providers Stating that CPT Code 64568 Is the Code for Inspire V

213. Between August and October 2025 and continuing until the end of the Class Period, Inspire published its "2025 Hospital/ASC [ambulatory surgical center] Billing Guide" for the Inspire V on its publicly-available website. The 2025 Hospital/ASC Billing Guide reflected coding information that, in substance, the Company had provided to investors since January 13, 2025 and to providers since the start of the soft launch in late 2024. The 2025 Hospital/ASC Billing Guide stated that "***Procedures involving HGNS [hypoglossal nerve stimulation] may involve the following code***" and then prominently listed ***64568*** and its descriptive text, and no other potential CPT code, as reflected below:

**Hospital Outpatient Codes – Implant Procedure**
**CPT® Procedure Codes**

Hospitals report outpatient procedures using CPT® codes. Procedures involving HGNS may involve the following code:

| CPT®Code | Code Description | Components |
|---|---|---|
| 64568 | Open implantation of cranial nerve (eg, vagus nerve) neurostimulator electrode array and pulse generator | Generator & Simulation Lead |

**APC**

For hospital outpatient payments, Medicare assigns each CPT® code to a specific Ambulatory Payment Classification (APC). Each APC has a fixed payment amount which includes the cost of any devices. The HGNS implantation procedure may involve the following APC:

| CPT® Code | APC Code | APC Description | SI |
|---|---|---|---|
| 64568 | 5465 | Level 5 Neurostimulator and Related Procedures | J1 |

2025 APCs as published in CMS 1786-FC Addendum B. Nov 2024.

214. The 2025 Hospital/ASC Billing Guide also includes examples of billing forms, for both hospital outpatient and ambulatory surgical center facilities. In the exemplar forms, Inspire

pre-filled the fields calling for a CPT code to indicate "***64568***" for Inspire V—and no other CPT code or modifier.

215. For example, Inspire filled in the "CPT/HCPCS" field of Medicare's Health Insurance Claim form (CMS-1500) for ambulatory surgical centers, and left the "Modifier" field blank, as follows:


D. PROCEDURES, SERVICES, OR SUPPLIES
(Explain Unusual Circumstances)

| CPT/HCPCS | MODIFIER | | | |
|---|---|---|---|---|
| 64568 | | | | |

216. The same 2025 Hospital/ASC Billing Guide that instructed providers to use CPT code 64568 also stated that: "***All Medicare Administrative Contractors (MACs) have developed positive Local Coverage Determination policies for Inspire***."

**9. In November 2025, CMS Increases Reimbursement for CPT Code 64568, Driving Inspire's Stock Price Up 40%**

217. For about three years prior to Inspire's decision to use CPT code 64568 for Inspire V, that code had significant upside potential. That upside potential was known to those familiar with Medicare reimbursement for neurostimulator devices—including Defendant Herbert, who previously held an executive position responsible for reimbursement at Medtronic and was personally involved in the decision to use 64568, and Defendant Weatherby, the executive responsible for Inspire's Market Access and Reimbursement division at the start of the Class Period. On November 21, 2025, 64568's upside arrived.

218. On November 21, 2025, CMS published a fact sheet disclosing its new facility reimbursement rates for claims year 2026. The fact sheet showed that CPT code 64568 would be reassigned to APC 1580 (New Technology), which had the effect of increasing the facility fee to about $45,000 for hospital outpatient and to about $42,373 for an ambulatory surgical center—

increases of about $14,600 (or 48%) and $15,550 (or 58%), respectively. CMS's final rule with those new rates was published in the *Federal Register* on November 25, 2025.

219. As a result of Defendants' repeated prior statements that CPT code 64568 was the correct code for Inspire V, analysts widely viewed the increased reimbursement for 64568 as good news for Inspire. Analysts understood that a 48%-58% increase in procedural reimbursement would correspondingly increase the demand for Inspire V devices and allow Inspire to raise its prices by a comparable degree.

220. While the potential upside of a possible reimbursement increase for CPT code 64568 was previously known to some, it remained uncertain whether and when an increase in reimbursement would occur, and the news on November 21, 2025 substantially exceeded any prior market expectations of an increase. For example:

- On November 25, 2025, Wolfe Research upgraded its rating to Outperform (from Perform) and established a new price target of $180 per share, writing that it had been "[n]eutral for almost 4 years" on the Company but was compelled to upgrade its rating to Overweight due to the increased reimbursement announcement, which it described as a "surprise" and a "miracle."

- That same day, Truist Securities increased its rating to Buy (from Hold) and increased its price target to $165 per share (from $128) citing CMS's "'Upcode.'"

- On December 4, 2025, Baird increased its price target to $180 per share (from $125) stating the Company "will benefit from the +50%/58% outpatient/ASC facility reimbursement uplift in FY26."

- On December 8, 2025, Oppenheimer upgraded the stock to Outperform (from Perform) with a new price target of $175, writing that it was "Tactically Upgrading on CMS Blunder."

- The same day, Piper Sandler increased its price target to $165 per share (from $135), describing the announcement about 64568 as "important" because it expected the Company to "increase the price of its technology to U.S. customers given the reimbursement change."

221. In response to the news of the reimbursement increase, which became available after market hours on Friday, November 21, 2025, the Company's stock price increased by more

than 40%: specifically, by 30.5% on Monday, November 24, 2025, and then by another 11.1% on Tuesday, November 25, 2025.

222. Inspire prepared to take full advantage of this windfall. FE 6, a senior territory manager at the Company in Texas for years before the Class Period until December 2025, confirmed that, in late November 2025, during a town hall, the Company (likely Kimberly Konopa, Inspire's Vice President of Market Access and Reimbursement) announced that CMS was increasing reimbursement for CPT code 64568.

223. According to FE 6, Katie McClure (Area Vice President) then had a meeting with the territory managers to go out and sell pack deals of the Inspire V. FE 6 explained that McClure told the sales force to print out the letter about the increase in reimbursement to convince health care systems to purchase more.

224. Inspire encouraged analysts' expectations that CMS's reimbursement increase for CPT code 64568 would allow a corresponding price increase for Inspire V. At the Piper Sandler Healthcare Conference on December 2, 2025, when asked by an analyst whether Inspire would increase the price of Inspire V in response to the reimbursement increase, Defendant Herbert responded that "the teams are looking at this very closely right now" and that the news was "obviously an opportunity," adding that "we know how the calculations work" and "we understand how the system works and where we need to be." On December 8, 2025, the Piper Sandler analyst who asked the question wrote in his next report: "Given INSP's commentary at our healthcare conference last week, we fully expect INSP to increase its ASP [average selling price] beginning in CY 2026."

225. At the same conference on December 2, 2025, Defendant Herbert repeated the Company's prior statements that adoption of CPT code 64568 had ceased to be a headwind after

the first half of 2025 (*see supra* § IV.F.7). Herbert stated that "***[t]he Medicare challenges with CPT code 64568 got cleared up [i]n July to allow for people to use that code with Inspire V***."

226. As noted by an Oppenheimer analyst report dated December 19, 2025, in the aftermath of CMS's reimbursement increase, Inspire "sent mailers to hospitals telegraphing forthcoming price increases given reimbursement changes."

## G. In Truth, Defendants' Statements Regarding Reimbursement and Coding for Inspire V Were Materially False and Misleading

### 1. "All Seven" MACs Did Not "Provide Coverage" for Inspire V on a "Fully Aware" and "Fair Shake" Basis

227. As discussed above, Defendants made multiple misleading statements about Medicare reimbursement for Inspire V. Defendants represented that "***all seven Medicare Administrative Contractors provide coverage of Inspire therapy***," that "***[w]e continue to validate the coding scenarios***" with MACs and other payors, that the Company had given the MACs and other payors a "***fair shake at all the information***" and made them "***fully aware***" of the coding-relevant facts, that "***[a]ll [MACs] have developed positive Local Coverage Determination policies for Inspire***," that "***code [64568] has been incorporated into … Medicare***" policies, and that the Medicare issues with CPT code 64568 had been "***cleared up***" and "***cleaned up***" on July 1, 2025 and thereafter were "***no longer a headwind***."

228. Defendants' statements about Medicare coverage and coding were false and misleading. In truth, as of November 4, 2024, the Company was not "***continuing to validate***" its choice of coding with the MACs, and the Company had not made the MACs "***fully aware***" of the coding-relevant facts or given the MACs a "***fair shake at all the information***."

229. Defendants' statements in every Form 10-Q during the Class Period and in the February 10, 2025 Annual Report on Form 10-K, that "***all seven***" MACs "***provide coverage***" for Inspire V were false and misleading because less than all seven MACs provided coverage for

Inspire V based on the Company's chosen CPT code, 64568, and the acceptability of that code to the MACs was subject to substantial undisclosed risk and uncertainty.

230. As of November 4, 2024 and February 10, 2025, no MACs had 64568 in their Billing and Coding Articles; as of May 5, 2025, August 4, 2025, and November 3, 2025, only one, two, and three MACs, respectively, had 64568 in their Billing and Coding Articles; two of the MACs never updated their Billing and Coding Articles to add 64568 at any point during 2025 (or since); all five MACS that added 64568 to their Billing and Coding Articles for some time period during 2025 removed it after becoming fully aware of the coding-relevant facts.

231. Further, contrary to the Company's statement in its Billing Guide about "***all***" MACs having a "***Local Coverage Determination***," no MAC had a Local Coverage Determination that allowed the use of CPT code 64568 for Inspire V.

232. For all these reasons, Medicare coverage and the adoption of CPT code 64568 remained a "***headwind***" and was not "***cleared up***" or "***cleaned up***" after July 1, 2025.

233. The falsity of Defendants' statements about "***validat[ing]***" the coding with the MACs, making the MACs "***fully aware***," and giving the MACs a "***fair shake at all the information***" was partially revealed starting in December 2025, as the MACs and then CMS unanimously rejected Inspire's use of CPT code 64568 for Inspire V.

234. By December 24, 2025, no MAC had CPT code 64568 in its relevant Billing and Coding Article. *See infra* §§ IV.I.3-4, VI (discussing Billing and Coding Articles).

235. In removing CPT code 64568, two MACs (Noridian and WPS) stated that the code had been "added in error." Another MAC (NGS) stated that "64568 is no longer used for hypoglossal nerve stimulator due to development of specific CPT codes for this technology."

236. Three MACs (Palmetto, CGS, and WPS) told *The Capitol Forum*, as reported on December 15, 2025, that they had been conducting "internal review[s]."

237. On January 22, 2026, CMS stated that CPT code 64568 had been "incorrectly added," that it was "specific to vagus nerve stimulation" and "unrelated to obstructive sleep apnea," and that the MACs "will adjust affected claims."

238. On February 11, 2026, Defendant Herbert confirmed that Inspire V must be coded as 64582-52 for Medicare—while refusing to get "too specific into the details of who, when, and how" Inspire had reached that conclusion.

239. The MACs and CMS repudiated Inspire's use of CPT code 64568 because it was inaccurate and fraudulent, not because they deemed it too expensive. The MACs have no financial incentive to deny valid claims. They are compensated on a cost-plus basis with incentives linked to accuracy, as determined by CMS audit, not to expenditure. *See, e.g.*, 42 U.S.C. § 1874A(b)(1)(D), (f). MACs can be penalized financially if they make too many errors, which includes both paying non-covered claims and denying covered claims.

240. Taken together and in context, the MACs and CMS's unanimous repudiation of Inspire's coding strategy shows that the MACs and CMS became aware of the coding-relevant facts no earlier than late 2025—not on or around November 4, 2024, when Defendant Herbert stated that Inspire was validating the coding, making the MACs fully aware, and giving the MACs a fair shake at all the information.

241. Indeed, analysts noted the tension between Inspire's prior statements about its dealings with the MACs and the MACs' actions in December 2025. For example, Piper Sandler wrote on December 18, 2025 that it was "very surprised" that the MACs would take these actions

given Defendants' prior representations (which Piper Sandler and other analysts had credited) that Inspire had "carefully coordinated a transition to CPT code 64568."

242. Defendants' response to the MACs unanimous repudiation is further inconsistent with Defendants' prior statements. For example, at the J.P Morgan Healthcare Conference on January 12, 2026, Defendant Herbert stated: "[W]e're communicating with everybody. … Everybody just kind of take a breather and slow down a little bit and let's get the clarification laid out so everybody can understand what's the proper way to do this. … [W]e're being very open and providing all the information that all the appropriate parties need to have to be able to get clarification across the board."

243. Inspire's need to communicate with "everybody" and to provide "all the information" in January 2026 is inconsistent with the Company having previously "validat[ed] the coding," made the MACs "fully aware" of the coding-relevant facts, and giving the MACs a "fair shake at all the information" in or around November 2024.

244. Notably, Herbert did not—on January 12, 2026 or at any other time—identify any coding-relevant facts for Inspire V that had only recently become available or changed in December 2025 or January 2026. The Inspire V implantation procedure had not changed. The procedural description of CPT code 64568 had not changed, and the relevant rules governing CPT coding had not changed. The use of 64568 for the implantation of Inspire V was just as inaccurate at the start of the Class Period as it was when the MACs and CMS repudiated it.

245. On the same January 12, 2026 call, Defendant Herbert attempted to downplay the MACs' actions. He referred to the MACs as having "a little bit of a reaction" because of CMS's reimbursement increase for CPT code 64568. However, Herbert's characterization of the MACs' actions was misleading because MACs are not incentivized to reduce reimbursement expenditure.

246. Further, one of the MACs (NGS) repudiated CPT code 64568 for Inspire V on October 9, 2025, before CMS's reimbursement increase announced November 21, 2025. The timing of NGS's action suggests that the other MACS' coding reviews too began before CMS's reimbursement increase was announced.

247. In addition, CGS added CPT code 64568 to its relevant Billing and Coding Article on November 24, 2025, which was after the reimbursement increase—only to remove it days later.

248. The falsity of Defendants' statements, including that "***all seven***" MACs "***provide coverage of Inspire therapy***," was also revealed by the fact that two MACs (Novitas and FCSO) never updated their relevant Billing and Coding Articles in 2025 (or since) to add CPT code 64568. The two MACs' inaction now shows that they did not accept CPT code 64568 for Inspire V during 2025. *See infra* § VI.A (explaining context of Billing and Coding Articles).

249. The contradiction was not apparent to investors during the Class Period because there can be a significant delay before a MAC's reimbursement practices are reflected in its relevant Billing and Coding Article.

250. For example, as summarized in the graphic set forth in ¶252 below, the MACs that did update their relevant Billing and Coding Articles in 2025 to add CPT code 64568 did so on April 24, 2025 (WPS), July 14, 2025 (Noridian), August 15, 2025 (NGS), September 18, 2025 (Palmetto), and November 24, 2025 (CGS).

251. It only recently became clear to the public that Novitas and FCSO's failure to update their Billing and Coding Articles reflected their refusal to adopt CPT code 64568 during 2025, as opposed to reflecting a delay in those MACs updating their Billing and Coding Articles.

252. As a result, each of Defendants' statements about coverage and coding—including Defendants' claims of coverage from "***all seven***" MACs—were false and misleading because at

least two of those seven MACS (Novitas and FCSO) did not provide coverage for Inspire V based on the Company's stated CPT code of 64568.




253. In addition, NGS updated its relevant Billing and Coding Article to remove CPT code 64568 on October 9, 2025, explaining that "64568 is no longer used for hypoglossal nerve stimulator due to development of specific CPT codes for this technology."[3]

254. NGS's action predates several of Defendants' statements about coverage and coding, including the claim of coverage by "***all seven***" MACs in Inspire's November 3, 2025 Quarterly Report on Form 10-Q for the third quarter of 2025, Defendant Herbert's statement that

[3] NGS's October 9, 2025 update did not reveal the truth to the market. NGS's Billing and Coding Article was one of thousands of local coverage articles on CMS's website, investors had no reason to sift through those local coverage articles in light of Defendants' misstatements, the update was not readily digestible to investors in its native state, and the update was not reported by any contemporaneous news or analyst reports (unlike the changes made by the MACs on December 17-18, 2025).

"we have coverage by ***all*** the major players and Medicare" (November 10, 2025), and Herbert's statement that "***[t]he Medicare challenges with CPT code 64568 got cleared up [in] July***" (December 2, 2025).

255. As a result, each of Defendants' post-October 9, 2025 statements about coverage and coding—including Defendants' claims of coverage from "***all seven***" MACs—were additionally false and misleading as to NGS.

256. The temporary presence during 2025—varying between 24 days to eight months for particular MACs—of CPT code 64568 in five MACs' relevant Billing and Coding Articles does not establish the truth of any of Defendants' statements about Medicare coverage and coding. Those edits were made in error. At the time of those edits, the relevant MACs (unlike Defendants) were not yet fully aware of the coding-relevant facts for Inspire V.

257. Moreover, the MAC's temporary errors were not the basis for Defendants' statements. Defendants' false statements about their discussions with the MACs began on November 4, 2024, and Defendants' false statements that 64568 was the correct CPT code for Inspire V began on January 13, 2025—months before any MAC had added the code to its Billing and Coding Article.

258. Further, the Company's statement in its Billing Guide that "[a]ll [MACs] have developed positive Local Coverage Determination policies for Inspire" was false and misleading because no MAC had a relevant Local Coverage Determination that included CPT code 64568, the code that Inspire's Billing Guide advised providers to use for Inspire V. A Billing and Coding Article is not a Local Coverage Determination and lacks the force of law of a Local Coverage Determination. *See infra* § VI.A.

259. Defendants' statements that the issues with CPT code 64568 "***cleared up***" and were "***cleaned up***" and "***no longer a headwind***" after July 1, 2025 remained misleading for all these reasons.

260. As Defendants knew (or at a minimum were severely reckless in disregarding), CPT code 64582-52 (for physicians) and 64999 (for facilities), not 64568, was the correct code for the Inspire V implantation; CMS and the MACs had not agreed to the code "***fully aware***" and after a "***fair shake at all the information***."

261. All that took place on July 1, 2025 was a previously-scheduled quarterly software update. At minimum, there remained enormous risk and uncertainty regarding CPT code 64568 after July 1, 2025.

### 2. "All" (or "Virtually All") "Large National Commercial Insurers" Did Not Have "Positive Coverage Policies" and Were Not "On Board"

262. Defendants' statements about private health insurance coverage were also false and misleading. Defendants represented that "***all***" (as of February 10, 2025, May 5, 2025, August 4, 2025, and November 3, 2025) or "***virtually all***" (as of November 4, 2024) "***large national commercial insurers***" had "***positive coverage policies***," and that "***the insurance companies are on board***" (January 13, 2025).

263. At each relevant time, one or more large national commercial insurers had not agreed to cover Inspire V at all (using any CPT code) or had not agreed to cover Inspire V using the Company's stated CPT code of 64568.

264. As of November 4, 2024, January 13, 2025, and February 10, 2025, several large national commercial insurers—including Blue Cross Blue Shield, United Healthcare, Aetna, Cigna, and Providence Health did not cover the Inspire V procedure at all.

265. Contrary to Defendant Herbert's statement that the insurance companies were "on board," as soon as Inspire informed private insurers of its plan to use CPT code 64568, they had immediate and sustained objections to that code.

266. By early 2025, contrary to its public statements that 64568 was the code to bill for Inspire V procedures, Inspire was already secretly instructing its sales and field representatives to cause providers to use 64582-52 for certain payors.

267. For example, by January 16, 2025, following objections previously conveyed privately from Providence Health to Inspire, Providence Health adopted a written policy rejecting Inspire's proposed use of CPT code 64568 for Inspire V.

268. Providence Health offers a multi-state health plan that covers approximately 1.9 million lives and is affiliated with various providers, such as Proliance Surgeons. Providence Health's policy, titled "Sleep Disorder Surgery," stated in relevant part (emphasis in original):

> [T]he manufacturer may advise providers to use CPT code 64582 when Inspire IV is used, and CPT 64568 when Inspire V is used. However, the Plan has determined providers should use CPT 64582 regardless of model as follows:
>
> - 64582 – Inspire IV
> - 64582-**52** – Inspire V
>
> **Rationale**
>
> Prior to 2022, CPT 64568 was used to report some elements of this procedure. However, since 2022 and the development of CPT 64582, a CPT code specific to the hypoglossal nerve stimulator implantation procedure now exists. Because it is more specific than CPT 64568, it is felt to be the more appropriate code, regardless of the device model.
>
> Modifier -52 is used to identify a "reduced service," and it is defined by the AMA as follows:
>
>> "Under certain circumstances a service of procedure is partially reduced or eliminated at the discretion of the physician or other qualified healthcare professional. Under these circumstances the service provided can be identified by its usual procedure number and the addition of modifier 52,

> signifying that the service is reduced. **This provides a means of reporting reduced services without disturbing the identification of the basic service**..."

> In the case of the two Inspire models, while there is no longer a respiratory sensor lead, the "basic service" remains unchanged as it is still a hypoglossal nerve stimulator implantation service. The same nerve is targeted for stimulation regardless of which model device (Inspire IV or Inspire V) is used.

> By using modifier 52 with CPT 64582, the provider maintains the basic service, while indicating the full description of the CPT code isn't met. It is felt by the Plan that using the CPT code 64568 changes the "basic service" rendered. While the hypoglossal nerve is technically a "cranial nerve," the existing CPT code specific to the hypoglossal nerve more accurately represents the service.

> Finally, the use of modifier -52 is consistent with instructions from the local MAC for HNS revision, replacement, or removal services when the entire description of the HNS code is not performed (see Noridian LCA A57949). The Plan is applying the same logic to the implantation procedure.

269. Providence Health's policy correctly stated some of the reasons why Inspire's use of CPT code 64568 was incorrect and Inspire was well aware of it.

270. FE 7 was an employee in Inspire's Market Access and Reimbursement department from before the Class Period until the summer of 2025. FE 7's title and departure month are known to Lead Counsel but withheld at FE 7's request to protect FE 7's identity. FE 7's job responsibilities included speaking with health care provider offices, ENT offices, hospitals, and ambulatory centers to educate them on the reimbursement process for the Inspire IV and V, assisting with resolving denials, providing resources, and writing appeal letters.

271. FE 7 stated that Proliance Surgeons (a provider associated with Providence Health), questioned the Company's decision to use CPT code 64568. FE 7 participated in a call with Proliance Surgeons' Vice President of Revenue Cycle, Jessica Weathers, along with Ben Van Thorne, Inspire's Senior Director of Reimbursement, and Terrell Hickmon, an Inspire Area Vice President. According to FE 7, on the call, Weathers said that she refused to adopt Inspire V and

reported Inspire's coding to the American Medical Association (AMA). FE 7 confirmed that Proliance continued only with the Inspire IV.

272. FE 7 recalled that Providence Health put out a policy refusing the use of code 64568 and instead recommending 64582 with modifier 52. FE 7 stated that Providence Health never adopted Inspire's recommended coding for Inspire V.

273. Lead Counsel obtained Providence Health's written policy (referenced above) and confirmed from the written policy that it was initially dated January 16, 2025. Based on the date of that written policy, the call between Inspire and Proliance described by FE 7 occurred prior to January 16, 2025.

274. Providence Health was not the only private health insurer to push back against use of CPT 64568 code for Inspire V. FE 7 stated that payors were not on board from the first day of the limited market release, including United Healthcare, which never approved Inspire's recommended CPT code for Inspire V (during FE 7 's tenure); and Carelon, which denied Inspire V claims.[4] FE 7 stated that much of the hesitation from the payors to adopt Inspire V came down to Inspire's recommended coding.

275. Additional former employees interviewed in Lead Counsel's investigation further confirmed that several large health insurance companies did not cover the Inspire V procedure—at least for significant portions of 2025.

[4] Carelon, Blue Cross Blue Shield, and Anthem are all operating subsidiaries of Elevance Health, one of the nation's largest health insurance companies. In 2025, Carelon was the third-party reviewer for Anthem Blue Cross Blue Shield in at least 13 states, reviewing claims for approximately 30 million covered lives.

276. FE 3, a territory manager from before the Class Period to January 2026, attended an in-person national sales meeting in Orlando, Florida in January 2025,[5] and upon his return, met with his supervisor, a Regional Sales Manager, who told him that the Inspire V was not quite ready to be sold because not every payor was onboard. At that time, United Healthcare, Blue Cross Blue Shield, Aetna, and Cigna had not signed on.

277. According to FE 3, Blue Cross Blue Shield, Aetna, and Cigna signed payor contracts between March and June 2025. To FE 3's knowledge, United Healthcare did not sign a payor contract and refused to adopt Inspire V at all during his tenure. FE 3 was aware of coverage decisions because they affected patients within his territory.

278. FE 1, another territory manager from before the Class Period to May 2025, confirmed that, during his tenure, not every insurance company covered Inspire V. For example, United Healthcare, one of the largest private health insurance companies in the United States, had not picked up coverage for Inspire V before FE 1 left the Company. The Company tracked coverage through a Microsoft Dynamics customer relationship management (CRM) database. According to FE 1, Inspire management 100% had access to the Dynamics system. FE 1 explained that the same Dynamics system tracked insurance approvals and denials, and everyone had access and all denial letters sent to the physicians or hospitals were also uploaded to Dynamics.

279. Corroborating FE 1, FE 3, and FE 7's accounts that United Healthcare did not cover Inspire V, United Healthcare's third-party administrator, UMR, did not revise its policy for Obstructive and Central Sleep Apnea Treatment to add CPT code 64568 until its February 2026 *Medical Policy Update Bulletin* (effective April 1, 2026).

---

[5] At the JP Morgan Healthcare Conference on January 13, 2025, Defendant Herbert stated that the Company's "national sales meeting" was "coming up in a few weeks"—meaning that it occurred after the JP Morgan Healthcare Conference on January 13, 2025.

280. Corroborating FE 3's statement that Aetna did not cover Inspire V until March-to-June of 2025, the "Review History" for Aetna's Clinical Policy Bulletin for "Obstructive Sleep Apnea in Adults" indicates that it was "updated with additional coding" on May 19, 2025 (although the publicly available Review History does not indicate which codes were updated on that date).

281. Because, as of November 4, 2024, January 13, 2025, and February 10, 2025, several large national commercial insurers—including Blue Cross Blue Shield, United Healthcare, Aetna, Cigna, and Providence Health—either did not cover Inspire V at all or did not cover Inspire V under CPT code 64568, Defendants' statements that "***all***" (February 10, 2025) or "***virtually all***" (November 4, 2024) "***large national commercial insurers***" had "***positive coverage policies***" and that "***the insurance companies are on board***" (January 13, 2025) were false and misleading.

282. Defendants' further representations that Inspire had secured coverage for "***260 million lives***" (as of November 4, 2024 and February 10, 2025) were also false and misleading. According to the most recent available U.S. Census Bureau data (for 2024), there are only 310 million covered lives in the United States. Medicare covered 64.3 million lives. Blue Cross Blue Shield, United Healthcare, Aetna, and Cigna covered 118 million, 37.1 million, 26.2 million, and 18.4 million lives, respectively—a total of nearly 200 million lives.[6]

283. Thus, it was not mathematically possible for Defendants to claim coverage for 260 million lives without including in that total the lives covered by Blue Cross Blue Shield, or Medicare, or some combination of Carelon, United Healthcare, Aetna, and Cigna—for which payors (as well as Providence Health) the statements were false or misleading.

284. Because, as of May 5, 2025, August 4, 2025, and November 3, 2025, several large national commercial insurers—including United Healthcare and Providence Health—either did

[6] Conservatively, these covered-lives figures exclude Medicare Advantage plans offered by these insurers.

not cover Inspire V at all or did not cover Inspire V under CPT code 64568, Defendants' continued statements that "***all large national commercial insurers***" had "***positive coverage policies***" continued to be false and misleading.

285. Defendants' further representations of having secured coverage for "***300 million lives***" (as of May 5, 2025, August 4, 2025, and November 3, 2025) were also false and misleading. It was not possible for Defendants to claim coverage for 300 million lives without including in that total the lives covered by all of Medicare, Carelon, and United Healthcare—for which payors (as well as Providence Health) the statements were false or misleading.

286. Defendant Herbert's statements that "***this code [64568] has been incorporated into policies covering approximately 80% of our over 300 million covered lives***" (May 5, 2025) and "***CPT code 64568 … has been accepted for plans covering over 90% of our 300 million covered lives, including Medicare***" (November 3, 2025) were also false and misleading. 80% and 90% of 300 million are 240 million and 270 million, respectively.

287. It was not possible for Herbert to claim coverage for 240 million lives without including in that total the lives covered by at least two of Medicare, Carelon or United Healthcare—for which payors (as well as Providence Health) the statement was false or misleading.

288. It was not possible for Herbert to claim coverage for 270 million lives without including in that total the lives covered by Medicare or Carelon—for which payors (as well as United Healthcare and Providence Health) the statement was false or misleading.

### 3. 64568 Was Not the Correct CPT Code for Inspire V

289. Contrary to Defendants' statements such as "we can do 64568 with Inspire V," "CPT code 64568 … ***accurately describes***" and "***appropriately reflects***" the Inspire V

implantation procedure, and "***[t]he code for the procedure is 64568*** (current Inspire V (five) implant)," among others, 64568 was not the correct CPT code for Inspire V.

290. The correct CPT coding for Inspire V's implantation was the 64999 (the code for "unlisted" nervous system procedures) for facilities and 64582-52 (CPT code 64582 with modifier -52) for physicians. Inspire providers were required to use 64999 and 64582-52 unless and until a new code was created—a multi-year process that Inspire belatedly began only towards the end of the Class Period.

291. The incorrectness of CPT code 64568 for Inspire V has now been confirmed by, inter alia, the changes made to the relevant Billing and Coding Articles of NGS on October 9, 2025, Noridian and CGS on December 18, 2025, Palmetto on December 22, 2025, and WPS on December 24, 2025, which changes left the MACs unanimous in their rejection of the Company's coding strategy of 64568; CMS's *MLN Connects Newsletter* on January 22, 2026, which also rejected the Company's coding strategy of 64568; Inspire's own disclosure on February 11, 2026 that the CPT code 64582-52 must be used with Medicare for Inspire V going forward; and the American Hospital Association's (AHA) published advice to its members in April 2026 to use CPT code 64999 for commercial payors and C8007 (discussed *infra* ¶¶314-19) for Medicare for a hypoglossal nerve stimulator (like Inspire V) "without a separate respiratory sensing electrode."

292. The decisions of CMS and the MACs and Inspire's announcement on February 11, 2026 are all based on binding coding rules, which existed throughout the Class Period and are summarized *infra* § VI.A-B.

293. The same is true of the AHA's advice in April 2026 to use CPT code 64999 for commercial payors; C8007, which the AHA advised for Medicare claims, was a new code created in February 2026 (effective April 2026).

294. The incorrectness of 64568 and the correctness of 64582-52 (for physicians) is confirmed by a series of Linkedin comments made in January 2026 by Brian Carlson, Inspire's Senior Director of Market Access and Reimbursement from 2020 to 2022.

295. Carlson's posts explain that providers are required to use the "most specific CPT code"; that the difference between the Inspire IV and V implantations is "only a few minutes of work," which "doesn't justify switching into a different CPT family"; that the Company used code 64568 "only in the very earliest years because no HGNS [hypoglossal nerve stimulation]-specific code existed at the time"; and that the 64582 code was created because the reimbursement levels for 64568 code are based on vagus nerve implantation, which is a "fundamentally different procedure."

296. Carlson's statements are further corroborated by other former Inspire employees. The AlphaSense Expert Insights platform published a transcribed interview on May 1, 2026 (interview date April 17, 2026) between an analyst and a former Inspire employee who identified himself as the former Director of Research at Inspire, working at Inspire for 13 years after starting in 2011 as "Inspire employee number 18."

297. The former Director of Research stated that his responsibilities included clinical trials, "working closely with reimbursement to get the data established for reimbursement," patient marketing, and "competitive analysis of all the emerging players that are coming into the market outside."

298. When asked about Inspire's use of CPT code 64568 for Inspire V, the former Director of Research responded that it was "a ***misinterpretation***" and "***just a strategy***" because 64568 was for vagus nerve stimulation. The former Director of Research stated:

> Going back to the coding. I really do think that was it, I think it was late last year, this is blip. That they could go back to CPT code 64568. I really think that

> was a mistake. I think it was a ***misinterpretation*** of something, because the whole plan from the very beginning is to separate vagal nerve stimulation, which has been used 64568 for a long time. Carve off a separate 64582, which is due to be specific for HNS. Inspire, unfortunately got itself into its own pickle here because the exact words in CPT code 64582 are implantation of a hypoglossal nerve stimulation array, and distal sensing lead. Inspire five has no distal sensing lead. Inspire strategy was to try to go back to 64568. It has no mention of the distal sensing leads. It was really intended for vagus nerve stimulation in the beginning. That was ***just a strategy***, I think, to get around the difference in the words, but it's pretty clear that Medicare is like, "No, you can't do that." It's carving out, CPT code 64582 to be the billing.

299. The AlphaSense Expert Insights platform also published a transcribed interview on February 26, 2026 (interview date February 23, 2026) between an analyst and a former Inspire employee during part of the Class Period who identified himself as a former Inspire Territory Manager, reporting to an Area Sales Director.

300. When asked about "reimbursement," the former Territory Manager stated:

> This is the hard thing, is that nobody really knows. Even when I was actively working with Inspire, there were questions about reimbursement. … There's just a lot of question marks around it …. Anyone who tells you they know exactly what's going to happen with the reimbursement stuff is lying to you. ***Even high up in the internal side of the company, some of the leadership meetings I attended, it was just a big question mark***.

301. FE 3 confirmed that Defendants Herbert and Weatherby, and Randy Ban were part of every senior leadership team meeting.

302. For physicians, the binding coding rules prohibiting the use of CPT code 64568 include the description of the "Reduced Services" modifier (-52), found in Appendix A of the AMA's CPT Coding Handbook. That modifier requires reduced surgical procedures to be identified with the "usual procedure number" plus that modifier, rather than "disturbing the identification of the basic service."

303. The implantation procedure for Inspire V was a reduced version of the implantation procedure for Inspire IV and should have been described using the code for the implantation of a

"hypoglossal nerve" stimulator (64582) rather than the more general code for "cranial nerve (e.g. vagus nerve)" stimulator.

304. The description of modifier -52 is reinforced by other binding coding rules. The CMS National Correct Coding Initiative (NCCI) Policy Manual requires that "[p]rocedures shall be reported with the most comprehensive HCPCS/CPT code that describes the services performed."

305. The American Academy of Otolaryngology-Head and Neck Surgery, the physician specialty association that created CPT code 64582 (together with the Company), advises its members (surgeons who implant Inspire devices) that providers should use "the code most specific to the service performed."

306. Defendants' knowledge that CPT code 64568 was incorrect, and that 64582-52 was correct (for physicians), is further confirmed by former employees interviewed in Lead Counsel's investigation who describe that insurers refused to adopt, and pushed back on the use of, CPT code 64568. *Supra* § IV.G.2.

307. Providers also objected to CPT code 64568. During the limited market release of Inspire V, FE 7 supported reimbursement for the states west of the Mississippi River and also the north central United States. FE 7 stated that many health care systems could not wrap their minds around the Company's new coding of 64568 for Inspire V. According to FE 7, health systems were debating the coding description from the onset of the limited release.

308. FE 7 encountered pushback on the coding in multiple states, including Arizona, Minnesota, and Washington. FE 7 confirmed that he agreed with the health systems that were pushing back but could not change the outcome. FE 7 struggled to have those conversations with the health systems.

309. FE 7 further confirmed that 64568 did not accurately describe the Inspire V device, did not match the actual device, and was not the most appropriate code to use.

310. FE 7 explained that leadership was well aware of the coding push back. FE 7 further confirmed that the Company should have applied for a new code but wanted to avoid the delay in obtaining that code.

311. FE 7 personally raised the coding issues to Kimberly Konopa, Inspire's Vice President of Market Access and Reimbursement in February or early March 2025.

312. Further, starting in February 2025 and contrary to Defendants' public statements that CPT code 64568 was the correct code for Inspire V, Inspire was instructing sales and field staff to use 64582-52.

313. FE 1 stated that in February 2025, the sales personnel in his region started having meetings about billing and coding practices. The information was relayed from Konopa down to the Area Vice President and then to the Regional Sales Manager who shared it with him and his sales colleagues. In these meetings, there were some discussions about possibly using CPT 64582 with modifier -52 for Inspire V. FE 1 understood that the reimbursement for physicians was worse under 64582 with modifier -52.

314. On February 26, 2026, CMS wrote in the *MLN Connects Newsletter*: "CMS is aware of questions regarding coding for hypoglossal nerve neurostimulators for the treatment of obstructive sleep apnea and concerns that the current CPT codes don't accurately describe some newer hypoglossal nerve neurostimulators. To address this issue, we'll add 6 new HCPCS codes to the April 2026 Integrated Outpatient Code Editor, effective January 1, 2026." Three of the new codes were for the Inspire V (implantation, revision, and removal), and the other three were for Nyxoah's Genio. The new code for the implantation of Inspire V was "C8007: Open implantation

of hypoglossal nerve neurostimulator array and pulse generator, not requiring insertion of a separate distal respiratory sensor electrode or electrode array."

315. The six new codes are HCPCS Level II codes or "C-codes." CMS's action in creating the C-codes provides further confirmation that CPT code 64568 was not the correct CPT code for Inspire V and did not "***accurately describe***" or "***appropriately reflect***" the implantation of Inspire V.

316. In reports published on February 26 and 27, 2026, analysts widely noted that the creation of the C-codes did not resolve the Inspire V's reimbursement problems. Leerink Partners wrote: "Overall, … we do not expect these new CMS C-codes in isolation to directly address INSP's primary ongoing reimbursement headwinds related to physician reimbursement." Oppenheimer wrote: "If CMS follows standard protocol using claims data, logic dictates that these temporary facility codes should also map to legacy $31.5K APC rates, especially given the lower resource intensity with INSP V." RBC wrote: "the crux of the problem with Inspire V adoption, which is physician payments and procedure profitability remains an outstanding question." UBS wrote: "final code and associated reimbursement rate remain uncertain, and could ultimately land below the CPT code 64582 level." Wells Fargo wrote that the C-codes are "temporary and used only for Medicare outpatient services and procedures," "will only affect facility payments," and that "CPT code 64582 is most likely to be linked to these C-codes."

317. On March 2, 2026, UBS cited discussions with a key opinion leader physician that "recent coding changes" had "driven the now higher reimbursement barrier across centers." The physician noted that "82+modifier" was used with Medicare, while the "68 code" continued to be used with some private payors "until they can," which caused "higher denials."

318. On or about March 4, 2026, Inspire removed statements that CPT code 64568 is the correct CPT code for Inspire V (*see supra* ¶196) from its public webpage. This further confirms that 64568 was not the correct CPT code.

319. On March 27, 2026, CMS published a Change Request assigning C8007 to APC 5465, the same APC for CPT code 64582 (as opposed to CPT code 64568's APC 1580), which means that the reimbursement levels for C8007 will track that of 64582, not 64568. CMS's action provides further confirmation that the Company's use of CPT code 64568 for Inspire V was not correct and that 64568 did not "***appropriately reflect***" the work of implanting Inspire V.

320. In April 2026, the AHA published its *AHA Coding Clinic* for the Fourth Quarter of 2025 (Volume 25, Number 4), which further confirms that 64568 was not the correct CPT code for Inspire V. The purpose of the AHA publication is to provide advice on correct CPT coding to the AHA's members, which include approximately 5,000 hospitals and health care systems in the United States and tens of thousands of individuals who are health care professionals.

321. The publication answered a question from a member, who described an Inspire V implantation procedure, and asked "What is the correct CPT code to report implantation of this hypoglossal nerve stimulator generator with stimulation lead and cuff, but without a separate respiratory sensing electrode?" AHA answered:

> For commercial payors, assign CPT code ***64999***, *Unlisted procedure, nervous system*, for the placement of the hypoglossal nerve stimulator generator and stimulation lead with cuff, without a separate respiratory sensor. Please note, when reporting an unlisted code to describe a procedure or service, it may be necessary to submit supporting documentation.
>
> For Medicare facility reporting, assign HCPCS Level II code C8007, *Open implantation of hypoglossal nerve neurostimulator array and pulse generator, not requiring insertion of a separate distal respiratory sensor electrode or electrode array*. This code has an effective date of January 1, 2026 and will be added to the April 2026 Integrated Outpatient Code Editor (I/OCE) software.…

322. In addition to defrauding investors, Defendants' statements about coding also defrauded providers and payors (including Medicare), and Defendants' fraud on providers and payors was an important part of Defendants' scheme to defraud investors. By inducing providers to submit and payors to pay claims for Inspire V using CPT code 64568, Defendants created the false impression for investors that Inspire's lucrative coding was valid.

### 4. Defendants' Statements Referencing the Company's Prior Use of CPT Code 64568 as Support for Its Current Use Were Misleading

323. Defendants' statements invoking the Company's prior use of CPT 64568 (which was for Inspire IV from 2014 to 2021) as purported support for the correctness of that code for Inspire V, were also misleading. These statements include Defendant Herbert's statements that: "three years ago, we transitioned from 64568 to 64582. And here we are ***by eliminating the pressure sensor, we're transitioning right back***"; and "***[n]ow that the pressure sensing lead isn't there, it reverts right back to the original code, 64568***."

324. These statements were misleading and omitted material facts, including that: (i) any prior use of code 64568 for Inspire devices had occurred before any hypoglossal nerve-specific CPT code existed; (ii) Inspire itself had partnered with the American Academy of Otolaryngology-Head and Neck Surgery to create hypoglossal nerve-specific CPT codes (including 64582) because 64568 described the implantation of vagus-nerve devices and did not accurately or appropriately describe the implantation of hypoglossal nerve devices; (iii) Inspire knew that, after the creation of the hypoglossal nerve-specific CPT codes (such as 64582), physicians were required to use the "more specific" codes and could not simply revert back to 64568; and (iv) binding coding rules required that physicians account for the removal of the distal respiratory sensor with modifier -52 to code 64582, rather than by switching to code 64568.

325. Defendants' statements about Inspire's prior use of CPT code 64568 were also misleading because, as Defendant Herbert belatedly revealed on January 12, 2026, "all the way back to 2014 … we always had challenges back then with the first code."

### 5. The Use of CPT Code 64568 for Inspire V Was Directed by the Company's Senior Management, Not Professional Coders

326. Contrary to Defendant Herbert's statements that CPT coding was "***above you [the analyst] and I's paygrade***," that "***this is all determined by certified coders***," and that "***certified coders looked at Inspire, and that's why we're using 64568 versus our previous 64582***," Inspire's use of CPT code 64568 was directed by Inspire's senior management, including Herbert himself, because that code was more lucrative than the correct coding (64999 for facilities and 64582-52 for physicians).

327. The higher reimbursement level, not the impartial advice of certified coders, was the reason "***why***" Inspire was "***using 64568***." Further, at the time that the decision was made, Inspire did not employ "***certified coders***."

328. Defendant Herbert's references to certified coders were further misleading because Inspire's use of CPT code 64568 was contrary to the binding and objective coding rules that certified coders apply.

329. Contrary to Defendant Herbert's statement that coding was "***above [his] paygrade***," former employees interviewed in Lead Counsel's investigation confirmed that Inspire's decision to tell providers to use CPT code 64568 was made by Inspire's executives, including Defendants Herbert and Weatherby. FE 3 explained that Defendants Herbert and Weatherby and Randy Ban worked closely with the team that does reimbursement, which worked directly with the payors.

330. FE 7 confirmed that Inspire wanted a CPT code for Inspire V that provided good reimbursement for facilities. FE 7 further confirmed that Inspire did

not create a new code because the process of doing so would take anywhere from one to three years. FE 7 explained that the reimbursement incentive for facilities under 64568 to use the Inspire V was much greater than 64582 for the Inspire IV by about $2,000. According to FE 7, the Company should have applied for a new code but wanted to avoid the delay.

331. None of Defendants Herbert, Weatherby, or Buchholz, or Ban has any credential that would qualify them as "***certified coders***." While not certified, these executives had sufficient knowledge of coding and reimbursement coding to select the most lucrative coding strategy for Inspire V and to orchestrate the fraudulent scheme. For example, Herbert formerly held a management position at Medtronic with responsibility for reimbursement, similar to the position held by Weatherby and then Ban at Inspire.

332. A review of all available Linkedin biographies for Inspire current or former employees in the Market Access and Reimbursement department, who worked at the Company during the Class Period (plus the time period between FDA approval of the Inspire V and the start of the Class Period), reveals that the Company did not employ anyone—let alone two or more people (Defendant Herbert referred to "coders" (plural))—that a reasonable investor would understand to be a "certified coder."

333. Specifically, the Company did not employ anyone claiming the Certified Professional Coder (CPC) credential issued by the American Academy of Professional Coders (AAPC) or the Certified Coding Specialist (CCS) credential issued by the American Health Information Management Association (AHIMA), which are the credentials to which a reasonable investor would understand the phrase "certified coders" to refer. Those two credentials are widely recognized in the industry and by CMS. For example, CMS's Medicare Program Integrity Manual requires the Supplemental Medical Review Contractor to "[e]nsure each coding review is

conducted by a Certified Professional Coder (CPC) or Certified Coding Specialist (CCS) with an active certification."

334. Kimberly Konopa, in her LinkedIn biography, claims to have a "Registered Medical Coder licensure" and names herself as "Kimberly Konopa, RMC, MBA," but a reasonable investor would not consider a person with that purported credential—which is issued by a for-profit, online educational company, is not widely recognized in the industry, and is not a "licensure" at all—to be a "certified coder."

**6. CMS Identifies Inspire V as a Source of "Fraud, Waste, and Abuse"**

335. Contemporaneously with the MACs and CMS's coding actions in December 2025 and January 2026 (*infra* §§ IV.I.3-5), CMS publicly identified Defendants' use of CPT code 64568 as an example of fraud, waste, and abuse. On December 31, 2025, CMS added hypoglossal nerve stimulation for obstructive sleep apnea to its Wasteful and Inappropriate Service Reduction (WISeR) pilot program, which targets services that are known sources of "fraud, waste, and abuse."

336. As CMS has explained: "WISeR targets a narrow set of items and services that have been a source of fraud, waste, abuse," including "electrical nerve stimulation"; and "an unfortunate truth . . . is that some health care providers abuse Medicare by providing expensive items or services, like . . . implantation of electrical nerve stimulators, in situations where . . . they do not meet Medicare coverage criteria. WISeR will proactively curtail these practices."

337. On January 16, 2026, in its "Wasteful and Inappropriate Service Reduction (WISeR) Model Provider Factsheet," CMS took the additional step of announcing that "CPT 64568 is also subject to prior authorization and pre-payment review under Hypoglossal Nerve Stimulation (HGNS) for the Inspire V device."

338. Inspire and Inspire V are the only Company and only medical device, respectively, called out by name in CMS's January 2026 Factsheet.

339. In the WISeR "Provider and Supplier Operational Guide" updated March 12, 2026, CMS clarified that (i) "WISeR does not include CPT 64568 billed with ICD-10 code G47.33 (obstructive sleep apnea)," which is incorrect per CMS's *MLN Connects Newsletter* dated January 22, 2026, as opposed to being approvable after prior authorization and pre-payment review; and (ii) that WISeR does include the use of CPT code 64582 or HCPCS code C8007 for hypoglossal nerve stimulation for the treatment of obstructive sleep apnea.

340. In states subject to the WISeR pilot program, Inspire devices now require prior authorization and pre-payment review for each and every patient—a deviation from normal Medicare procedure, which typically pays claims without pre-payment review and then relies upon post-payment review or audits to identify improperly paid claims.

341. According to a CMS policy document, pre-payment review is one of the "most substantial administrative actions available," typically reserved for "serious problems" and "repeated infractions."

### H. Defendants Issued and Reaffirmed Baseless and Unrealistic Guidance that They Attributed to SleepSync Adoption and Inspire V's Coding

342. In light of the known issues regarding the bundled SleepSync programmer and CPT code 64568, Defendants knew that their aggressive 2025 guidance for revenue and diluted net income per share was baseless and unrealistic—yet they reaffirmed and increased that baseless and unrealistic guidance throughout the first half of the year.

343. On January 13, 2025, the Company announced guidance of full year 2025 revenue of $940 million to $955 million, representing a 17% to 19% increase over 2024. This guidance was reviewed and approved by Defendant Herbert, who was quoted in the press release, Defendant

Weatherby, who was named in the press release, and Defendant Buchholz, who signed the Form 8-K attaching the press release.

344. Defendants issued this guidance despite knowledge by January 13, 2025 that SleepSync adoption was facing headwinds due to IT testing and integration issues. For instance, as detailed by FE 2, who worked on testing the SleepSync patient programmer in the last quarter of 2024, the software was not ready for release because there were bugs, deficiencies, and anomalies which had been reported to management. ¶¶138-39, 608, 614.

345. Defendants also issued this guidance despite knowledge by January 13, 2025 that the Company's chosen CPT code for Inspire V (64568, announced publicly the next day) was incorrect, had not been approved by the MACs on a fully-aware and fair-shake basis, had not been approved by several large national commercial insurers, and at minimum, was subject to substantial risk and uncertainty that threatened the launch. *Supra* § IV.G.

346. On February 10, 2025, Inspire "***reaffirm[ed]***" its 2025 revenue guidance and announced additional guidance of full year 2025 diluted net income of $2.10 to $2.20 per share. This guidance was reviewed and approved by Individual Defendants, including Defendant Herbert who was quoted in the press release.

347. On Inspire's earnings call that day, Herbert stated that Inspire was "reiterating" its revenue guidance "[g]iven our strong performance." Defendant Buchholz repeated the revenue and diluted net income guidance and stated: "our strong performance and business momentum provide us with confidence in our outlook for 2025."

348. In response to an analyst question, Defendant Herbert claimed that Inspire's guidance was built on a "detailed plan" and "detailed model" that "[took] into account" the Inspire

V launch and expected that most growth could come from providers already doing Inspire procedures:

> [Analyst]: I was hoping you can touch a little bit on your guidance philosophy. You're obviously exiting 2024 on a pretty high note. 25% year-over-year growth, you're guiding to high teens. What are you assuming in terms of a step down, besides [lost] large numbers, it seems it's just that. But then what factors can really help you deliver another year of 2025 growth? It seems like the Inspire V launch, you said it's going to be a bit of a phased commercial launch. So, maybe help us think through how you thought about the guidance and what you factored influenced Inspire V?
>
> Herbert: … We built a detailed plan at the beginning of the year. We take into account all the elements that you identified. Rick, earlier had identified many of those elements, as well as – as far as the tailwinds and even some challenges we see to build a detailed model. It's early in the year and so as we progress, we see - we'll continue to open up new centers, but we expect the majority of our growth to come from increase[d] work at existing centers or same store sales. And we also continue to scale our field team to be able to continue our growth and continue to invest in our growth going forward.

349. Defendants reaffirmed and expanded this guidance despite knowledge by February 10, 2025 that SleepSync adoption continued to face headwinds due to providers' HIPAA and information security concerns. For instance, FE 1 started talks with his accounts about SleepSync in December 2024, yet by February 2025 (and continuing through May 2025) none of his accounts had installed SleepSync or signed an IT agreement. ¶¶146, 626.

350. Defendants also issued this guidance despite knowledge by February 10, 2025 that the Company's chosen CPT code for Inspire V (64568) remained incorrect, had not been approved by the MACs on a fully-aware and fair-shake basis, had not been approved by several large national commercial insurers (and had been expressly rejected by payors, including Providence Health in January 2025), and at minimum, was subject to substantial risk and uncertainty that threatened the launch. ¶¶230, 264, 267.

351. Analysts were reassured by the reaffirmed revenue guidance and new diluted net income per share guidance, which helped "allay" investor "concerns," including about "coding frictions."

352. For example, regarding Inspire's guidance announced February 10, 2025, Truist Securities wrote on February 10, 2025 that: "We think this should help allay some concerns from investors worried about an 'air pocket' impacting revs due to a transition to Inspire V (either due to a building patient backlog, or coding frictions) as it seems that mgmt has a strategy in place to manage the new product."

353. UBS wrote on February 11, 2025 that it had updated its estimates "to reflect management's newly issued guidance" and "to reflect the now sustainable profitability profile and management's newly issued EPS guide of $2.10-$2.20."

354. On May 5, 2025, Inspire announced that it was "***maintaining***" its 2025 revenue guidance and "***increasing diluted net income per share guidance for the full year 2025 to between $2.20 to $2.30***" (up from $2.10 to $2.20). This guidance was reviewed and approved by Individual Defendants, including Defendant Herbert, who was quoted in the press release, and Defendant Buchholz, who signed the Form 8-K attaching the press release.

355. On an earnings call that same day, Defendant Herbert justified the maintained and increased guidance based on Inspire's purported "experience to-date" and providers that were "working through the launch process":

> Looking forward to the balance of 2025, ***we are reiterating our full year 2025 revenue guidance of $940 million to $955 million***, representing 17% to 19% growth year-over-year. Regarding profitability, we are increasing our full share diluted net income guidance to be in the range of $2.20 to $2.30 per share. As we initiate the full launch of the Inspire V system, we anticipate the second quarter will be a transition quarter as we work through the steps necessary to launch this system. For centers, this process includes a contract amendment, implementation of the new physician programmer and working through their Inspire IV inventory. ***Our***

> ***experience to-date with Inspire V system has been very positive and well received by healthcare providers***, especially with ENT surgeons. Since the start of the limited market release last year, we have continued to add additional centers and increased the number of patients receiving the new device. This led to an increased general awareness of the pending Inspire V launch. And late in the first quarter and continuing into the second quarter, we started to see evidence of patients waiting for the new device. Combining this with ***centers working through the launch process***, we expect the second quarter to be a transition quarter and for revenue to grow mid-to-high-single-digits sequentially. As the full launch of Inspire V system progresses, we expect a strong second half of 2025, and as such, we are reiterating our full year revenue guidance and raising our EPS guidance.

356. On the same call, Defendant Buchholz reiterated the guidance, stating that "our strong performance and business momentum provide us with confidence in our outlook for 2025."

357. In response to an analyst question asking whether the "CPT code" could "slow things down," Defendant Herbert again reaffirmed the guidance:

> ***[A]gain, we're reiterating our full year guidance.*** So we're going to work hard that the field and the physicians are excited for Inspire V. The contracting, as you recall, is quite simple because it's just a one page or multi-page, it's small contract amendment, just a changed from Inspire IV to Inspire V. So that should be pretty simplistic. And the new physician programmer, which was launched last year, most centers are ready to take on the new physician programmer. So the transition should not be that difficult. We're going to work very hard in the second quarter and – but we'll track that as we get into Q3. And Rick talked about the cadence for the second half of the year. As far as the linking to the ICD-10 or ICD-9 diagnostic code, we're already working with CMS to get that done. And as we mentioned before, we already have 80% of our 300 million covered lives that does include Medicare, that does include commercial payers, it does include the VA. And we have overcome that connection that you're talking about because we addressed that right upfront.

358. Analysts reacted positively to the reaffirmed revenue guidance and increased diluted net income per share guidance. For example, UBS wrote on May 6, 2025 that: "INSP also raised EPS guidance by $0.10 to $2.20 - $2.30 coming in ~4% ahead of consensus which we think serves as evidence that the positive leverage in this model remains underappreciated. Shares traded up mid-single digits in the after-market on the back of a solid print, upward EPS guidance revision, and confirmation of a timely Inspire V launch."

359. Defendants reiterated and increased this guidance despite mounting evidence by May 5, 2025 that SleepSync and CPT coding were headwinds to the Inspire V launch. For example, in March or April 2025, FE 3 spoke to his Regional Sales Manager about the SleepSync IT issues and learned that other territory managers were all having the same issues and were all frustrated. ¶¶151-52.

360. Inspire's chosen CPT code for Inspire V (64568) remained incorrect, still had not been approved by the MACs on a fully-aware and fair-shake basis, had not been approved by several large national commercial insurers (and had been expressly rejected by payors, including by Providence Health in January 2025), and at minimum, was subject to substantial risk and uncertainty that threatened the launch. ¶¶230, 264, 267, 350.

361. Yet, on August 4, 2025, Inspire downgraded the revenue and diluted net income guidance that it had reaffirmed and increased, respectively, in May 2025. Specifically, Inspire lowered: (i) its full year 2025 revenue guidance to $900 million to $910 million, down from $940 to $955 million; and (ii) its full year 2025 diluted net income per share guidance to $0.40 to $0.50**–** down from $2.20 to $2.30 per share, a decrease of ***78.2% to 81.8%***. On Inspire's earnings call the next day, Defendants explained that the two "predominant" "headwinds" had been the SleepSync programmer and CPT code 64568.

362. As alleged *supra* §§ IV.E, G, the problems with the SleepSync programmer and CPT code 64568 were not new problems that arose unexpectedly between May 5, 2025 and August 4, 2025 (or between January 13, 2025 and August 4, 2025). Rather, these problems were known to Defendants and misleadingly concealed from investors from the outset of the Inspire V launch, before Defendants first issued guidance for 2025 on January 13, 2025, before Defendants

reaffirmed and expanded that guidance on February 10, 2025, and before Defendants reaffirmed and increased that guidance on May 5, 2025.

363. Further, the two downgrades on August 4, 2025 illustrate the extreme (and previously undisclosed) sensitivity of Inspire's diluted net income per share guidance to changes in revenue. While Inspire's revenue guidance was reduced by only 4.2% to 4.7%, its diluted net income per share guidance was reduced by 78.2% to 81.8%. As a result of the sensitivity of the guidance, and the known headwinds related to SleepSync and CPT coding, Defendants knew that the guidance was baseless and unrealistic.

### I. The Company's Stock Price Declined in Response to Revelations Regarding the Adoption of SleepSync and CPT Code 64568

364. As discussed directly below, the truth was revealed through eight partial disclosures. *First*, on August 4, 2025 (after market close), Inspire surprised the market by revealing that non-adoption of the SleepSync programmer and CPT code 64568 were the two "predominant" "headwinds" to the Inspire V launch. The Company's stock price plummeted $42.04 per share (32.35%) the next trading day, and another $9.46 (10.7%) the following day.

365. *Second*, on September 3, 2025, Defendant Weatherby revealed that the adoption of SleepSync had continued to be a headwind into the third quarter of 2025. The Company's stock price dropped another $8.91 (9.4%).

366. *Third*, a series of partial disclosures originating from third parties in December 2025 and January 2026 revealed that Inspire V's use of CPT code 64568 was under "review" and then repudiated by the MACs and CMS. On December 15, 2025, *The Capitol Forum* reported that Inspire V's use of CPT code 64568 was under "review" by at least three MACs. Inspire's stock price dropped $11.42 per share (8.73%).

367. *Fourth*, after the close of trading on December 17, 2025, two MACs updated their relevant Billing and Coding Articles to remove CPT code 64568 as a possible code for hypoglossal nerve stimulation, with one explaining that code was "added in error," and on December 18, 2025, a third MAC told *The Capitol Forum* that it would do the same. On December 18, 2025, Inspire's stock price dropped another $23 per share (19.4%).

368. *Fifth*, on January 22, 2026, CMS confirmed that CPT code 64568 was "incorrectly added" as an indication for obstructive sleep apnea. Inspire's stock price dropped another $15.39 (15.99%).

369. *Sixth*, on February 11, 2026, Inspire stated that Inspire V implantation procedures must be coded as 64582-52 for Medicare, resulting in a 10-50% reduction in physician reimbursement, and that private insurers were likely to adopt that same coding as Medicare. Inspire's stock price dropped another $8.56 per share (12.55%).

370. *Seventh*, on March 17, 2026, Defendants revealed continued "challenges" with "reimbursement" and WISeR, including continued "confusion" about coding, "slowed or delayed procedures," and prior authorization denials and "delays and frustration" from WISeR, all of which was "impacting our business." Inspire's stock price dropped another $3.72 per share (6.32%).

371. *Finally*, on May 4, 2026, Inspire revealed that the American Hospital Association had recommended that facilities use CPT code 64999 for Inspire V procedures reimbursed by commercial insurers. Inspire further noted that 64999 is an "unlisted" code and thus that its use requires "additional supporting documentation, which may result in increased claims review and processing time." Further, Inspire revealed "delays due to the new WISeR requirements" for Medicare procedures" and "ongoing coding and reimbursement challenges." In response to this news, Inspire's stock price dropped another $6.59 per share (12.01%).

372. In the aggregate, in response to these partial disclosures, Inspire's stock price declined 77.6% from its Class Period high of $215.42 per share, representing a total decline of more than $4 billion in Inspire's market capitalization, and causing devastating losses to the Class.

### 1. August 4, 2025: Inspire Reveals that the Adoption of the SleepSync Programmer and CPT Code 64568 Are the Two "Predominant" "Headwinds" to the Launch of Inspire V

373. On August 4, 2025, after the close of trading, the Company issued a press release downgrading the revenue and diluted net income guidance that it had established, reaffirmed, and/or increased in the first half of the year. Inspire lowered: (i) its full year 2025 revenue guidance to $900 million to $910 million (from $940 to $955 million); and (ii) its full year 2025 diluted net income per share guidance to $0.40 to $0.50—down from $2.20 to $2.30 per share, a reduction of ***78.2% to 81.8%***.

374. In the press release, Defendant Herbert stated that the Inspire V's "U.S. commercial launch is progressing slower than expected, and the timeline to complete the full transition to Inspire V has been pushed forward, which will impact financial results for the year," citing "operational headwinds."

375. On an earnings call held an hour after the press release, Defendant Herbert provided "important context" on the "operational headwinds" referenced in the press release. The two "predominant" "headwinds" were the slow adoption of the SleepSync programmer and of CPT code 64568. Herbert stated:

> As the quarter progressed, we encountered certain headwinds that slowed our efforts to transition customers to Inspire V. … [W]e are disappointed with the elongated timeframe we now expect for the rollout ….
>
> I'd now like to provide some detail regarding the ***challenges faced during the quarter*** …. ***First***, in the second quarter, many centers did not complete the training, contracting, and onboarding criteria required prior to the purchase and implant of Inspire V. Specifically, ***implementation of SleepSync has been the most challenging step to accomplish***. Although not technically difficult, the approval

> process from our customers' IT departments has taken longer than expected. Additionally, some centers have been delaying implementing SleepSync until their first patients are scheduled to receive the Inspire V device. To increase the rate of implementation of SleepSync by our customers, we began and continued to leverage our technical teams. To date, we have completed the implementation at over 50% of the U[.]S[.] centers. With these technical resources fully engaged, we expect to complete the vast majority by the end of the third quarter.
>
> ***The second challenge related to adoption of CPT code 64568 for Inspire V for Medicare patients***. The approval of the code change was announced in April with a retroactive effective date of January 1, 2025. However, the software update for claims, submissions, and processing did not take effect until July 1. Thus, although traditional Medicare and Medicare Advantage patients could receive Inspire therapy, implanting centers would not be able to bill for those procedures until July 1. Given this dynamic, many centers continued to treat Medicare patients with Inspire IV.

376. On that same call, a Piper Sandler analyst asked for additional details on the "handful of different headwinds" that Inspire had identified. In response, Defendant Herbert stated that the "***two . . . predominant factors***" driving the revised guidance were (1) "the number of centers" that had not added "SleepSync to their systems to be able to use the Inspire V programmer" and (2) "the concern over billing Medicare."

377. These disclosures stunned analysts, who raised issues with management credibility. On August 4, 2025 and the following days, at least nine analysts downgraded their ratings and/or lowered their price targets for Inspire:

- Baird lowered its price target to $150 per share (from $236), stating that Inspire's disclosure concerning the SleepSync rollout and Medicare reimbursement updates "raises questions around market fundamentals."

- Jefferies lowered its price target to $160 per share (from $205) echoing management's disclosure about the delay in "SleepSync installation, which has faced IT approval delays" and "challenges related to CPT code 64568 adoption."

- JPMorgan lowered its rating to Neutral (from Overweight) and reduced its price target to $110 per share (from $195). JPMorgan wrote that that "it's frustrating to see a negative revision of this magnitude after original 2025E guidance was already framed as being conservative to reflect conservatism around Inspire V launch dynamics" and that in light of management's admissions "it's hard to underwrite management's expectations for a revenue reacceleration to above +12-13%."

- Lake Street Capital Markets lowered its price target to $150 per share (from $270) citing a need to "Reset[] Expectations" due to "Slower Than Anticipated Ramp With Inspire V" tied to "[i]mplementation friction tied to SleepSync IT approvals and the delayed ability to bill Medicare under the new CPT code (64568)."

- Morgan Stanley lowered its price target to $182 per share (from $200), citing the SleepSync and Medicare coding issues and stating that "the ***impact to trust*** [was] not inconsiderable (given ***at least some of these issues were perhaps notable ahead of time***)."

- Mizuho lowered its price target to $170 per share (from $215) describing Inspire's disclosures as "Everything But Kitchen Sink Hitting Biz" with "SleepSync remain[ing] a gating factor" and CPT code 64568 being a part of "the launch woes."

- Piper Sandler lowered its price target to $150 per share (from $233), noting that the "magnitude of the cut to both the top and bottom-line guidance" due to SleepSync and Medicare coding updates was a disappointment. Piper Sandler tied the issues together, noting that "some centers dragged their feet on getting the requisite SleepSync software installed (required for gen 5 programming) in part because [of the] Medicare [coding] issue."

- RBC lowered its price target to $180 per share (from $215). RBC described the announcement as "[t]he biggest surprise" and attributed it to "multiple factors" including "SleepSync" delays in implementation and "Medicare headwinds" related to code adoption.

- Truist Securities downgraded its rating to Hold (from Buy) and lowered its price target to $125 per share (from $190), citing uncertainty over the news and noting that it needed to figure out "what is truly transient vs. more structural," but highlighted the SleepSync adoption delay in detail: "SleepSync was a challenging step of the onboarding given delays in IT approvals and mgmt noted that some accounts are delaying the installations of SleepSync until patients are scheduled to receive I-5 further slowing the process."

- Wells Fargo lowered its price target to $101 per share (from $174). Wells Fargo similarly stated that the "magnitude of reduction was surprising" and attributed it first to "[m]any ctrs [being] slow to complete training, contract, SleepSync update, leading to most units sold in Q2 being Inspire IV."

378. On the first trading day following the press release and the earnings call, August 5, 2025, the Company's stock price dropped from the previous day's close by $42.04 (from a close of $129.95 on August 4, 2025 to $87.91 on August 5, 2025), a drop of 32.35%. The next day, the

stock declined another $9.46 or 10.7%. On August 5, 2025 alone, 10,973,600 shares of Inspire common stock were traded, by far the largest trading volume in Inspire's history since its IPO.

379. Despite the partial disclosures, Defendants continued to make misstatements about reimbursement and CPT coding, including the false and misleading statements that the Medicare issues were "***cleared up***" and "***cleaned up***" on July 1, 2025 and "***no longer a headwind***." Morgan Stanley, for example, agreed that "these impacts for INSP are transitory in nature."

**2. September 3, 2025: Defendant Weatherby Reveals that SleepSync Continued to be a Headwind**

380. Defendant Weatherby spoke at the Wells Fargo Healthcare Conference on September 3, 2025. In response to an analyst request for "update on the transition to Inspire V" since "the Q2 call," Weatherby stated:

> The third step, which I'll call the ***longest pole in the tent*** or rate limiting, was our SleepSync programmer. And that requires software to be downloaded within the health systems and was just taking longer and was the piece that was behind the other two requirements.
>
> During the call, we said that about 50% of our implanting sites had gone through the step of getting the SleepSync programmer installed or implemented. And today, we're closer to two-thirds. So, over 60%, closer to 65% of our implanting accounts that have gone through that step.

381. Defendant Weatherby's update revealed that the SleepSync adoption was proceeding worse than disclosed on August 4, 2025, when Defendant Herbert had stated that "we expect to complete the vast majority by the end of the third quarter." Wells Fargo noted Weatherby's statement that the SleepSync "programming" implementation was only 65%.

382. That day, Inspire's stock dropped from the previous day's close by $8.91 (from a close of $94.51 on September 2, 2025 to $85.60 on September 3, 2025), a drop of 9.4%. *Financial Content* reported on the 9.4% stock drop, explaining that Defendant Weatherby had "flagged multiple near-term headwinds, which spooked markets."

### 3. December 15, 2025: *The Capitol Forum* Reveals that the Use of CPT Code 64568 for Inspire V Is Not Settled But Rather Under "Review" by the MACs.

383. On Monday, December 15, 2025, *The Capitol Forum* revealed that the use of CPT codes 64568 for Inspire V was under "review" by at least three MACs: CGS, Palmetto, and WPS. At the time, those MACs were three of only four MACs with CPT code 64568 in their Billing and Coding Articles for Hypoglossal Nerve Stimulation for Obstructive Sleep Apnea. CGS and the fourth MAC, Noridian, had pulled the code from those Billing and Coding Articles on December 12 and December 8, 2025, respectively—only for CMS to "lift[] the edit" on December 15, 2025 at Inspire's request. *The Capitol Forum* published on-the-record quotations from CGS, Palmetto, and WPS. Inspire declined *The Capitol Forum*'s request for comment.

384. The revelation that the use of CPT code 64568 for Inspire V was under "review" by CGS, Palmetto, and WPS was inconsistent with Defendants' prior statements, for example, that Inspire "continues to validate" the coding with the MACs and that the MACs had been made "fully aware" and given a "fair shake at all the information."

385. *The Capitol Forum* quoted Palmetto's Chief Medical Officer as stating that Palmetto "is aware of the issue involving utilization of CPT codes 64568/64582 and the discrepancies in coding guidance amongst the MACs. This is currently under internal review with the goal of providing a consensus approach for appropriate billing and coding."

386. *The Capitol Forum* quoted CGS's spokesperson, who stated: "CGS is aware of the issue involving the use of CPT codes 64568/64582 and the discrepancies in the coding guidance in our article and those of the other MACs. We are currently doing an internal review of the billing and coding policy article to provide appropriate billing and coding information as well as a consensus approach with the other MACs on this issue."

387. *The Capitol Forum* quoted WPS's spokesperson, who stated: "WPS is aware of the discrepancies in coding guidance and the utilization of CPT codes 64568/64582 across MACs. This issue is undergoing internal review efforts as well as multi-jurisdiction MAC collaboration."

388. That day, the Company's stock price dropped $11.42 (from a closing price of $130.68 on December 12, 2025 to a closing price of $119.26 on December 15, 2025), or a drop of 8.73%, on elevated trading volume.

389. Analysts were concerned about the MACs' reviews, which indicated that the risk and uncertainty related to the use of CPT code 64568 for Inspire V was higher than previously understood. For example, on December 18, 2025, Piper Sandler wrote that it was "very surprised" to see that Noridian and CGS had "removed the use of CPT code 64568 from their billing/coding page for HGNS [hypoglossal nerve stimulation]," and stated that "we worry some that the reimbursement uncertainty/whipsawing could be a bit of a headwind to volumes until there's a concrete pathway forward." Piper Sandler further wrote: "Our understanding is that AMA (American Medical Association) determines coding (i.e., which device can use which code) and CMS determines the reimbursement amount. We can't recall any similar situations arising in our 10+ years covering the medical device space, such as this."

#### 4. December 18, 2025: Three MACs (Noridian, CGS, and Palmetto) Remove CPT Code 64568 from Their Billing and Coding Articles for Hypoglossal Nerve Stimulation for Obstructive Sleep Apnea

390. After the close of trading on December 17, 2025, Noridian and CGS's Billing and Coding Articles for Hypoglossal Nerve Stimulation for Obstructive Sleep Apnea were updated to remove CPT code 64568 from the list of approved Group 1 CPT codes. These removals represented the reinstatement, on CMS's website, of these MACs' prior edits (on December 8 and 12, 2025) that CMS had previously "lift[ed]" at the Company's request. Noridian stated in its update that CPT code 64568 had been "added in error."

391. On December 18, 2025, *The Capitol Forum* reported that a third MAC, Palmetto, would likewise be updating its Billing and Coding Article (which it did on January 1, 2026). Inspire again declined *The Capitol Forum*'s request for comment. After Noridian, CGS, and Palmetto's actions, the sole remaining MAC with CPT code 64568 in its Billing and Coding Article was WPS, which had already announced that the Inspire's use of the code was "undergoing internal review."

392. Noridian, CGS, and Palmetto's actions were inconsistent CPT code 64568 being the correct CPT code for the implantation of Inspire V and inconsistent with Defendants' prior statements, among others, that the MACs had approved Inspire's proposed coding after being made "fully aware" and after being given a "fair shake at all the information." As a result of that inconsistency, analysts were stunned by the MACs' actions in reports published that day and the following day.

- CFRA (Washington Analysis) wrote that the "error message reported by Noridian's revision history points to the code having been mistakenly re-listed under HGNS [hypoglossal nerve stimulation]" and that "using 64568 for HGNS procedures will be considered inconsistent with CPT hierarchy and CMS coding logic. …" CFRA expected that 64582's "lower reimbursed rate" would instead apply.

- Oppenheimer wrote "[w]e have a hard time envisioning MACs going rogue and making these changes in isolation," noted that Noridian and CGS's jurisdictions include Inspire's "top utilization sites," and stated that "[u]ncertainty" was "now through the roof" as the news affected "billing, inventory stocking, device pricing and sales outlook."

- Piper Sandler wrote that it was "very surprised to see these policy revisions" in light of Inspire's public statements (which Piper Sandler had credited) that Inspire had "carefully coordinated a transition to CPT code 64568" for the Inspire V "with both CMS and AMA."

- RBC reported that "INSP's stock is trading lower due to confusion [a]round billing codes and reimbursement."

- Truist Securities stated that the "MAC Flip Flop Adds Uncertainty to a Confusing Roller Coaster Coding Saga."

393. On December 18, 2025, Inspire's stock price declined by $23 (from a closing price of $118.27 on December 17, 2025 to a closing price of $95.27 on December 18, 2025), or a drop of 19.4%. That day, Inspire's trading volume was the second highest since its IPO.

394. Following the MACs' repudiation of the use of CPT code 64568 for Inspire V, the Company made misleading statements to analysts to the effect that the MACs' actions were improper. For example, the Company stated to RBC on December 18, 2025: "We are in close contact with CMS who issued very clear direction in their transmittal to the MACs to add the OSA diagnosis code G47.33 to be billed again with 64568 at the request of Inspire which was the only company to have a device on the market at that time for the treatment of OSA with one lead."

395. Certain analysts credited Inspire's statement that the MACs' actions were improper and believed, based on Inspire's statements, that CPT code 64568 would be reinstated for Inspire V. RBC said, "We believe INSP is currently getting further clarity from CMS on the reasons driving this confusion and a path forward." Further, Piper Sandler wrote that it was "optimistic" that CMS would amend its policies such that "CPT Code 64568" would be "reinstated." Truist Securities predicted that the MACs would "eventually have to follow CMS guidelines."

#### 5. January 22, 2026: CMS Reveals that CPT Code 64568 Was "Incorrectly Added" as a Covered Indication for Obstructive Sleep Apnea and that MACs "Will Adjust Affected Claims"

396. In its *MLN Connects Newsletter* dated January 22, 2026, CMS published the following update under the heading "Claims, Pricers & Codes":

> Vagus Nerve Stimulation National Coverage Determination: Removing National Edit for Diagnosis Code G47.33
>
> CMS ***incorrectly added*** ICD-10 diagnosis code G47.33 (Obstructive Sleep Apnea) as a covered indication for CPT code 64568 under National Coverage Determination (NCD) 160.18. This NCD is ***specific to vagus nerve stimulation*** for medically refractory partial onset seizures for whom surgery is not recommended or for whom surgery has failed and treatment-resistant depression. It is ***unrelated to obstructive sleep apnea***; coverage of this diagnosis code falls under your

Medicare Administrative Contractor's (MAC's) discretion and isn't mandated by the NCD. . . .

***Your MAC will adjust affected claims***.

397. In reports published that day and the following days, analysts widely viewed the CMS update as unexpected, negative news:

- Jefferies lowered its price target for Inspire to $81 per share (reduced from $100), explaining that "today's CMS clarification increases the likelihood of broader MAC pushback on OSA coverage under code 64568 and consequently reduces potential for ASP-related upside to INSP guide and street estimates."

- J.P. Morgan predicted that Inspire V would revert "to the old 64582 that Inspire 4 was billed under."

- Oppenheimer reduced its rating to Perform (from Outperform) and stopped providing a price target (previously $175 per share) because of CMS's revelation that "it incorrectly added Obstructive Sleep Apnea [OSA] as a covered indication under the vagus nerve stimulation NCD." Oppenheimer understood that, with CMS's announcement, "[l]ogic dictates that most claims" made under 64568 "should get denied." Oppenheimer further wrote that the addition of "modifier 52" to 64582 was possible, and if that coding prevailed, the use of 64582-52 would "end[] up being net negative" for Inspire's revenue prospects.

- RBC reduced its rating to Perform (from Outperform) and lowered its price target to $90 (from $175), noting that "revised CMS guidance puts INSP in a precarious position with respect to its commercial strategy that is likely to impact utilization."

- Truist Securities reduced its rating to Hold (from Buy) and lowered its price target to $96 per share (from $120), assessing that "[i]n a best case this essentially puts INSP back to the 'status quo' position that existed before the 11/20 CMS coding update" and that "a less favorable (than status quo) case INSP potentially could be worse off than it was prior to the late Nov. coding update."

398. On January 22, 2026, Inspire's stock price declined by $15.39 per share (from a closing price of $96.20 on January 21, 2026 to a closing price of $80.81 on January 22, 2026), or a drop of 15.99%, on elevated trading volume.

399. Despite CMS's action, Inspire made misleading statements to analysts to the effect that the correct coding for Inspire V remained unresolved. For example, the Company stated to RBC on January 26, 2026 that it "'will provide an update' on reimbursement at [its] Q4'25

earnings call that is scheduled for 2/11" and that it "continue[s] to work with the relevant stakeholders around different aspects of reimbursement."

### 6. February 11, 2026: Inspire Reveals that Providers Must Use CPT Code 64582 with Downward Modifier -52 for Inspire V and that Creating a New CPT Code Will Take Until 2028

400. On February 11, 2026 after the close of trading, Inspire finally revealed that Inspire V should be coded to CPT code 64582-52 for Medicare claims. Its press release stated:

> "In the last week, we received clarification regarding the coding that should be used for the Inspire V procedure. Currently, healthcare centers and physicians should bill the most recent healthcare policies, be it a Medicare Administrative Contractor (MACs) or a commercial payor, and based on this clarification, we believe ***the code will transition to CPT code 64582 for the Inspire V procedure, including the use of a -52 modifier,"*** continued Mr. Herbert. "While we are disappointed with this result, this clarification provides direction for us going forward, and we will work with payers, including the MACs, government agencies, commercial payers and physician societies to attempt to minimize the impact to the physician fee from this change. Additionally, ***we are seeking a long-term solution, namely the creation of a separate CPT code that would support appropriate reimbursement for the Inspire V procedure***.

401. Later that day, the Company held an earnings call. In prepared remarks on the call, Defendant Herbert stated:

> The ***key challenge for our business*** since late last year is, of course, the coding of the Inspire V procedure. A few weeks ago, at an investor conference, we shared that we were actively engaging with key government agencies and physician societies regarding the use of CPT code 64568 versus CPT code 64582 with a -52 modifier for the Inspire V procedure. In the last week, we received clarification regarding the coding that should be used for the Inspire V procedure.
>
> Currently, healthcare centers and physicians should bill the most recent healthcare policies, be it a MAC, or a commercial payer. Based on the clarification, we believe the code will transition to CPT code 64582 for the Inspire V procedure, including the use of a -52 modifier.
>
> We estimate that the reduction to the professional fee associated with applying the -52 modifier could range from approximately ***10% to 50%*** of the base rate. The actual reduction may vary by MAC, and we will not know the precise impact until sufficient claims data have been submitted and processed across payers.

> In any case, we believe that a significant decrease in the professional fee resulting from use of the -52 modifier will likely influence physicians' willingness to perform the Inspire V procedure and may limit the number of cases they choose to undertake. …
>
> Given this dynamic reimbursement landscape, we have revised and widened our full year revenue guidance for 2026 to reflect the broad range of possible impacts that we may experience throughout the year. Over the long-term, we will be focused on developing a new CPT code.

402. After Herbert's remarks, Matt Osberg, Inspire's current CFO, stated:

> Turning to our 2026 outlook, we are revising our full year revenue outlook to be in the range of $950 million to $1 billion, representing 4% to 10% growth. This range reflects the expected impact on our first quarter from coding uncertainty, as well as the range of outcomes that exist by adopting CPT code 64582 with the -52 modifier, and the related physician reimbursement rates for the full year.
>
> The low end of our outlook contemplates a 50% discount to the physician fee, while the high end of our outlook contemplates a 10% discount.

403. In response to an analyst question, Defendant Herbert further stated: "we do believe that [commercial payors] will transition over to code 64582 and likely to include the -52 modifier."

404. In reports published that day and the following day, analysts widely viewed the Company's use of CPT code 64582-52 for Inspire V as unexpected, negative news.

- Baird downgraded its rating to Neutral (from Outperform) and lowered its price target to $74 per share (reduced from $130), noting that recent reimbursement developments had given it "little confidence in a clearer path forward" into future Inspire V utilization and new account growth.

- Jefferies lowered its price target to $66 per share (reduced from $81), writing: "INSP has decided to use CPT code 64582 (dedicated Inspire 4 code) for Inspire 5 + a modifier to reflect reduced services, which mgmt expects could reduce the pro fee ($723 national average) by 10%-50% depending on the MAC."

- JPMorgan reduced its price target to $67 per share (reduced from $118), describing the "Reimbursement Cuts" disclosure about the "-52 [downward] modifier" as a "disappointing update."

- Mizuho lowered its price target to $85 per share (reduced from $130), referring to the guidance reduction as "steep" given the "2026 CMS decision to not allow Inspire-5 (I5) to bill under the existing vagus stimulation code. …"

- RBC lowered its price target to $68 per share (down from $90) and called the guidance revision due to "Coding Headwinds" the "biggest surprise."

- Truist Securities lowered its price target to $70 per share (from $96), citing "Incr[eased] Reimbursement Headwinds & Need for New Code."

- UBS lowered its price target to $67 per share (from $89) citing "reimbursement [u]ncertainties [p]os[ing] [i]ncreased [u]ncertainty in [p]hysician [w]illingness to [i]mplant."

- Wells Fargo downgraded Inspire to Equal Weight (from Overweight) and lowered its price target to $70 per share (from $145), citing "significant continued uncertainty" over physician reimbursement.

- Wolfe Research downgraded its rating to Peer Perform (from Outperform) and stopped reporting a price target (previously $180 per share), while noting that the news would go down "in the med tech coding and payment hall of shame."

405. On February 12, 2026, Inspire's stock price declined by $8.56 per share (from a closing price of $68.21 on February 11, 2026 to a closing price of $59.65 on February 12, 2026), or a drop of 12.55%, on elevated trading volume.

#### 7. March 17, 2026: Inspire Reveals Continued "Challenges" with Reimbursement and WISeR that Are "Impacting Our Business"

406. On March 17, 2026, at approximately 1:30pm, Defendant Herbert and Inspire CFO Matt Osberg appeared at a KeyBanc Healthcare Forum event. In response to a request from a KeyBanc analyst for an "update" on "reimbursement dynamics," Herbert revealed that continuing reimbursement issues "created confusion amongst the centers and physicians and many have slowed or delayed procedures as a result." Herbert also revealed that "we had a little bit of challenges with the coding aspect" as part of CMS's WISeR pilot program (*see supra* § IV.G.6 ), which had resulted in prior authorization denials and "caused delays and frustration for the centers in those six states" that are subject to the WISeR pilot program.

407. In response to the same question, CFO Osberg added that "clearly these things are impacting our business in the first quarter" and that "we're going to bake that into our forecasting process as we think about the rest of the year."

408. Herbert further stated that Inspire was now directing providers to "bill CPT 64582 without modification" for Inspire V and that Inspire was asking the MACs "to make a statement as well to clarify" that "CPT 64582 without a modifier" was correct for Inspire V. Herbert noted too that the new "C-code" for Inspire V (*see supra* ¶¶315-16) was expected to "map to the same Level 5 APC and CPT 64582. …" Herbert stated: "Once the C-codes are in place, do we expect that the commercial payers will eventually transition over? Probably."

409. Herbert's statements further revealed the falsity of his prior statements, among others, that CPT code 64568 "accurately describes" and "appropriately reflects" the Inspire V implantation procedure.

410. Herbert further stated that the Company's "new CPT code application" had been submitted to the AMA, was on the agenda for the May 1, 2026 AMA meeting, and if approved, would not be available until January 1, 2028.

411. KeyBanc viewed Inspire's statements at the KeyBanc Healthcare Forum as further unexpected, negative news. KeyBanc wrote on March 18, 2026 that the -52 modifier "remains a source of uncertainty for centers" and that "we think it is fair to assume most commercial payers will eventually conform with the new CMS C-Codes."

412. On March 17, 2026, Inspire's stock price declined by $3.72 per share (from a closing price of $58.87 on March 16, 2026 to a closing price of $55.15 on March 17, 2026), or a drop of 6.32%.

413. RBC wrote on April 13, 2026: "We believe investor sentiment is negative going into Q1 and the balance of the year due to lack of visibility into the business as the coding dynamics unfold not only with CMS, but to be followed by payers on the commercial side later this year; potential WISER impact around over utilization; and ***lack of management credibility*** due to a series of misses on key Inspire V milestones."

### 8. May 4, 2026: Inspire Reveals that the American Hospital Association Recommends CPT Code 64999 for Inspire V and that Coding and Reimbursement Adversely Affected Inspire's Q1 2026 Revenue and Would Continue to Adversely Affect Revenue Through 2026

414. On May 4, 2026, following the close of trading, Inspire filed its Quarterly Report on Form 10-Q for Q1 2026, filed a press release on Form 8-K, and hosted earnings calls with analysts.

415. Inspire's May 4, 2026 10-Q revealed that: (i) in April 2026 the American Hospital Association "recommended use of CPT code 64999 for Inspire V commercial cases[,]" an "unlisted code" that requires "additional supporting documentation, which may result in increased claims review and processing time"; (ii) "coding and reimbursement decisions (particularly the uncertainty of the decisions and volatility of the announcements from multiple stakeholders) have adversely impacted our revenue in the first quarter" and were expected to "continue to adversely impact revenue during 2026"; and (iii) Inspire "experienced delays" due to the WISeR program, "which adversely impacted our revenue in the first quarter" and was expected to "continue to adversely impact revenue for the remainder of 2026."

416. Inspire's May 4, 2026 8-K revealed that: (i) "coding and reimbursement uncertainty that arose at the beginning of the year" caused "disruption"; (ii) CPT code 64568 used in "2025 is no longer available for reimbursement of Medicare cases"; (iii) Q1 2026 revenue was reduced by "the adverse effects of reimbursement disruption and the Wasteful and Inappropriate Service

Reduction (WISeR) program"; (iv) Defendant Herbert expected "the challenges caused by this uncertainty to persist through the balance of 2026"; and (v) the Company was reducing its 2026 revenue guidance to $825-875 million, "which represents a decline of 4% to 10% compared to 2025."

417. On the May 4, 2026 call, Defendant Herbert stated:

> [C]oding uncertainty has ***adversely impacted*** the number of patients in the pipeline, including the number of prior authorizations submitted to commercial payers as we moved through the first quarter. … During the first quarter, the WISeR program created prior authorization of delays for traditional Medicare procedures in the six WISeR states, resulting in a ***headwind to our first quarter revenue***. … ***With the ongoing coding and reimbursement challenges and the WISeR program impact, we are revising our full year revenue outlook***.

418. On the same call, Inspire's new CFO Matt Osberg stated that the reduced revenue guidance "incorporates updated assumptions of the expected impact on our full year results from continued coding and reimbursement uncertainty in the WISeR program."

419. In response to an analyst question, Osberg stated that "the main part of the revenue take down in our outlook is due to the reimbursement headwinds."

420. In reports published that day, analysts viewed Inspire's disclosures as unexpected, negative news. JP Morgan wrote that "coding and reimbursement uncertainty" and "continued disruption from the WISeR pilot program" were "challenges" that "have wound up [to be] more disruptive than expected." Key Bank wrote that "[s]lower than expected INSP V product transition continues to weight on [net] revenue growth trends" as "possible impacts associated with CPT coding changes" was one of the leading "Investment Risks" investors should be aware of.

421. In response to the news, several analysts downgraded their price targets and/or ratings of Inspire common stock:

- Bank of America went even further. After first downgrading its rating and price target from Buy to Neutral and $120 to $53, respectively, on May 5, 2026, in reaction to the

company's May 4, 2026 announcements, on May 22, 2026, Bank of America further downgraded Inspire even further to underperform and its price target from $53 to $39, stating, after additional analyses, "until there's an official code for Inspire V, which is at best Jan 1, 2028," providers lacked "a smooth and consistent coding pathway," putting the company's future financial estimates at risk.

- Jefferies downgraded Inspire's price target to $50 from $62 per share, echoing management's disclosure that "coding and reimbursement challenges negatively impacted 1Q by $20MM."

- Relatedly, Piper Sandler downgraded Inspire from Overweight to Neutral, citing "the ongoing reimbursement uncertainty."

- Leerink Partners downgraded its Price Target to $52 per share from $78, noting "[w]e came away from the 1Q26 print incrementally cautious on INSP . . . due to reimbursement uncertainty and impact from WISeR."

- Mizuho Securities downgraded Inspire's price target to $55 from $70 due to "CMS coding + WISeR program accelerat[ing] delays near-term."

## V. POST-CLASS PERIOD DEVELOPMENTS

422. On May 15, 2026, the AMA CPT Editorial Panel made public a "Summary of Actions" taken at its May 2026 meeting (held on April 30-May 2, 2026). "Tab 12" of the agenda for that meeting was a proposal to revise CPT Code 64568 (and 64569 and 64570) "to exclude hypoglossal nerve and add parentheticals under each code to refer to the appropriate hypoglossal nerve codes (64582, 64583, 64584)." According to the Summary of Actions, that proposal was "accepted," with an effective date of January 2027.

423. "Tab 13" of the agenda for that meeting was a proposal, supported by Inspire, to create a new CPT code "for the implantation of a single lead hypoglossal nerve neurostimulator electrode array and pulse generator." According to the Summary of Actions, that proposal was "REJECTED."

424. In other words, the May 2026 AMA CPT Editorial Panel confirmed that the use of CPT code 64568 for Inspire V is incorrect and declined the request, supported by Inspire, for a new CPT code specific to the implantation of Inspire V.

425. The materials submitted to the AMA CPT Editorial Panel and the discussion at the May 2026 meeting are not publicly available, but they are known to Inspire and to Defendant Herbert.

426. At the Bank of America Securities Healthcare Conference on May 13, 2026, an analyst asked Herbert for "color on what happened" at the May 2026 meeting, and Herbert responded tersely: "We were certainly there. We presented. They asked the normal questions, we think. And then they took a vote."

427. Herbert's refusal to elaborate on what happened at the meeting suggests—as do the Summary of Actions, made public two days later—that the discussion at the meeting is inconsistent with the truth of Defendants' prior statements about coding.

## VI. THE RULES GOVERNING CPT CODING THAT APPLY TO INSPIRE'S INCORRECT USE OF CPT CODE 64568 FOR INSPIRE V

### A. Background on Medicare

428. Medicare is a federal health insurance program established in 1965 that primarily insures persons 65 and older. Today, Medicare is administered by the Centers for Medicare & Medicaid Services ("CMS"), a federal agency within the United States Department of Health and Human Services ("HHS"). Medicare is divided into four parts (A, B, C, and D). Most relevant here are Part B, which includes reimbursement for facilities for outpatient services (both hospital outpatient and ambulatory surgical centers) and reimbursement for physicians, and Part C (Medicare Advantage).

#### 1. Medicare Administrative Contractors (MACs)

429. Since the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Part B claims have been processed by private Medicare Administrative Contractors

("MACs"). For Part B claims, during the Class Period, there were seven MACs, covering the following territories listed in order of estimated Medicare Part B Beneficiaries:

| **MAC** | **Territory** | **Approx. Medicare Part B Beneficiaries** |
|---|---|---|
| Novitas Solutions ("Novitas") | AR, CO, DC, DE, LA, MD, MS, NJ, NM, OK, PA, TX | 8.1 million |
| Noridian Healthcare Solutions ("Noridian") | AL, AZ, CA, HI, ID, MT, ND, NV, OR, SD, UT, WA, WY (and Guam, Northern Marianas Islands, and American Samoa) | 7.1 million |
| National Government Services ("NGS") | CT, IL, ME, MA, MN, NH, NY, RI, VT, WI | 6.1 million |
| Palmetto GBA ("Palmetto") | AL, GA, NC, SC, TN, VA, WV | 4.9 million |
| Wisconsin Physicians Service ("WPS") | IA, KS, MO, NE, IN, MI | 3.3 million |
| First Coast Service Options ("FCSO") | Florida (and Puerto Rico and U.S. Virgin Islands) | 2.4 million |
| CGS Administrators ("CGS") | KY, OH | 1.6 million |

430. The Medicare statute defines coverage by standards such as "reasonable and necessary." 42 U.S.C. § 1395y(a). Coverage decisions for Part B claims are made in the first instance by the MACs, subject to administrative and judicial review. *See* 42 U.S.C. §§ 405(g), 1395ff(b)(1)(A), 1395kk-1(a)(4)(A); 42 C.F.R. §§ 405.904, 405.920.

431. Coverage is further defined by rulemaking, specifically National Coverage Determinations ("NCDs") issued by CMS and Local Coverage Determinations ("LCDs") issued by each MAC. *See* 42 U.S.C. §§ 1395ff, 1395kk-1(a)(1), (4), 1395y(l)(6)(A), 42 C.F.R. § 405.1060(a). NCDs are binding at all levels of the administrative review process, while LCDs are binding at the lowest level of administrative review and entitled to "substantial deference" at higher levels of administrative review. *See* 42 U.S.C. § 1395ff(c)(3)(B)(ii)(II); 42 C.F.R. §§ 405.968(b)(2)-(3), 405.1060(a)(4), 405.1062(a)-(b). CMS must follow notice-and-comment to

adopt NCDs, 42 U.S.C. § 1395y(l)(3), while LCDs do not require notice-and-comment, *Agendia, Inc. v. Becerra*, 4 F.4th 896 (9th Cir. 2021).

### 2. CMS and MAC Coding Guidance

432. "An NCD does not include a determination of what code, if any, is assigned to a particular item or service covered under Medicare or a determination of the amount of payment made for a particular item or service." 42 C.F.R. § 405.1060(a)(2). Likewise, "[a]n LCD does not include a determination of which procedure code, if any, is assigned to a service or a determination with respect to the amount of payment to be made for the service." 42 C.F.R. § 400.202.

433. Instead, CMS provides coding guidance to MACs in Transmittals or Change Requests, which CMS publishes in its *Medicare Learning Network* (MLN) or *MLN Connects* newsletter. CMS Change Requests do not require notice-and-comment to issue, amend, or withdraw. MACs provide coding guidance in Local Coverage Articles (LCAs), generally and as relevant here in Billing and Coding Articles. LCAs, including Billing and Coding Articles, do not require notice-and-comment to issue, amend, or withdraw.

434. There is no NCD for hypoglossal nerve stimulation or obstructive sleep apnea. Coverage for vagus nerve stimulation is addressed in NCD 160.18. Each MAC has an LCD for hypoglossal nerve stimulation for obstructive sleep apnea and a Billing and Coding Article for hypoglossal nerve stimulation for obstructive sleep apnea.

435. CMS and MAC billing guidance describe procedures using Healthcare Common Procedure Coding System (HCPCS) codes. HCPCS codes include both: (1) Current Procedural Terminology Codes, which are defined by the AMA, specifically the CPT Editorial Panel (also called HCPCS Level I codes); and (2) "A-V" codes, which are created and maintained by CMS (also called HCPCS Level II codes). HCPCS Level II codes are temporary and are typically used

while the process of creating a new CPT code is underway; HCPCS Level II codes starting with the letter "C" (or C-codes) describe outpatient procedures.

436. CMS and MAC billing guidance describe diagnoses using International Classification of Diseases, 10th Revision ("ICD-10") diagnostic codes. ICD-10 diagnostic codes are defined by the World Health Organization (WHO).

437. Medicare Advantage (or Part C) includes private health insurance plans that generally replace traditional Medicare (Parts A and B), with the exception of some carved-out services that remain covered by traditional Medicare. Medicare pays the private plan operator a fixed payment for each enrollee, and the Medicare Advantage plan must cover all traditional Medicare services.

438. Medicare Advantage plans can also provide additional coverage beyond traditional Medicare. In the absence of a plan provision providing additional coverage, Medicare Advantage plans generally follow the written coverage and coding policies of CMS and the relevant MAC for their location, including the MAC's Billing and Coding Articles (or the policies of a chosen MAC, if a Medicare Advantage plan spans multiple MAC jurisdictions).

439. Other private health insurers make their own coverage and coding decisions, but they often are influenced by Medicare coverage and coding decisions and likewise make use of CPT codes (or other HCPCS codes), and ICD-10 diagnostic codes.

### 3. Medicare Claim Forms

440. Medicare claims must be submitted on designated forms, drafted in conformity with CMS and MAC rules. Those forms and rules require surgical procedures to be accurately described using correct CPT codes (or other HCPCS codes) and incorporate by reference certain instructions, such as the National Uniform Claim Committee (NUCC) Instruction Manual, which also require surgical procedures to be accurately described using correct CPT codes (or other HCPCS codes).

441. The CPT codes, in turn, include and incorporate by reference accompanying instructions published by the AMA, including the AMA's *Professional CPT Coding Manual* and the AMA's *CPT Assistant*. For example, the AMA's *Professional CPT Coding Manual* requires providers to select a CPT code that "accurately identifies" the procedure and prohibits providers from selecting a CPT code that "merely approximates" the procedure:

> Select the CPT code of the procedure or service that accurately identifies the procedure or service performed. Do not select a CPT code that merely approximates the procedure or service provided. If no such specific code exists, then report the procedure or service using the appropriate unlisted procedure or service code. When using an unlisted code, any modifying or extenuating circumstances should be adequately and accurately documented in the medical record. Furthermore, all the language within a code descriptor should be assessed when selecting the appropriate procedure or service. This includes information directly in the descriptor that may be enclosed in parentheses.

442. The AMA's *Professional CPT Coding Manual* further provides that:

> When reporting codes for services provided, it is important to assure the accuracy and quality of coding through verification of the intent of the code by use of the related guidelines, parenthetical instructions, and coding resources, including CPT Assistant and other publications resulting from collaborative efforts of the American Medical Association with the medical specialty societies (ie, Clinical Examples in Radiology).

443. HHS has adopted "Current Procedural Terminology, Fourth Edition (CPT-4), as maintained and distributed by the American Medical Association" as a "medical data code set," 45 C.F.R. § 162.1002(a)(5), which Medicare claims are required to use.

444. CMS's *Medicare Claims Processing Manual* also requires the use of accurate CPT codes.

445. Private insurers also generally require the accurate use of CPT codes for claims.

### 4. Processing of Medicare Claims

446. Medicare claims, both paper and electronic, pass through a series of automated checks. Claims that pass the automated checks are known as "clean" claims, and clean claims are

paid within 14 to 30 days, subject to a right of post-payment review. Un-clean claims are not paid within 30 days. They are either automatically rejected or flagged for further pre-payment review.

447. Among other things, as relevant here, a "clean" claim must have a permissible combination of ICD-10 diagnosis code and CPT code (or other HCPCS code). These checks are known as "diagnosis-to-procedure edits."

448. In general, and as relevant here, the permissible diagnosis-to-procedure combinations are set forth in the Billing and Coding Articles of the MACs.

449. Even if a Medicare claim is "clean," and even after payment, claims remain subject to post-payment review. 42 C.F.R. § 405.800 *et seq.*

450. A MAC may reopen a claim within one year for any reason, within four years for "good cause," and at any time for fraud. 42 C.F.R. § 405.980.

### B. CPT Codes 64568 and 64582, Modifier -52, and "Unlisted" CPT Codes Such as 64999

#### 1. 64568 (Vagus or Other Cranial Nerve Stimulator)

451. The procedure description for CPT code 64568 is: "*Open implantation of cranial nerve (eg, vagus nerve) neurostimulator electrode array and pulse generator*."

452. The AMA CPT Editorial Panel created CPT code 64568 in 2010, effective January 1, 2011. At inception, only a single FDA-approved device used CPT code 64568: a vagus nerve stimulator for treatment of drug-resistant epilepsy manufactured by Cyberonics, Inc. (now known as LivaNova), which received FDA approval in 1997.

453. The relative value units ("RVUs") for CPT code 64568 are based on an AMA survey of implantation procedures for vagus nerve stimulators. In November 2010, CMS assigned CPT code 64568 to APC 0318 (Implantation of Cranial Neurostimulator Pulse Generator and

Electrode) for 2011. That APC was renamed Level 4 Neurostimulator for 2015 and renumbered 5464 for 2016. For 2021, CPT code 64568 was reassigned to APC 5465 (Level 5 Neurostimulator).

454. Inspire claims to have used CPT code 64568 for Inspire II from 2014 to 2018 and for Inspire IV from 2018 to 2021—which was prior to the creation of CPT code 64582 effective 2022. As of Inspire's IPO in May 2018, the Company said it was using CPT code 64568. To the extent Inspire used 64568 during this prior period, it "always had challenges."

455. As depicted in the following graphic, on varying dates between 2019 and 2021, the MACs adopted Billing and Coding Articles for Hypoglossal Nerve Stimulation for Obstructive Sleep Apnea that recognized the use of CPT code 64568. In late 2021 and early 2022, effective January 1, 2022, all seven MACs revised their Billing and Coding Articles for Hypoglossal Nerve Stimulation for Obstructive Sleep Apnea to remove CPT code 64568 and to replace it with the newly created CPT code 64582. As two of the MACs explained: "CPT code 64568 is no longer used for hypoglossal nerve stimulator due to development of specific CPT codes for this technology," specifically "64582."




456. After the creation of CPT code 64582 effective 2022, the AMA revised the description of CPT code 64568 and "incorporated into illustrations included in the CPT 2022 code set for visual instruction, including the illustration entitled 'Implantation Neurostimulator Electrodes, Cranial Nerve (Vagus Nerve Stimulation).'" AMA, *CPT Assistant*, Vol. 32, No. 3 (Mar. 2022).

457. The added graphic depicts a "Vagus Nerve Stimulation" device and specifically labels its connection to the "Vagus nerve":




458. During 2025, as discussed *supra* ¶¶250, 256, five of the seven MACs restored CPT code 64568 to their Billing and Coding Articles for varying periods, ranging from days to months.

459. By December 24, 2025, all five of those MACs had removed the code again.

460. Some MACs removed the code retroactively to January 1, 2025 or January 1, 2022.

461. From December 24, 2025 to present, no MAC has included CPT code 64568 in its relevant Billing and Coding article.

**2. 64582 (Hypoglossal Nerve Stimulator)**

462. The procedure description for CPT code 64582 is: "*Open implantation of hypoglossal nerve neurostimulator array, pulse generator and distal respiratory sensor electrode or electrode array*."

463. From 2020 to 2022, Inspire worked closely with a physician specialty association, the American Academy of Otolaryngology-Head and Neck Surgery ("AAO-HNS," or the "Academy"), to create a family of CPT codes specific to hypoglossal nerve stimulation. Otolaryngology surgeons, also known as Ear, Nose, and Throat ("ENT") surgeons, are the doctors that implant the Inspire devices in patients.

464. The Company and the Academy thus had a shared interest in the highest possible level of reimbursement. Inspire has a long-standing relationship with the Academy, providing financial support and technical information. In August 2025, Inspire and the Academy formalized their relationship by signing a "Corporate Champions Partnership," but the relationship dates back to at least the time period when the hypoglossal-specific CPT codes were created.

465. According to the Academy, "the lack of a dedicated CPT code" for the implantation of a hypoglossal nerve stimulation device "created reimbursement obstacles at many institutions."

466. In an explanation published shortly after the CPT Editorial Panel decision, Academy explained that the new, hypoglossal nerve stimulation-specific codes were created because CPT code 64568 was "originally created for other stimulators and are also used to define placement of stimulators on other nerves, most commonly the vagus nerve."

467. The Academy's code creation request for hypoglossal nerve stimulation-specific codes was approved by the AMA CPT Editorial Panel during a virtual meeting in October 2020. The Panel created three placeholder codes (645X1, 645X2, and 645X3) corresponding to the implantation, revision or replacement, and removal of a hypoglossal nerve stimulation device.

468. In its proposed rule dated July 23, 2021, CMS adopted those placeholder codes and proposed relative value units (RVUs) to them, and in its final rule dated November 16, 2021, CMS adopted three corresponding CPT codes (64582, 64583, and 64584) and assigned them to Ambulatory Payment Classifications (APCs) for reimbursement purposes. 64582 was assigned to APC 5465 (Level 5 Neurostimulator), which resulted in an initial facility payment rate of approximately $30,208.51. The hypoglossal nerve stimulation-specific CPT codes (including 64582) became effective for Medicare reimbursement on January 1, 2022.

469. When CPT code 64582 was created, Inspire IV was the only FDA-approved hypoglossal nerve stimulation device on the market.

470. As noted above, in late 2021 and early 2022, effective January 1, 2022, all seven MACs revised their Billing and Coding Articles for Hypoglossal Nerve Stimulation for Obstructive Sleep Apnea to remove CPT code 64568 and to replace it with the newly created CPT code 64582. CPT code 64582 has remained in those Billing and Coding Articles continuously since then and has never been removed.

**3. Modifier -52 (Reduced Services)**

471. Modifiers are used to describe services or procedures that have been altered relative to the description in the base CPT code (or other HCPCS code). There are dozens of modifiers, which are listed in Appendix A of the AMA *Professional CPT Coding Manual*. Level I CPT modifiers have two numeric digits, and Level II HCPCS modifiers have two alphanumeric characters. The CPT Manual states that "[a] modifier provides the means to report or indicate that a service or procedure that has been performed has been altered by some specific circumstance but not changed in its definition or code. Modifiers may be used to indicate to the recipient of a report that: … A service or procedure was increased or reduced."

472. Modifier -52 is a Level I CPT modifier. Its description reads:

> Reduced Services: Under certain circumstances a service or procedure is partially reduced or eliminated at the discretion of the physician or other qualified health care professional. Under these circumstances the service provided can be identified by its usual procedure number and the addition of modifier 52, signifying that the service is reduced. This provides a means of reporting reduced services without disturbing the identification of the basic service.

473. As explained *supra* (¶290), the correct physician coding for Inspire V during the Class Period was 64582-52. The use of the -52 modifier would have reduced physician reimbursement by 10-50% (relative to CPT code 64582), at the MACs' discretion.

474. In February 2026, the Executive Board (EB) of the CPT Editorial Board discussed the coding for a "hypoglossal neurostimulator device that does not include implantation of a distal respiratory sensor" and concluded that 64582-52 is the "most appropriate option" and "best available coding option."

475. The EB further concluded that no new guidance in the *CPT Assistant* was necessary because its conclusion was "consistent with existing CPT guidance." The EB wrote:

> Based on the current CPT code descriptors and published guidance, the EB believes that CPT code 64582, reported with modifier 52, remains the most appropriate option for describing this specific procedure at this time. As this approach is consistent with existing CPT guidance, the EB did not recommend issuing additional guidance through CPT Assistant. … In the absence of a distinct CPT code describing a single-lead hypoglossal neurostimulator device, the EB agreed that reporting CPT code 64582 with modifier 52 represents the best available coding option under the current code set.

#### 4. Unlisted CPT Codes Such as 64999 (Under Other Procedures of the Nervous System)

476. As noted above, the AMA's *Professional CPT Coding Manual* prohibits the use a CPT code that "merely approximates" a medical procedure and instructs physicians to report procedures using an "unlisted procedure or service code" if no "specific code exists." There are a variety of unlisted CPT codes, corresponding to each subsection of the CPT code manual, and ending in -99.

477. The unlisted CPT code for nervous system procedures is 64999, "*Unlisted procedure, nervous system*."

478. In light of these rules, as noted *supra* (¶¶291, 320), the American Hospital Association advised its members to use CPT code 64999 for Inspire V commercial claims in April 2026.

479. While the use of unlisted CPT codes is sometimes required, it can be unattractive to providers and device companies for several reasons. First, unlike listed CPT codes, CMS and

private payors do not guarantee fixed reimbursement levels for unlisted codes. Instead, reimbursement is determined on an ad hoc basis after the procedure.

480. Second, the use of unlisted codes is associated with a significantly increased administrative burden, because the claim must include sufficient documentation for that ad hoc inquiry.

481. Third, rather than being paid automatically (and within 14 to 30 days for Medicare), claims based on unlisted codes require manual review, which takes longer.

482. For these reasons, if Inspire had informed providers that they were required to use an unlisted code for the implantation of Inspire V, providers would be much less willing to pay Inspire $25,000 per device.

## VII. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

483. Throughout the Class Period, Defendants made multiple materially false and/or misleading statements, which were disseminated to investors through calls, analyst events, public filings, press releases, and the Company website. Defendants' materially false and misleading statements fall into three principal categories: (1) representations about the feedback for and adoption of the SleepSync programmer; (2) representations about the reimbursement for Inspire V implantation procedures from Medicare and private health insurers and the associated CPT coding; and (3) Inspire's guidance for 2025 revenue and earnings per share.

### A. False and Misleading Statements About the SleepSync Programmer

484. Throughout the Class Period, Defendants made false and/or misleading statements concerning the feedback from providers during the soft launch of the SleepSync programmer and they further misstated that obtaining IT approvals to install SleepSync was a standard process and not the key challenge to the Inspire V launch.

**1. November 4, 2024 Earnings Call**

485. On Inspire's November 4, 2024 earnings call for the third quarter of 2024, during prepared remarks, Defendant Herbert stated:

> We have begun the soft launch of our new SleepSync programming system designed to increase the efficiency of Inspire patient management with greater accessibility and a comprehensive view of therapy history. ***Early feedback is promising*** and we expect full U.S. availability this year, enhancing capacity for patient follow-ups and improving experiences for patients and providers.

486. The statement that "***early feedback is promising***" in ¶485 above was materially false and misleading because, in truth, far from being "promising," the "early feedback" from the pilot and soft launch (which began before November 4, 2024) had revealed software deficiencies and security vulnerabilities with the SleepSync software that had not been corrected and that posed a substantial risk to the commercial launches of the SleepSync programmer and Inspire V.

**2. December 3, 2024 Piper Sandler Healthcare Conference**

487. Defendants Herbert and Buchholz discussed the Inspire V launch with Piper Sandler analyst Adam Maeder at the Piper Sandler Healthcare Conference on December 3, 2024. In response to a question from Maeder about "where are we in terms of [the Inspire V] launch at this point?" Herbert responded:

> The good news is we will be doing our soft launch yet here in 2024. We're very excited about that and we'll be able to talk about that more in the very near future. So ***everything looks good***. We're gearing up for Inspire V. It's going to be a game changer when it comes to market and it really brings a new platform, a technology to allow us to springboard into Inspire VI and Inspire VII and Inspire VIII beyond that. So, pretty exciting and more to come in the near future.

488. The statement that "***everything looks good***" in ¶487 above was materially misleading because it misleadingly omitted that everything did not look good. The Company's pilot and soft launch (which began before November 4, 2024) had revealed software deficiencies and security vulnerabilities with the SleepSync software that had not been corrected and that posed

a substantial risk to the commercial launches of the SleepSync programmer and Inspire V, as Defendants later admitted.

### 3. January 13, 2025 J.P. Morgan Healthcare Conference

489. At the J.P. Morgan Healthcare Conference on January 13, 2025, in prepared remarks, Defendant Herbert stated:

> [T]he SleepSync connectivity is really going to have great benefits for patients down the road where we can start doing remote monitoring. … So, we started with Inspire V. We started with our good friends in Singapore at the Singapore General Hospital, which is a very, very impressive hospital, one of the largest in the world. We also worked over at the National University Hospital. We're doing a group of 44 patients. We've implanted 44 to date. There's still four patients who are already scheduled, but we haven't completed those implants.
>
> ***The feedback has been very, very strong***. … [W]e've put other features into it to help with the intraoperative testing and the device programming as we do the device activation. So, ***feedback so far is very good***.

490. The statements that "***feedback has been very, very strong***" and "***very good***" in ¶489 above were materially false and misleading because, in truth, far from being "very, very strong" or "very good," the "feedback" from the Company's pilot and soft launch (which began before November 4, 2024) had revealed software deficiencies and security vulnerabilities with the SleepSync software that had not been corrected and that posed a substantial risk to the launch of the SleepSync programmer and Inspire V.

### 4. May 5, 2025 Earnings Call

491. On the Company's May 5, 2025 earnings call for the first quarter of 2025, in response a question from an analyst (Anthony Petrone) for an "update on SleepSync," Defendant Herbert stated,

> We'll start talking about SleepSync. As we increase the number of patients treated, SleepSync provides an opportunity for the sleep physicians to manage a greater number of patients on a longitudinal basis. ***The majority of the high volume centers already have SleepSync*** as part of their practice, and they can leverage that to streamline patient flow and how they manage their patient[s].

492. In response to a different analyst's (Larry Biegelsen) questions about when the Company would "complete the transition to Inspire V," Defendant Herbert stated: "[T]he new physician programmer, which was launched last year, ***most centers are ready to take on the new physician programmer. So the transition should not be that difficult***."

493. The statement that the transition to the new SleepSync programmer "***should not be that difficult***" in ¶492 above was materially misleading because it misleadingly omitted that the Company was experiencing widespread delays in the adoption of the SleepSync programmer as a result of widespread hesitancy of providers' IT departments to approve the installation of the SleepSync software. These delays and hesitancy were a result of the Company's inability to address providers' HIPAA and information security concerns, which related to deficiencies and vulnerabilities known to the Individual Defendants and threatened the launches of the SleepSync programmer and Inspire V. Thus, as Defendants knew, the transition was "difficult."

494. Further, the statements that ***"[t]he majority of the high volume centers already have SleepSync***" and that "***most centers are ready to take on the new physician programmer***" in ¶¶491-92 above were materially misleading because they misleadingly omitted that there were widespread delays and hesitancy in the adoption of the SleepSync programmer and that the providers delaying IT approvals included "high volume" providers, such as the Mayo Clinic (one of the largest otolaryngology departments in the world, with three implanting locations) and Atrium Health (one of about a dozen centers recognized as a member of the Company's Patient Care Team of Excellence).

### 5. June 13, 2025 Wells Fargo MedTech Innovation Spotlight Conference

495. At the Wells Fargo MedTech Innovation Spotlight Conference on June 13, 2025, in response to a question from an analyst about "the timeline for that kind of full [Inspire V] transition…," Defendant Herbert stated:

> And the third step is, as mentioned in the slides, is that we have gone to a new physician programmer that directly interfaces with SleepSync. And therefore, the sites need to be on the SleepSync system, so the data changes that they make when programming a patient's device are automatically stored into SleepSync.
>
> So ***the majority of the top centers have already been on SleepSync***. And then, new programmer was approved by the FDA last year. So it's been in place for quite some time. But we need to make sure all the centers adapting to Inspire V are on SleepSync, so that can take a little bit longer, up to 30 days or longer if you're a sophisticated site, working with the IT departments. But we're quite experienced incorporating that. We don't see that as long-term showstopper.

496. The statement that "***the majority of the top centers have already been on SleepSync***" in ¶495 above was materially misleading because it misleadingly omitted that there were widespread delays and hesitancy in the adoption of the SleepSync programmer and that the providers delaying IT approvals included "top centers," such as the Mayo Clinic and Atrium Health.

### 6. June 17, 2025 Truist Securities MedTech Conference

497. Defendant Herbert attended the Truist Securities MedTech Conference on June 17, 2025, which was hosted by an analyst (Richard Newitter). In response to a question from Newitter calling for "[a]ny unanticipated either frictions or bottlenecks that have emerged since you went full launch" of Inspire V, Defendant Herbert said:

> Well, I think that, one, the obvious question that people ask us is SleepSync is so difficult to do and whereas, today, we had meetings with a lot of great investors and thank you for that, ***it's just, think about if you're going to add software to your computer at your firm and you got to call in the IT to make sure it's clear to be able to put that software on to your computer. And that's really what it's all about***. And we don't tie into the electronic medical records of a facility today, that's long term. … Today, it's just about putting new software on the computer and making sure we interface with IT to make sure we're comfortable with that. But we don't interface into their servers or into their networks. … So, ***it's a standard process, it's not really the key challenge. It's just one of the three steps***. …
>
> It's a step in the process is what we're highlighting. I think that as new programmer was actually approved a year ago, right? And ***many of the top centers are already at SleepSync***, right? And so, the key is going to be just getting everybody else on

SleepSync. And we're highlighting is one of the three steps that you go through in a transition to V.

498. The statements that "***it's a standard process***," "***it's not really the key challenge***," and "***[i]t's just one of the three steps***" in ¶497 above were materially false and misleading because in truth, obtaining approvals from providers' IT departments to install SleepSync was "the key challenge" in the Inspire V launch and was not a "standard process" or just "one of the three steps." It was, as Defendant Weatherby later admitted, "the longest pole in the tent."

499. Further, the statements that "***if you're going to add software to your computer at your firm and you got to call in the IT to make sure it's clear to be able to put that software on to your computer***" and "***that's really what it's all about***" in ¶497 above were materially misleading because they misleadingly omitted the providers' specific HIPAA and information security concerns, which were beyond the ordinary IT approvals that a business would require to install generic software, and which were particularly important concerns in the context of the healthcare industry.

500. Further, the statement that "***many of the top centers are already at SleepSync***" in ¶497 above was materially misleading because it misleadingly omitted that there were widespread delays and hesitancy in the adoption of the SleepSync programmer and that the providers delaying IT approvals included "top centers," such as the Mayo Clinic and Atrium Health.

### B. False and Misleading Statements About Reimbursement and Coding for Inspire V from Medicare and Private Health Insurers

501. Throughout the Class Period, Defendants made false and/or misleading statements concerning "positive coverage policies" from "large national commercial insurers," the number of "covered lives," coverage from "all seven" MACs, the MACs having been made "***fully aware***" and given a "***fair shake at all the information***," CPT code 64568 being the correct CPT code that "***accurately describes***" and "***appropriately reflects***" the Inspire V implantation procedure, the

Company's prior use of CPT code 64568 before 2022, and the use of CPT code 64568 purportedly having been "determined by certified coders" and not by Defendant Herbert.

### 1. November 4, 2024 10-Q and Earnings Call

502. On November 4, 2024, the Company filed its Quarterly Report on Form 10-Q for the third quarter of 2024, which was signed by Defendants Herbert and Buchholz. The 10-Q stated:

> As of November 4, 2024, ***we have secured positive coverage policies*** with many U.S. commercial payors, including ***virtually all large national commercial insurers, covering approximately 260 million lives in the U.S.*** In addition, ***all seven Medicare Administrative Contractors provide coverage of Inspire therapy*** when certain coverage criteria are met.

503. The statement that Inspire had "***secured positive coverage policies***" with "***virtually all large national commercial insurers, covering approximately 260 million lives***" in ¶502 above was materially false and misleading because, in truth, as of November 4, 2024, the Company lacked payor contracts for Inspire V with several "large national commercial insurers," including Blue Cross Blue Shield (118 million covered lives), United Healthcare (37.1 million covered lives), Aetna (26.2 million covered lives), Cigna (18.4 million covered lives). These large national commercial insurers had not agreed to cover Inspire V at all, much less to cover Inspire V based on the Company's chosen CPT code of 64568. Further, Blue Cross Blue Shield, United Healthcare, Aetna, and Cigna covered nearly 200 million of the 310 million covered lives in the United States. Thus, it was not mathematically possible to have secured positive coverage for 260 million lives without having secured positive coverage from Blue Cross Blue Shield, United Healthcare, Aetna, and Cigna.

504. The statement that "***all seven Medicare Administrative Contractors provide coverage of Inspire therapy***" in ¶502 above was also materially false and misleading because, in truth, as of November 4, 2024, "***all seven***" MACs had not agreed to provide coverage for Inspire V based on the Company's chosen CPT code of 64568. No MAC ever updated its relevant Billing

and Coding Article to include CPT code 64568 effective as of November 4, 2024; after November 4, 2024, two of the seven MACs never updated their relevant Billing and Coding Article to include CPT code 64568 as of any effective date; and all five MACs that added 64568 to their Billing and Coding Articles for some time period during 2025 removed it after becoming fully aware of the coding-relevant facts.

505. On Inspire's November 4, 2024 earnings call, during prepared remarks, Defendant Herbert told investors: "***We continue to validate the coding scenarios with payers and Medicare contractors*** to help ensure we are prepared for the full launch in 2025. We expect to provide more color on our coding strategy in early 2025 once we finalize discussions with the payers."

506. On the same November 4, 2024 call, an analyst asked about "the Inspire V coding strategy." Defendant Herbert responded that Inspire was "***already making good progress***" on getting "***the direct feedback from the MACs***," and that he believed they would "be ready to go when we launch."

507. Another analyst (Richard Newitter) asked Herbert to be "more specific" about the "Inspire V coding strategy," and Herbert responded: "[W]e're making sure that we have this worked through with the MACs and the payers first before we really kind of lay this out. ***We want to make sure that they have a fair shake at all the information to be able to come back and weigh in***."

508. Another analyst asked about the "coding strategies for Inspire V," and Defendant Herbert responded: "[W]e have really one action that we're working with the payers and ***we want to make sure that the Medicare or the MACs, as well as the payer are fully aware of this***…"

509. The statements that "***[w]e continue to validate the coding scenarios with payers and Medicare contractors***," that Inspire was "***already making good progress***" on getting "***the***

***direct feedback from the MACs***," that Inspire was making sure the MACs "***have a fair shake at all the information***," and that Inspire was making sure that MACs and other payers are "***fully aware***" in ¶¶505-08 above were materially false and misleading because, in truth, as of November 4, 2024, the Company had not "validate[d]" its chosen coding scenario (CPT code 64568) with any MAC and did not "***continue to validate***" its chosen coding scenario with the MACs. Further, the Company did not provide CMS or the MACs a "***fair shake at all the information***" and did not make sure that CMS or the MACs were "***fully aware***" of the facts relevant to the Company's chosen coding scenario. Nor, as of November 4, 2024, was the Company "***already making good progress***" on getting "***the direct feedback from the MACs***." To the extent the Company had received any "direct feedback from the MACs," it was materially misleading for the Company to tout that feedback when the feedback had not been obtained on a "fair shake" and "fully aware" basis. To the contrary, upon becoming fully aware of all the coding-relevant information, by December 24, 2025, all five of the MACs that had added CPT code 64568 to their relevant Billing and Coding Article in 2025 removed it, with some removing it retroactively and/or stating that the code was "added in error."

### 2. January 13, 2025 J.P. Morgan Healthcare Conference

510. Defendants Herbert, Buchholz, and Weatherby appeared at the J.P. Morgan Healthcare Conference on January 13, 2025, which was hosted by an analyst (Robbie Marcus) and bank (J.P. Morgan). In response to a question from Marcus about the "physician code," Defendant Herbert stated:

> ***64568 is a code for a neurostimulator and a stimulation lead*** … eventually we created a new code, 64582, which was for the Inspire that included the sensor. Now that we go to Inspire V, it has us in a transition period where ***we can do 64568 with Inspire V***, but we can't change the other code yet because Inspire IV is still available. … But in the meantime, ***the insurance companies are on board***, they prior authorized those cases, and so, we're going with 64568 to start with V. 64582 is still available for the Inspire IV units.

511. Defendant Herbert's statement that "***the insurance companies are on board***" with the use of CPT code 64568 for Inspire V in ¶510 above was materially false and misleading because, in truth, "the insurance companies" were not "***on board***" with the Company's use of CPT code 64568 for Inspire V. As of January 13, 2025, the Company lacked payor contracts for Inspire V with Blue Cross Blue Shield (118 million covered lives), United Healthcare (37.1 million covered lives), Aetna (26.2 million covered lives), and Cigna (18.4 million covered lives). These large national commercial insurers had not agreed to cover Inspire V at all, much less to cover Inspire V based on the Company's chosen CPT code of 64568.

512. Defendant Herbert's statement that "***64568 is a code for a neurostimulator and a stimulation lead***" in ¶510 above was also materially misleading because it misleadingly omitted that due to the existence of a hypoglossal nerve-specific CPT code (64582), 64568 was not the code for a hypoglossal nerve neurostimulator and a stimulation lead like Inspire V. The correct code for Inspire V was 64999 for facilities and 64582-52 for physicians, not 64568. Inspire was required to use those codes unless and until a new code was created—a multi-year process that Inspire began only at the very end of the Class Period.

513. Defendant Herbert's statement that "***we can do 64568 with Inspire V***" in ¶510 above was materially false and misleading because in truth, under binding coding rules, CPT code 64568 was not the correct CPT code for Inspire V and did not accurately describe its implantation procedure. The correct code for Inspire V was 64999 for facilities and 64582-52 for physicians, not 64568. Inspire was required to use those codes unless and until a new code was created—a multi-year process that Inspire began only at the very end of the Class Period.

514. In addition, to the extent that any of Defendant Herbert's statements in ¶510 above is an opinion, that statement is actionable because it was subjectively false, did not fairly align

with the information in Herbert's possession at the time, and contained false embedded facts. Herbert did not believe his statements, as evidenced by Herbert's extensive experience with coding (including in a management position responsible for reimbursement at Medtronic), his role in the creation of CPT code 64582, inconsistent statements made by Herbert's relevant subordinates (including Inspire's former Senior Director and Senior Vice President of Market Access and Reimbursement), the now-unanimous conclusion of CMS and the MACs, and Herbert and the Company's own subsequent abandonment of CPT code 64568. Herbert and Inspire's other senior executives knowingly selected CPT code 64568 for Inspire V, despite it being incorrect, because it was more lucrative for providers and thus for Inspire.

515. Defendant Herbert's statements were also materially misleading and did not fairly align with the information in Herbert's possession at the time because he did not disclose the facts indicating that CPT code 64568 was not the correct CPT code for Inspire V, or at minimum that its use was subject to substantial undisclosed risk and uncertainty, the possibility of using any other CPT code (including the correct coding for physicians, 64582-52), or the objections to the use of CPT code 64568 within the Company and from payors and providers.

### 3. February 10, 2025 10-K and Earnings Call

516. On February 10, 2025, the Company filed its Annual Report on Form 10-K for the fiscal year ended 2024, which was signed by Defendants Herbert and Buchholz. The 10-K stated:

> As of February 10, 2025, ***we have secured positive coverage policies with*** many U.S. commercial payors, including ***all large national commercial insurers, covering approximately 260 million lives in the U.S.*** In addition, ***all seven Medicare Administrative Contractors provide coverage of Inspire therapy*** when certain coverage criteria are met.

517. The statement that Inspire had "***secured positive coverage policies***" with "***all large national commercial insurers, covering approximately 260 million lives***" in ¶516 above was materially false and misleading because, in truth, as of February 10, 2025, the Company lacked

payor contracts for Inspire V with several "large national commercial insurers," including Blue Cross Blue Shield (118 million covered lives), United Healthcare (37.1 million covered lives), Aetna (26.2 million covered lives), and Cigna (18.4 million covered lives). These large national commercial insurers had not agreed to cover Inspire V at all, much less to cover Inspire V based on the Company's chosen CPT code of 64568. Further, Blue Cross Blue Shield, United Healthcare, Aetna, and Cigna covered nearly 200 million of the 310 million covered lives in the United States. Thus, it was not possible to have secured positive coverage for 260 million lives without having secured positive coverage from Blue Cross Blue Shield, United Healthcare, Aetna, and Cigna.

518. The statement that "***all seven Medicare Administrative Contractors provide coverage of Inspire therapy***" in ¶516 above was also materially false and misleading because, in truth, as of February 10, 2025, "***all seven***" MACs had not agreed to provide coverage for Inspire V based on the Company's chosen CPT code of 64568. As of February 10, 2025, no MAC had a relevant Billing and Coding Article that included CPT code 64568; two of the seven MACs never updated their relevant Billing and Coding Article in 2025 to include CPT code 64568; and all five MACS that added 64568 to their Billing and Coding Articles for some time period during 2025 removed it after becoming fully aware of the coding-relevant facts.

519. On Inspire's earnings call that day, in prepared remarks, Defendant Herbert stated:

> ***CPT code 64568 was originally used by Inspire for the first eight years since our approval in 2014 and accurately describes Inspire V procedure, namely one neurostimulator and one stimulation lead***. The current CPT code 64582 was only incorporated a few years ago and will continue to be used with all Inspire IV cases. We want to emphasize that ***the professional fee in CPT code 64568 appropriately reflects the reduced work of implanting the Inspire V system, specifically the elimination of implanting the pressure sensing lead***.

520. In response to a question from an analyst (Larry Biegelsen) about CPT code 64568, Defendant Herbert emphasized that the Company's prior use of 64568 for Inspire V was justified

by Inspire's use of that code for Inspire IV (prior to the creation of CPT code 64582, which became effective in 2022):

> I think three years ago, we transitioned from 64568 to 64582. And here we are ***by eliminating the pressure sensor, we're transitioning right back***. And so, we've done this and we work with the payers and lot of them still have the old – the 64568 still in their system.

521. Defendant Herbert's statements that "***CPT code 64568*** … ***accurately describes Inspire V procedure***" and that ***"the professional fee in CPT code 64568 appropriately reflects the reduced work of implanting the Inspire V system, specifically the elimination of implanting the pressure sensing lead***" identified in ¶519 above were materially false and misleading because, in truth, CPT code 64568 was not the correct CPT code for Inspire V, and it did not "***accurately describe***" or "***appropriately reflect***[]" the Inspire V implantation procedures. The correct code for Inspire V was 64999 for facilities and 64582-52 for physicians, not 64568, as Defendants later admitted. Inspire was required to use those codes unless and until a new code was created—a multi-year process that Inspire began only at the very end of the Class Period.

522. Defendant Herbert's statements that "***CPT code 64568 was originally used by Inspire for the first eight years since our approval in 2014***" and that "***by eliminating the pressure sensor, we're transitioning right back***" to 64568 in ¶¶519-20 above were also materially misleading because they misleadingly omitted that any prior use by the Company of CPT code 64568 occurred under materially different circumstances. Between 2014 and 2021, there was no hypoglossal nerve-specific CPT code (64582), a development material to the accuracy or appropriateness of 64568. Herbert himself had worked to create CPT code 64582 because 64568 did not accurately describe or appropriately reflect the work of the implantation procedure. Further, Herbert misleadingly omitted the alternative—which was in fact the correct CPT coding for physicians—of using modifier -52 to reflect the "reduced work" and "specifically the elimination

of implanting the pressure sensing lead." Herbert also misleadingly omitted that "all the way back to 2014" the Company "always had challenges back then with" 64568, as Defendants later admitted.

523. In addition, to the extent any of Defendant Herbert's statements identified in ¶¶519-20 above are opinions, those statements are actionable because they were subjectively false, did not fairly align with the information in Herbert's possession at the time, and contained false embedded facts. Herbert did not believe those statements, as evidenced by Herbert's extensive experience with coding (including in a management position responsible for reimbursement at Medtronic), his role in the creation of CPT code 64582, inconsistent statements made by Herbert's relevant subordinates (including Inspire's former Senior Director and Senior Vice President of Market Access and Reimbursement), the now-unanimous conclusion of CMS and the MACs, and Herbert and the Company's own subsequent abandonment of CPT code 64568. Herbert and Inspire's other senior executives knowingly selected CPT code 64568 for Inspire V, despite it being incorrect, because it was more lucrative for providers and thus for Inspire.

524. Defendant Herbert's statements were also materially misleading and did not fairly align with the information in Herbert's possession at the time because he did not disclose the facts indicating that CPT code 64568 was not the correct CPT code for Inspire V, or at minimum that its use was subject to substantial undisclosed risk and uncertainty, the possibility of using any other CPT code (including the correct coding for physicians, 64582-52), or the objections to the use of CPT code 64568 within the Company and from payors and providers.

**4. March 18, 2025 KeyBanc Healthcare Forum**

525. Defendants Herbert and Buchholz appeared at the KeyBanc Healthcare Forum on March 18, 2025, which was hosted by a KeyBanc analyst (Brett Fishbin). In response to a question

from Fishbin about "reimbursement coding," Defendant Herbert stated: ***"Now that the pressure sensing lead isn't there, it reverts right back to the original code, 64568***…"

526. Defendant Herbert's statement that "***[n]ow that the pressure sensing lead isn't there, it reverts right back to the original code, 64568***" in ¶525 above was materially misleading because it misleadingly omitted that any prior use by the Company of CPT code 64568 occurred under materially different circumstances. Between 2014 and 2021, there was no hypoglossal nerve-specific CPT code (64582), a development material to the accuracy or appropriateness of 64568. Herbert himself had worked to create CPT code 64582 because 64568 did not accurately describe or appropriately reflect the work of the implantation procedure.

527. Further, Defendant Herbert misleadingly omitted the alternative—which was in fact the correct CPT coding for physicians—of using modifier -52 to reflect that the "***the pressure sensing lead isn't there***." Herbert also misleadingly omitted that "all the way back to 2014" the Company "always had challenges back then with" 64568, as Defendants later admitted.

528. In addition, to the extent Defendant Herbert's statement in ¶525 above is an opinion, that statement is actionable because it was subjectively false, did not fairly align with the information in Herbert's possession at the time, and contained false embedded facts. Herbert did not believe his statement, as evidenced by Herbert's extensive experience with coding (including in a management position responsible for reimbursement at Medtronic), his role in the creation of CPT code 64582, inconsistent statements made by Herbert's relevant subordinates (including Inspire's former Senior Director and Senior Vice President of Market Access and Reimbursement), the now-unanimous conclusion of CMS and the MACs, and Herbert and the Company's own subsequent abandonment of CPT code 64568. Herbert and Inspire's other senior executives

knowingly selected CPT code 64568 for Inspire V, despite it being incorrect, because it was more lucrative for providers and thus for Inspire.

### 5. Statements on the Company's Website from at Least April 19, 2025 until the End of the Class Period

529. From at least April 19, 2025 until about August 7, 2025, the Company stated, on its publicly-available "Cost and Insurance" webpage:

> If you have U.S. commercial insurance or Medicare Advantage, it's best to check directly with your insurance company to confirm your coverage information for Inspire therapy. Here's a suggested way you may ask your insurance agent:
>
> "I am considering Inspire therapy to help treat my sleep apnea. I would like to understand if my health insurance plan would cover the procedure and if my clinic is in network. ***The code for the procedure is*** 64582 (existing Inspire implant) or ***64568 (Inspire V (five) implant)***, and it would be billed with a diagnosis code of G47.33. My clinic is [state your clinic here]."

530. Then from about August 7, 2025 and continuing until the end of the Class Period, the Company updated its publicly-available "Cost and Insurance" webpage to state:

> If you have U.S. commercial insurance or Medicare Advantage, it's best to check directly with your insurance company to confirm your coverage information for Inspire therapy. Here's a suggested way you may ask your insurance agent:
>
> "I am considering Inspire therapy to help treat my sleep apnea. I would like to understand if my health insurance plan would cover the procedure and if my clinic is in network. ***The code for the procedure is 64568 (current Inspire V (five) implant)*** or 64582 (previous Inspire implant) and it would be billed with a diagnosis code of G47.33*. My clinic is [state your clinic here]."
>
> *If you are a Medicare patient, you may need to provide a dual diagnosis code of Z68.XX.

531. The statements that the "***code for the procedure***" for Inspire V is "***64568***" in ¶¶529-30 above were materially false and misleading because, in truth, CPT code 64568 was not "[t]he code for the procedure" to implant Inspire V. The use of CPT code 64568 for Inspire V was contrary to binding and objective rules governing CPT coding. The correct code for Inspire V was 64999 for facilities and 64582-52 for physicians, not 64568. Inspire was required to use those

codes unless and until a new code was created—a multi-year process that Inspire began only at the very end of the Class Period.

532. In addition, to the extent the statements that the "***code for the procedure***" for Inspire V is "***64568***" in ¶¶529-30 above are opinions, those statements are actionable because they were subjectively false, did not fairly align with the information in the Individual Defendants and other management-level executives' possession at the time, and contained false embedded facts. The Company's management-level executives did not believe the statements on the website, as evidenced by Herbert's extensive experience with coding (including in a management position responsible for reimbursement at Medtronic), Herbert and the Company's role in the creation of CPT code 64582, inconsistent statements made by relevant executives (including the Company's former Senior Director and Senior Vice President of Market Access and Reimbursement), the now-unanimous conclusion of CMS and the MACs, and Herbert and the Company's own subsequent abandonment of CPT code 64568. Herbert and Inspire's other senior executives knowingly selected CPT code 64568 for Inspire V, despite it being incorrect, because it was more lucrative for providers and thus for Inspire.

533. The website statements in ¶¶529-30 above were also materially misleading and did not fairly align with the information in the Individual Defendants' and other management-level executives' possession at the time because they did not disclose the facts indicating that CPT code 64568 was not the correct CPT code for Inspire V, or at minimum that its use was subject to substantial risk and uncertainty, the possibility of using any other CPT code (including the correct coding for physicians, 64582-52), or the objections to the use of CPT code 64568 within the Company and from payors and providers.

### 6. May 5, 2025 10-Q and Earnings Call

534. On May 5, 2025, the Company filed its Quarterly Report on Form 10-Q for the first quarter of 2025, signed by Defendants Herbert and Buchholz. The 10-Q stated:

> As of May 5, 2025, ***we have secured positive coverage policies*** with many U.S. commercial payors, including ***all large national commercial insurers, covering more than 300 million lives in the U.S.*** In addition, ***all seven Medicare Administrative Contractors provide coverage of Inspire therapy*** when certain coverage criteria are met.

535. The statement that Inspire had "***secured positive coverage policies***" with "***all large national commercial insurers, covering more than 300 million lives***" in ¶534 above was materially false and misleading because, in truth, as of May 5, 2025, the Company lacked payor contracts for Inspire V with at least one "large national commercial insurer[]," United Healthcare. United Healthcare had not agreed to cover Inspire V at all, much less to cover Inspire V based on the Company's chosen CPT code of 64568. In addition, Carelon, a third party-reviewer for Blue Cross Blue Shield was widely denying Inspire V claims. United Healthcare covered approximately 37.1 million covered lives, and Carelon reviewed claims for approximately 30 million lives covered by Blue Cross Blue Shield, out of the 310 million covered lives in the United States. It was not possible to have secured positive coverage policies for 300 million lives without United Healthcare and Carelon.

536. The statement that "***all seven Medicare Administrative Contractors provide coverage of Inspire therapy***" in ¶534 above was also materially false and misleading because, in truth, as of May 5, 2025, less than "***all seven***" MACs had agreed to provide coverage for Inspire V based on the Company's chosen CPT code of 64568. As of May 5, 2025, only one MAC had a relevant Billing and Coding Article that included CPT code 64568; two of the seven MACs (Novitas and FCSO) never updated their relevant Billing and Coding Article in 2025 to include

CPT code 64568; and all five MACS that added 64568 to their Billing and Coding Articles for some time period during 2025 removed it after becoming fully aware of the coding-relevant facts.

537. On Inspire's May 5, 2025 earnings call, in prepared remarks, Defendant Herbert stated:

> Regarding reimbursement of the Inspire V system, on our last call, we detailed the transition to CPT code 64568. We are happy to announce that this ***code [64568] has been incorporated into policies covering approximately 80% of our over 300 million covered lives. This includes commercial payers, Medicare*** and the VA system.

538. On the same call and in response to an analyst question about whether "linking the Inspire V CPT code to the ICD-10 code for sleep apnea can also slow things down," Defendant Herbert stated:

> As far as the linking to the ICD-10 or ICD-9 diagnostic code, we're already working with CMS to get that done. And as we mentioned before, ***we already have 80% of our 300 million covered lives that does include Medicare, that does include commercial payers***, it does include the VA. And ***we have overcome that connection that you're talking about because we addressed that right upfront***.

539. Defendant Herbert's statements that CPT code 64568 "***has been incorporated into policies covering approximately 80% of our over 300 million covered lives***" in ¶537 above and that "***we already have 80% of our 300 million covered lives***" in ¶538 above were materially false and misleading because in truth, they overstated the number of lives covered by policies incorporating CPT code 64568 for Inspire V and they also misleadingly suggested that the Company had "***overcome***" the challenge of "linking" CPT code 64568 to the obstructive sleep apnea diagnosis with payors. 80% of 300 million is 240 million. As of May 5, 2025, United Healthcare, which covered 37.1 million lives, did not cover Inspire V at all, much less under CPT code 64568. In addition, Carelon, a third party-reviewer for approximately 30 million lives covered by Blue Cross Blue Shield, was widely denying Inspire V claims. It was not possible for CPT code 64568 to be incorporated into policies covering 240 million lives without including United

Healthcare and Carelon. Further, insurers such as Providence Health had adopted policies expressly refusing the Company's proposed use of CPT code 64568 for Inspire V; and at least two MACs (Novitas and FCSO) did not have policies incorporating CPT code 64568 for Inspire V.

540. On the same call and in response to an analyst question about the "level of confidence in "reimbursement," Defendant Herbert added: "***with the new CPT code 64568 … we're ready to throw the switch and be able to move into full launch***."

541. Defendant Herbert's statement that "***with the new CPT code 64568 … we're ready to throw the switch and be able to move into full launch***" in ¶540 above was materially false and misleading because in truth, CPT code 64568 was not the correct CPT code for Inspire V and because Herbert misleadingly omitted that, as of May 5, 2025, the Company's use of CPT code 64568 was subject to substantial objections from payors and providers and that the Company's use of CPT code 64568 was subject to substantial undisclosed risk and uncertainty, all of which threatened the Inspire V launch.

542. In addition, to the extent Defendant Herbert's statement in ¶540 above is an opinion, that statement is actionable because it was subjectively false, did not fairly align with the information in Herbert's possession, and contained false embedded facts. Herbert did not believe his statement, as evidenced by Herbert's extensive experience with coding (including in a management position responsible for reimbursement at Medtronic), his role in the creation of CPT code 64582, inconsistent statements made by Herbert's relevant subordinates (including Inspire's former Senior Director and Senior Vice President of Market Access and Reimbursement), the now-unanimous conclusion of CMS and the MACs, and Herbert and the Company's own subsequent abandonment of CPT code 64568. Herbert and Inspire's other senior executives knowingly

selected CPT code 64568 for Inspire V, despite it being incorrect, because it was more lucrative for providers and thus for Inspire.

543. On the same call and in response to a question from an analyst (Michael Sarcone) about "the Inspire V launch and CPT code 64568," Defendant Herbert stated: "And also remember, ***there's an increased payment to ambulatory surgical centers with the new code*** as well. ***So I think the payers are all been very accepting going on CPT code 64568***."

544. The statements that "***there's an increased payment to ambulatory surgical centers with the new code*** as well" and "***[s]o I think the payers are all been very accepting going on CPT code 64568***" in ¶543 above were materially false and misleading because, in truth, "***the payors***" had not "***all been very accepting***" of the Company's use of "code 64568" for Inspire V. As of May 5, 2025, the Company's use of the code was subject to substantial objections from payors, including United Healthcare (which refused to cover Inspire V at all), Carelon, Providence Health (which had adopted a policy rejecting CPT code 64568), and at least two MACs (Novitas and FCSO). Also, because 64568 was not the correct CPT code for Inspire V, ambulatory surgical centers were not entitled to an "***increased payment … with the new code***."

**7. June 13, 2025 Wells Fargo MedTech Innovation Spotlight Conference**

545. Defendants Herbert and Buchholz attended the Wells Fargo MedTech Innovation Spotlight on June 13, 2025, which was hosted by a Wells Fargo analyst (Larry Biegelsen). Biegelsen asked Herbert about the use of CPT code 64568 by competitor Nyxoah's Genio device, and Herbert responded:

> Well, I think, Larry, ***this is above you and I's paygrade. And this is all determined by certified coders.*** These are people that go to training. They take their test, they're qualified and certified to look at procedures and to determine the proper CPT code. And if a proper procedure is applicable and ***the certified coders looked at Inspire, and that's why we're using 64568 versus our previous 64582*** because we don't have the pressure sensing lead anymore.

546. Defendant Herbert's statements that "***this is above you and I's paygrade***," "***this is all determined by certified coders***," and "***certified coders looked at Inspire, and that's why we're using 64568 versus our previous 64582***" in ¶545 above were materially false and misleading because, in truth, the use of CPT code 64568 for Inspire V was "determined" and directed by Inspire's senior management, including Defendants Herbert and Weatherby and Executive Vice President, Patient Access and Therapy Development Randy Ban, because 64568 was more lucrative than the correct coding, and was not "above [Herbert's] paygrade." These statements were also materially false and misleading because, at the time the coding decision was made, the Company did not employ any relevant individuals that a reasonable investor would consider to be "certified coders."

547. Defendant Herbert's statements that "***this is above you and I's paygrade***," "***this is all determined by certified coders***," and "***certified coders looked at Inspire, and that's why we're using 64568***" in ¶545 above were also materially false and misleading because in truth, CPT code 64568 was not the correct CPT code for Inspire V and because Defendant Herbert misleadingly omitted that, as of June 13, 2025, the Company's use of CPT code 64568 was subject to substantial objections from payors and providers and that the Company's use of CPT code 64568 was subject to substantial undisclosed risk and uncertainty. The correct code for Inspire V was 64999 for facilities and 64582-52 for physicians, not 64568. Inspire was required to use those codes unless and until a new code was created—a multi-year process that Inspire began only at the very end of the Class Period.

548. In addition, to the extent any of the statements identified in ¶545 above are opinions, those statements are actionable because they were subjectively false, did not fairly align with the information in the Individual Defendants and other management-level executives'

possession at the time, and contained false embedded facts. Defendant Herbert did not believe that 64568 was the correct CPT code for Inspire V, as evidenced by Herbert's extensive experience with coding (including in a management position responsible for reimbursement at Medtronic), his role in the creation of CPT code 64582, inconsistent statements made by Herbert's relevant subordinates (including Inspire's former Senior Director and Senior Vice President of Market Access and Reimbursement), the now-unanimous conclusion of CMS and the MACs, and Herbert and the Company's own subsequent abandonment of CPT code 64568. Herbert and Inspire's other senior executives knowingly selected CPT code 64568 for Inspire V, despite it being incorrect, because it was more lucrative for providers and thus for Inspire.

### 8. August 4, 2025 10-Q and Earnings Call

549. On August 4, 2025, the Company filed its Quarterly Report on Form 10-Q for the second quarter of 2025, which was signed by Defendants Herbert and Buchholz. The 10-Q stated:

> As of August 4, 2025, ***we have secured positive coverage policies*** with many U.S. commercial payors, including ***all large national commercial insurers, covering more than 300 million lives in the U.S.*** In addition, ***all seven Medicare Administrative Contractors provide coverage of Inspire therapy*** when certain coverage criteria are met.

550. The statement that Inspire had "***secured positive coverage policies***" with "***all large national commercial insurers, covering more than 300 million lives***" in ¶549 above was materially false and misleading because, in truth, as of August 4, 2025, the Company lacked payor contracts for Inspire V with at least one "***large national commercial insurer[]***," United Healthcare. United Healthcare had not agreed to cover Inspire V at all, much less to cover Inspire V based on the Company's chosen CPT code of 64568. In addition, Carelon, a third party-reviewer for Blue Cross Blue Shield was widely denying Inspire V claims. United Healthcare covered approximately 37.1 million covered lives, and Carelon reviewed claims for approximately 30 million lives covered by Blue Cross Blue Shield, out of the 310 million covered lives in the United States. It

was not possible to have secured positive coverage policies for 300 million lives without United Healthcare and Carelon.

551. The statement that "***all seven Medicare Administrative Contractors provide coverage of Inspire therapy***" in ¶549 above was also materially false and misleading because, in truth, as of August 4, 2025, less than "***all seven***" MACs had agreed to provide coverage for Inspire V based on the Company's chosen CPT code of 64568. As of August 4, 2025, only two MACs had a relevant Billing and Coding Article that included CPT code 64568; two of the seven MACs (Novitas and FCSO) never updated their relevant Billing and Coding Article in 2025 to include CPT code 64568; and all five MACS that added 64568 to their Billing and Coding Articles for some time period during 2025 removed it after becoming fully aware of the coding-relevant facts.

552. On the Company's earnings call that day, during prepared remarks, Defendant Herbert stated: "***for Inspire V centers, we'll be billing CPT code 64568, which has been accepted for plans covering over 90% of our 300 million covered lives, including Medicare***."

553. Defendant Herbert's statement that "***CPT code 64568 … has been accepted for plans covering over 90% of our 300 million covered lives, including Medicare***" in ¶552 above was materially false and misleading because in truth, it overstated the number of lives covered by insurers who had "accepted" CPT code 64568 for Inspire V. 90% of 300 million is 270 million. As of August 4, 2025, United Healthcare, which covered 37.1 million lives, did not cover Inspire V at all and had not "accepted" CPT code 64568. In addition, Carelon, a third party-reviewer for approximately 30 million lives covered by Blue Cross Blue Shield was widely denying Inspire V claims. It was not possible for CPT code 64568 to be accepted by insurers covering 270 million lives without being accepted by United Healthcare and Carelon. Further, insurers such as Providence Health had adopted policies expressly refusing the use of CPT code 64568 for Inspire

V; and two MACs (Novitas and FCSO) did not have Billing and Coding Articles accepting CPT code 64568.

554. On the same call and in response to an analyst question about the "headwinds" facing the Inspire V launch, Defendant Herbert stated:

> And the second [headwind] is really the concern over billing Medicare, which is everybody was aware of it being approved, but not being able to bill it until July 1 has really put some centers in a tough spot and so they chose to continue to implant Inspire IV. And those two factors really are the predominant drivers. And we really got our arms around both of those. Of course, the ***Medicare is now approved and centers are able to bill 64568 for Inspire V*** ….

555. Defendant Herbert's statement that "***Medicare is now approved and centers are able to bill 64568 for Inspire V***" in ¶554 above was materially false and misleading because, in truth, 64568 was not the correct code to bill Medicare for Inspire V and "concern over billing Medicare" continued to be a "headwind" and a substantial undisclosed risk and uncertainty. As of August 4, 2025, less than all seven MACs had agreed to provide coverage for Inspire V based on the Company's chosen CPT code of 64568. Two of the seven MACs (Novitas and FCSO) never updated their relevant Billing and Coding Article in 2025 to include CPT code 64568.

556. On the same call and in response to an analyst question about whether the headwinds were a "transient issue," Defendant Herbert stated: "***we already have the payers in place, as we mentioned, with the CPT coding. We have Medicare now in place*** …."

557. Defendant Herbert's statements that "***we already have the payers in place … with the CPT coding***" and that "***[w]e have Medicare now in place*** …." in ¶556 above were also materially false and misleading because, in truth, several important "***payers***" were not "***in place … with the CPT coding***" of 64568, including United Healthcare, Carelon, Providence Health, and at least two of the seven MACs (Novitas and FCSO). Further, the Company did not have "***Medicare now in place***" because the Company's coding remained subject to a substantial

undisclosed risk and uncertainty once CMS and the MACs became fully aware of the coding-relevant facts and at least two of the seven MACs (Novitas and FCSO) did not have Billing and Coding Articles accepting CPT code 64568.

### 9. September 3, 2025 Wells Fargo MedTech Innovation Spotlight Conference

558. Defendant Weatherby attended the Wells Fargo MedTech Innovation Spotlight on September 3, 2025, which was hosted by a Wells Fargo analyst (Larry Biegelsen). In response to Biegelsen's question about whether "the coding issue" was "basically behind you," Defendant Weatherby stated:

> ***Correct. Yeah***. The coding, as we've described, was tied to Medicare and ultimately a software update that they put in place in July. But ***approval, we got in April***. That was retroactively applied to January. And so, there may have been some confusion around that, but it wasn't until July 1 when, I'll call it, there was full clearance for submissions to be run through the process and the software with Medicare. So, ***that's behind us and no longer a headwind in the process***.

559. Defendant Weatherby's statements that it was "***correct***" that "the coding issue" was "basically behind" Inspire, that "***that's behind us and no longer a headwind in the process***," and "***approval, we got in April***" in ¶558 above were materially false and misleading because, in truth, the CPT coding issue was not "basically behind" the Company and remained a material "headwind" to the Inspire V launch. Contrary to Weatherby's statement that the Company got Medicare "***approval … in April***" 2025, the Company lacked approval from all MACs, and any approvals that the Company had obtained were not obtained on a "fair shake" and "fully aware basis." At least two of the seven MACs (Novitas and FCSO) had not approved CPT code 64568 for Inspire V, and Medicare reimbursement remained subject to a substantial undisclosed risk and uncertainty once CMS and the MACs became fully aware of the coding-relevant facts. Further, Weatherby misleadingly omitted that several important private payors had not approved the

Company's chosen CPT coding of 64568 for Inspire V, including United Healthcare, Carelon, and Providence Health.

### 10. Statements in the Billing Guide on the Company's Website by October 2025 until the End of the Class Period

560. Starting between August and October 2025 and continuing until the end of the Class Period, Inspire published on its publicly-available website its "2025 Hospital/ASC Billing Guide" for the Inspire V. The Billing Guide stated that "***Procedures involving HGNS [hypoglossal nerve stimulation] may involve the following code***" and then listed ***64568*** (and its descriptive text) and no other potential CPT code, as reflected below:

**Hospital Outpatient Codes – Implant Procedure**
**CPT® Procedure Codes**
Hospitals report outpatient procedures using CPT® codes. Procedures involving HGNS may involve the following code:

| CPT®Code | Code Description | Components |
|---|---|---|
| 64568 | Open implantation of cranial nerve (eg, vagus nerve) neurostimulator electrode array and pulse generator | Generator & Simulation Lead |

**APC**
For hospital outpatient payments, Medicare assigns each CPT® code to a specific Ambulatory Payment Classification (APC). Each APC has a fixed payment amount which includes the cost of any devices. The HGNS implantation procedure may involve the following APC:

| CPT® Code | APC Code | APC Description | SI |
|---|---|---|---|
| 64568 | 5465 | Level 5 Neurostimulator and Related Procedures | J1 |

2025 APCs as published in CMS 1786-FC Addendum B. Nov 2024.

561. The Billing Guide also includes two examples of billing forms (one for hospital outpatient, the other for ambulatory surgical centers). The Company pre-filled each form to include CPT code ***64568*** and no other CPT code as the correct billing code for the Inspire V.

562. The statements that ***"[p]rocedures involving HGNS [hypoglossal nerve stimulation] may involve" 64568*** identified in ¶560 above were materially false and misleading because, in truth, CPT code 64568 was not the correct code for Inspire V and "[p]rocedures involving HGNS [hypoglossal nerve stimulation]" did not involve CPT code 64568. The correct code for Inspire V was 64999 for facilities and 64582-52 for physicians, not 64568. Inspire was

required to use those codes unless and until a new code was created—a multi-year process that Inspire began only at the very end of the Class Period.

563. In addition, to the extent the statements in ¶560 above are opinions, those statements are actionable because they were subjectively false, did not fairly align with the information in the Individual Defendants and other management-level executives' possession at the time, and contained false embedded facts. The Company's management-level executives did not believe the statements on the website, as evidenced by Herbert's extensive experience with coding (including in a management position responsible for reimbursement at Medtronic), Herbert and the Company's role in the creation of CPT code 64582, inconsistent statements made by relevant executives (including Inspire's former Senior Director and Senior Vice President of Market Access and Reimbursement), the now-unanimous conclusion of CMS and the MACs, and Herbert and the Company's own subsequent abandonment of CPT code 64568. Herbert and Inspire's other senior executives knowingly selected CPT code 64568 for Inspire V, despite it being incorrect, because it was more lucrative for providers and thus for Inspire.

564. The website statements identified in ¶560 above were also materially misleading and did not fairly align with the information in the Individual Defendants' and other management-level executives' possession at the time because they did not disclose the facts indicating that CPT code 64568 was not the correct CPT code for Inspire V, or at minimum that its use was subject to substantial undisclosed risk and uncertainty, the possibility of using any other CPT code (including the correct coding for physicians, 64582-52), or the objections to the use of CPT code 64568 within the Company and from payors' and providers.

565. The Billing Guide also stated that "***All Medicare Administrative Contractors (MACs) have developed positive Local Coverage Determination policies for Inspire***."

566. The statement that "***[a]ll Medicare Administrative Contractors (MACs) have developed positive Local Coverage Determination policies for Inspire***" in ¶565 above was materially misleading because it misleadingly omitted that no MAC had a Local Coverage Determination that supported the use of CPT code 64568 for Inspire V. Further, two of the seven MACs (Novitas and FCSO) never updated their relevant Billing and Coding Articles at any time during 2025 to include CPT code 64568.

**11. November 3, 2025 10-Q and Earnings Call**

567. On November 3, 2025, the Company filed its Quarterly Report on Form 10-Q for the third quarter of 2025, which was signed by Defendants Herbert and Buchholz. The 10-Q stated:

> As of November 3, 2025, ***we have secured positive coverage policies*** with many U.S. commercial payors, including ***all large national commercial insurers, covering more than 300 million lives in the U.S.*** In addition, ***all seven Medicare Administrative Contractors provide coverage of Inspire therapy*** when certain coverage criteria are met.

568. The statement that Inspire had "***secured positive coverage policies***" with "***all large national commercial insurers, covering more than 300 million lives***" in ¶567 above was materially false and misleading because, in truth, as of November 3, 2025, the Company lacked payor contracts for Inspire V with at least one "large national commercial insurer[]," United Healthcare. United Healthcare had not agreed to cover Inspire V at all, much less to cover Inspire V based on the Company's chosen CPT code of 64568. In addition, Carelon, a third party-reviewer for Blue Cross Blue Shield, was widely denying Inspire V claims. United Healthcare covered approximately 37.1 million covered lives, and Carelon approximately 30 million lives covered by Blue Cross Blue Shield, out of the 310 million covered lives in the United States, so it was not possible to have secured positive coverage policies for 300 million lives without having included United Healthcare and Carelon.

569. The statement that "***all seven Medicare Administrative Contractors provide coverage of Inspire therapy***" in ¶567 above was also materially false and misleading because, in truth, as of November 3, 2025, less than "***all seven***" MACs had agreed to provide coverage for Inspire V based on the Company's chosen CPT code of 64568. As of November 3, 2025, only three MACs had a relevant Billing and Coding Article that included CPT code 64568; two of the seven MACs (Novitas and FCSO) never updated their relevant Billing and Coding Article in 2025 to include CPT code 64568; another MAC (NGS) had removed CPT code 64568 from its Billing and Coding Article on October 9, 2025, instead requiring the use of a hypoglossal nerve-specific code; and all five MACS that added 64568 to their Billing and Coding Articles for some time period during 2025 removed it after becoming fully aware of the coding-relevant facts.

570. On Inspire's earnings call that day, during prepared remarks, Defendant Herbert stated: "***for Inspire V, centers bill CPT code 64568, which has been accepted for plans covering over 90% of our 300 million covered lives, including Medicare***."

571. Defendant Herbert's statement that "***for Inspire V, centers bill CPT code 64568, which has been accepted for plans covering over 90% of our 300 million covered lives, including Medicare***" in ¶570 above was materially false and misleading because in truth, it overstated the number of lives covered by insurers who had "accepted" CPT code 64568 for Inspire V. 90% of 300 million is 270 million. As of November 3, 2025, United Healthcare, which covered 37.1 million lives, did not cover Inspire V at all and had not "accepted" CPT code 64568. Further, Carelon, a third party-reviewer for approximately 30 million lives covered by Blue Cross Blue Shield, was widely denying Inspire V claims. It was not possible for CPT code 64568 to be accepted by insurers covering 270 million lives without being accepted by United Healthcare and Carelon. Further, insurers such as Providence Health had adopted policies expressly refusing the

use of CPT code 64568 for Inspire V; and three MACs (Novitas, FCSO, and NGS) did not have Billing and Coding Articles accepting CPT code 64568.

### 12. November 10, 2025 UBS Healthcare Conference

572. Defendant Herbert attended the UBS Healthcare Conference on November 10, 2025, which was hosted by an analyst (Danielle Antalffy). In response to a question from Antalffy about the "friction point" of "reimbursement" and "getting these payors aligned," Defendant Herbert stated:

> [N]ow that ***we have coverage by all the major players and Medicare*** and military and VAs, what's most important now is to drive consistency of the coverage policies. And ***if you go to all the different payers and Medicare, local coverage determinations are all pretty consistent***, but there's just those little things out of everything. So, we want every policy that to really be uniform, so it's really consistent and makes it quite easier. And so, there's no confusion with – from the physician side … when they're going for coverage and identify what's important. ***The transition with Inspire V going to the new code 64568, which is actually going back to the old code, that transition has gotten really well***. We had challenges in the second quarter, as you all recall, with CMS not having that on their computer systems, but ***that was cleaned up on July 1, and has since it's really been streamlined***, and most recently that reimbursement's gone up.

573. Defendant Herbert statements that "***we have coverage by all the major players and Medicare***" and that "***if you go to all the different payers and Medicare, local coverage determinations are all pretty consistent***" in ¶572 above were materially false and misleading because, in truth, Inspire did not "have coverage by all the major players and Medicare" and coverage was not "pretty consistent" among all the different payers and the Medicare. Major players such as United Healthcare, which covered 37.1 million lives, did not cover Inspire V at all. Another major player, Carelon, a third party-reviewer for approximately 30 million lives covered by Blue Cross Blue Shield, was widely denying Inspire V claims. Providence Health, which covered 1.9 million lives, had adopted policies expressly refusing the Company's proposed use of CPT code 64568 for Inspire V. Three MACs (Novitas, FCSO, and NGS) did not have Billing and

Coding Articles accepting CPT code 64568, and one of those (NGS) had withdrawn the code after July. Those were not "little things."

574. Further, Defendant Herbert's statement that "***[t]he transition with Inspire V going to the new code 64568, which is actually going back to the old code, that transition has gotten really well***" in ¶572 above was materially misleading because it misleadingly omitted that the circumstances had changed materially since the Company's prior use of CPT code 64568. Between 2014 and 2021, there was no hypoglossal nerve-specific CPT code (64582), a development material to the accuracy or appropriateness of 64568. Herbert himself had worked to create CPT code 64582 because 64568 did not accurately describe or appropriately reflect the work of the implantation procedure. Further, Herbert misleadingly omitted the alternative—which was in fact the correct CPT coding for physicians—of using modifier -52 to reflect the "reduced work" and "specifically the elimination of implanting the pressure sensing lead." Herbert also misleadingly omitted that "all the way back to 2014" the Company "always had challenges back then with" 64568, as Defendants later admitted.

575. In addition, the statement that Medicare reimbursement "***was cleaned up on July 1, and has since it's really been streamlined***" in ¶572 above was materially false and misleading because in truth, Medicare reimbursement had not been "***cleaned up on July 1***," but rather remained subject to substantial undisclosed risk and uncertainty—not only at those three MACs (Novitas, FCSO, and NGS), but also the others—once CMS and the MACs became fully aware of the coding-relevant facts.

576. In addition, to the extent any of Defendant Herbert's statements identified in ¶572 above are opinions, those statements are actionable because they were subjectively false, did not fairly align with the information in Herbert's possession at the time, and contained false embedded

facts. Herbert did not believe that 64568 was the correct CPT code for Inspire V, as evidenced by Herbert's extensive experience with coding (including in a management position responsible for reimbursement at Medtronic), his role in the creation of CPT code 64582, inconsistent statements made by Herbert's relevant subordinates (including Inspire's former Senior Director and Senior Vice President of Market Access and Reimbursement), the now-unanimous conclusion of CMS and the MACs, and Herbert and the Company's own subsequent abandonment of CPT code 64568. Herbert and Inspire's other senior executives knowingly selected CPT code 64568 for Inspire V, despite it being incorrect, because it was more lucrative for providers and thus for Inspire.

577. Defendant Herbert's statements were also materially misleading and did not fairly align with the information in Herbert's possession at the time because he did not disclose the facts indicating that CPT code 64568 was not the correct CPT code for Inspire V, or at minimum that its use was subject to substantial risk and uncertainty, the possibility of using any other CPT code (including the correct coding for physicians, 64582-52), or the objections to the use of CPT code 64568 within the Company and from payors' and providers.

### 13. December 2, 2025 Piper Sandler Healthcare Conference

578. At the Piper Sandler Healthcare Conference on December 2, 2025, in response to an analyst question about "how much visibility do you have in the business," Defendant Herbert stated: "***The Medicare challenges with CPT code 64568 got cleared up on July to allow for people to use that code with Inspire V***."

579. Defendant Herbert's statement that "***[t]he Medicare challenges with CPT code 64568 got cleared up on July to allow for people to use that code with Inspire V***" in ¶578 above was materially false and misleading because, in truth, the "Medicare challenges" had not "***cleared up***" in July. Three MACs (Novitas, FCSO, and NGS) did not have Billing and Coding Articles accepting CPT code 64568, and one of those (NGS) had withdrawn the code after July. Medicare

reimbursement remained subject to substantial undisclosed risk and uncertainty—not only at those three MACs (Novitas, FCSO, and NGS), but also the others—once CMS and the MACs became fully aware of the coding-relevant facts. Between six and twenty-two days after Defendant Herbert's statement, the remaining four MACs withdrew CPT code 64568: Noridian on December 8, CGS on December 18, Palmetto on December 22, and WPS on December 24. The MACs stated that the removals were the result of a coordinated "review."

580. Further, Defendant Herbert's statement that "***[t]he Medicare challenges with CPT code 64568 got cleared up on July to allow for people to use that code with Inspire V***" in ¶578 above was also materially false and misleading because in truth, CPT code 64568 was not the correct CPT code for Inspire V and because Defendant Herbert misleadingly omitted that, as of December 2, 2025, the Company's use of CPT code 64568 was subject to substantial objections from payors and providers and that the Company's use of CPT code 64568 was subject to substantial undisclosed risk and uncertainty. For physicians, 64582-52 was the correct CPT code for Inspire V, not 64568. Inspire was required to use 64582-52 unless and until a new code was created–a multi-year process that Inspire began only at the very end of the Class Period.

581. In addition, to the extent Defendant Herbert's statement in ¶578 above is an opinion, that statement is actionable because it was subjectively false, did not fairly align with the information in Herbert's possession at the time, and contained false embedded facts. Herbert did not believe that 64568 was the correct CPT code for Inspire V, as evidenced by Herbert's extensive experience with coding (including in a management position responsible for reimbursement at Medtronic), his role in the creation of CPT code 64582, inconsistent statements made by Herbert's relevant subordinates (including Inspire's former Senior Director and Senior Vice President of Market Access and Reimbursement), the now-unanimous conclusion of CMS and the MACs, and

Herbert and the Company's own subsequent abandonment of CPT code 64568. Herbert and Inspire's other senior executives knowingly selected CPT code 64568 for Inspire V, despite it being incorrect, because it was more lucrative for providers and thus for Inspire.

**14. January 12, 2026 J.P. Morgan Healthcare Conference**

582. Defendant Herbert attended the J.P. Morgan Healthcare Conference on January 12, 2026, which was hosted by an analyst (Robbie Marcus) and bank (J.P. Morgan). In response to a question from Marcus about the updates to the MACs' Billing and Coding Articles in December 2025, Defendant Herbert stated: "As we developed Inspire V, it's a **–** ***when we go to the certified coders and we look at what code best describes that procedure, it's 64568***."

583. Defendant Herbert's statement that "***when we go to the certified coders and we look at what code best describes that procedure, it's 64568***" in ¶582 above was materially false and misleading because, in truth, the use of CPT code 64568 for Inspire V was determined and directed by Inspire's senior management, including Herbert and Weatherby and Executive Vice President, Patient Access and Therapy Development Randy Ban, because 64568 was more lucrative than the correct coding, and not because "certified coders" advised that 64568 "best describes" the Inspire V implantation procedure. This statement was also materially false and misleading because, at the time the coding decision was made, the Company did not employ any relevant individuals that a reasonable investor would consider to be "certified coders."

584. Further, Defendant Herbert's statement that "***when we go to the certified coders and we look at what code best describes that procedure, it's 64568***" in ¶582 above was also materially false and misleading because in truth, CPT code 64568 was not the correct CPT code for Inspire V and because Defendant Herbert misleadingly omitted that, as of January 12, 2026, the Company's use of CPT code 64568 was subject to substantial objections from private payors and providers and that the Company's use of CPT code 64568 was subject to substantial

undisclosed risk and uncertainty. For physicians, 64582-52 was the correct CPT code for Inspire V, not 64568. Inspire was required to use 64582-52 unless and until a new code was created—a multi-year process that Inspire began only at the very end of the Class Period.

585. In addition, to the extent Defendant Herbert's statement in ¶582 above is an opinion, that statement is actionable because it was subjectively false, did not fairly align with the information in Herbert's possession at the time, and contained false embedded facts. Herbert did not believe that 64568 was the correct CPT code for Inspire V, as evidenced by Herbert's extensive experience with coding (including in a management position responsible for reimbursement at Medtronic), his role in the creation of CPT code 64582, inconsistent statements made by Herbert's relevant subordinates (including Inspire's former Senior Director and Senior Vice President of Market Access and Reimbursement), the then-unanimous conclusion of MACs (soon after joined by CMS), and Herbert and the Company's own subsequent abandonment of CPT code 64568 shortly thereafter. Herbert and Inspire's other senior executives knowingly selected CPT code 64568 for Inspire V, despite it being incorrect, because it was more lucrative for providers and thus for Inspire.

### C. False and Misleading Guidance

586. From January to May 2025, Defendants issued, reaffirmed, and/or increased false and misleading guidance for the Company's revenue and diluted net income per share for 2025 that was baseless and unrealistic in light of known problems with the adoption of the SleepSync programmer and with the Company's use of CPT code 64568 for Inspire V.

#### 1. January 13, 2025 Revenue Guidance

587. On January 13, 2025, the Company published a press release and filed a Form 8-K announcing the following guidance: "***Revenue for full year 2025 is anticipated to be in the range of $940 million to $955 million***, a 17% to 19% increase over full year 2024." Defendants Herbert,

Buchholz, and Weatherby reviewed and approved the guidance. Buchholz signed the Form 8-K, Herbert was quoted in the press release, and Weatherby was named in the press release.

588. The statement that "***[r]evenue for full year 2025 is anticipated to be in the range of $940 million to $955 million***" in ¶587 above was materially false and misleading because the guidance was baseless and unrealistic. Defendants knew that the Inspire V launch was highly risky and uncertain due to the known issues with the SleepSync programmer and CPT coding, which called into question the Company's ability to meet this aggressive guidance. The 2025 revenue guidance was revealed as false on August 4, 2025, when the Company downgraded it to: "$900 million to $910 million, which represents growth of 12% to 13% over full year 2024 revenue of $802.8 million," citing the SleepSync programmer and CPT coding issues as the two "predominant" "headwinds" driving the guidance downgrade. Both of those headwinds were known prior to January 13, 2025, when the Company announced this guidance, as providers expressed hesitancy about adopting SleepSync on their IT systems to Inspire employees, and Inspire had not received positive coverage determinations from several large national insurers. *See supra* §§ IV.E, G. As a result of these and related issues, when Defendants issued this guidance on January 13, 2025, Inspire was unlikely to achieve the guidance metrics Defendants touted.

589. Defendants' public statements exclude other issues (unrelated to the problems with the adoption of the SleepSync programmer and with the CPT coding) as the cause of the downgrade. For example, on May 5, 2025, Defendant Herbert stated: "we knew we were going to work through the Inspire IV inventory. It's just a timing issue as we do the full launch in the second quarter." On June 17, 2025, Herbert stated: "when we did the guidance, we kind of had that knowledge [that patients would wait for Inspire V] and we knew when we're going to launch a product, we had a good feel for what the transition period would be." On December 2, 2025,

Herbert stated: "We knew in the beginning of the year is always a challenge as we're launching Inspire V. And there's challenges with that and we held back on opening new centers in the first half the year, kind of held back a little bit on direct-to-consumer and building awareness to give us time to get that product out."

**2. February 10, 2025 Reaffirmed Revenue Guidance and New Diluted Earnings Per Share Guidance**

590. On February 10, 2025, Inspire reaffirmed its prior 2025 revenue guidance and announced additional guidance for 2025 diluted earnings per share. Defendants Herbert, Buchholz, and Weatherby reviewed and approved the guidance. Buchholz signed the Form 8-K, and Herbert was quoted in the press release. The press release stated:

> Full Year 2025 Guidance
>
> ***Inspire's previously announced full year 2025 revenue guidance remains between $940 million to $955 million***, which represents expected growth of 17% to 19% over full year 2024 revenue of $802.8 million.
>
> Gross margin for the full year is anticipated to be in the range of 84% to 86%.
>
> ***Inspire is introducing full year 2025 diluted earnings per share guidance of $2.10 to $2.20***.

591. On Inspire's earnings call that day, Defendant Herbert explained that the guidance "[took] into account…a phased commercial launch" of Inspire V and that the "majority of [the] growth [would] come from increase[d] work at existing centers or same store sales."

592. On Inspire's earnings call that day, Defendant Herbert stated that the Company was "reiterating" its revenue guidance "[g]iven our strong performance." Defendant Buchholz repeated the revenue, diluted net income, and gross margin guidance and stated: "our strong performance and business momentum provide us with confidence in our outlook for 2025."

593. The statements that "***Inspire's previously announced full year 2025 revenue guidance remains between $940 million to $955 million***" and that "***Inspire is introducing full***

***year 2025 diluted earnings per share guidance of $2.10 to $2.20***" in ¶590 above were materially false and misleading because the guidance was baseless and unrealistic. Defendants knew that the Inspire V launch was highly risky and uncertain due to the known issues with the SleepSync programmer and CPT coding, which called into question the Company's ability to meet this aggressive guidance. *See supra* §§ IV.E, G. The 2025 revenue and 2025 diluted earnings per share guidance were revealed as false on August 4, 2025, when the Company downgraded them to: "$900 million to $910 million, which represents growth of 12% to 13% over full year 2024 revenue of $802.8 million" and "$0.40 to $0.50" (a decrease of 78.2% to 81.8%), respectively, citing the SleepSync programmer and CPT coding issues as the two "predominant" "headwinds" driving the guidance downgrade. Both of those headwinds were known prior to February 10, 2025, when the Company reaffirmed and announced this guidance, as providers expressed hesitancy about adopting SleepSync on their IT systems to Inspire employees, and Inspire had not received positive coverage determinations from several large national insurers. *See supra* §§ IV.E, G. As a result of these and related issues, when Defendants reaffirmed and issued this guidance on February 10, 2025, Inspire was unlikely to achieve the guidance metrics Defendants touted.

### 3. May 5, 2025 Reaffirmed Revenue Guidance and Increased Diluted Net Income Per Share Guidance

594. On May 5, 2025, Inspire reaffirmed its 2025 revenue guidance and increased its 2025 diluted net income per share guidance.[7] Defendants Herbert, Buchholz, and Weatherby reviewed and approved the guidance. Buchholz signed the Form 8-K, and Herbert was quoted in the press release. The press release stated:

Full Year 2025 Guidance

[7] As used in Inspire's guidance and understood by analysts, "diluted net income per share" (May 5, 2025) was the equivalent of "diluted earnings per share" (February 10, 2025).

> ***Inspire is maintaining its full year 2025 revenue guidance of between $940 million to $955 million***, which represents growth of 17% to 19% over full year 2024 revenue of $802.8 million.
>
> The company is maintaining its full year 2025 gross margin guidance of 84% to 86%.
>
> ***Inspire is increasing diluted net income per share guidance for the full year 2025 to between $2.20 to $2.30***. This compares to the prior guidance of $2.10 to $2.20 per share.

595. On Inspire's May 5, 2025 earnings call, Defendants Herbert and Buchholz both repeated the guidance. Explaining the increased guidance, Herbert stated: "Our experience to-date with Inspire V system has been very positive and well received by healthcare providers, especially with ENT surgeons" and Buchholz stated that "our strong performance and business momentum provide us with confidence in our outlook for 2025."

596. In response to an analyst, Defendant Herbert stated:

> [A]gain, we're reiterating our full year guidance. … And the new physician programmer, which was launched last year, most centers are ready to take on the new physician programmer. So the transition should ***not*** be ***that difficult***. ... As far as the linking to the ICD-10 or ICD-9 diagnostic code, we're already working with CMS to get that done. And as we mentioned before, we already have ***80% of*** our ***300 million covered lives*** that does include Medicare, that does include commercial payers, it does include the VA. And we have overcome that connection that you're talking about because we addressed that right upfront.

597. The statements that "***Inspire is maintaining its full year 2025 revenue guidance of between $940 million to $955 million***" and that "***Inspire is increasing diluted net income per share guidance for the full year 2025 to between $2.20 to $2.30***" in ¶594 above were materially false and misleading because the guidance was baseless and unrealistic. Defendants knew that the Inspire V launch was highly risky and uncertain due to the known issues with the SleepSync programmer and CPT coding, which called into question the Company's ability to meet this aggressive guidance. *See supra* §§ IV.E, G. The 2025 revenue and diluted earnings per share guidance were revealed as false on August 4, 2025, when the Company downgraded them to:

"$900 million to $910 million, which represents growth of 12% to 13% over full year 2024 revenue of $802.8 million" and "$0.40 to $0.50" (a decrease of 78.2% to 81.8%), respectively, citing the SleepSync programmer and CPT coding issues as the two "predominant" "headwinds" driving the guidance downgrade. Both of those headwinds were known prior to May 5, 2025, as providers expressed hesitancy about adopting SleepSync on their IT systems to Inspire employees, and Inspire had not received positive coverage determinations from several large national insurers, among other things. *See supra* §§ IV.E, G. As a result of these issues, when Defendants reaffirmed and increased this guidance on May 5, 2025, Inspire was unlikely to achieve the guidance metrics Defendants touted.

## VIII. ADDITIONAL LOSS CAUSATION ALLEGATIONS

598. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss, *i.e.*, damages, suffered by Lead Plaintiff and the Class.

599. During the Class Period, Lead Plaintiff and Class members purchased or otherwise acquired Inspire common stock at artificially inflated prices and were damaged thereby when the price of Inspire common stock declined in response to the partial disclosures. Throughout the Class Period, the price of Inspire common stock was artificially inflated and/or maintained as a result of Defendants' materially false and misleading statements and omissions. The price of Inspire common stock significantly declined, causing investors to suffer losses, in response to a series of partial disclosures concerning or connected to the facts misrepresented or concealed by Defendants, which are described more fully above in § IV.I. Throughout the disclosure period, Defendants mitigated Inspire's stock price declines by making additional false assurances concerning the alleged fraud, as described herein.

600. As a result of the disclosures described herein, Inspire common stock declined by 77.6% from a Class Period high of $215.42 per share, representing a total decline of more than $4 billion in Inspire's market capitalization.

| **Date*** | **Disclosure Summary** | **Closing Stock Price** | **Common Stock Price Change** | **S&P 500 Price Change** | **Trading Volume** | **Approx. Market Cap Loss** |
|---|---|---|---|---|---|---|
| 8/4/25<br>(8/5/25)<br>(8/6/25) | Defendants downgrade guidance and reveal SleepSync and CPT coding are the two predominant headwinds | 8/5<br>$87.91<br><br>8/6<br>$78.45 | 8/5<br>-$42.04<br>(-32.35%)<br><br>8/6<br>-$9.46<br>(-10.76%) | 8/5<br>-0.49%<br><br>8/6<br>+0.73% | 8/5<br>10,973,600<br><br>8/6<br>3,637,400 | 8/5<br>$1.24 billion<br><br>8/6<br>$280 million |
| 9/3/25 | Defendant Weatherby reveals SleepSync continues to be a headwind | $85.60 | -$8.91<br>(-9.43%) | +0.51% | 1,896,600 | $263 million |
| 12/15/25 | *The Capitol Forum* Reports Use of Code 64568 for Inspire V Under "Review" by Three MACs | $119.26 | -$11.42<br>(-8.73%) | -0.16% | 2,701,000 | $332 million |
| 12/17/25 and 12/18/25<br>(12/18/25) | Three MACs Make Public Withdrawal of CPT code 64568 for Inspire V | $95.27 | -$23.00<br>(-19.45%) | +0.79% | 6,538,000 | $668 million |
| 1/22/26 | CMS Withdraws Obstructive Sleep Apnea as a Covered Indication for CPT code 64568 | $80.81 | -$15.39<br>(-15.99%) | +0.55% | 4,725,700 | $447 million |

| **Date*** | **Disclosure Summary** | **Closing Stock Price** | **Common Stock Price Change** | **S&P 500 Price Change** | **Trading Volume** | **Approx. Market Cap Loss** |
|---|---|---|---|---|---|---|
| 2/11/26 (2/12/26) | Defendants Say CPT code 64582-52 Must Be Used with Medicare for Inspire V | $59.65 | -$8.56 (-12.55%) | -1.57% | 4,025,200 | $245 million |
| 3/17/26 | Defendants Reveal Continued Challenges with Coding and WISeR | $55.15 | -$3.72 (-6.32%) | +0.25% | 1,441,300 | $106 million |
| 5/4/26 (5/5/26) | Defendants Reveal AHA's Recommendation for Facilities to Use 64999 for Inspire V Commercial Claims and Ongoing Reimbursement and WISeR Challenges | $48.25 | -$6.59 (-12.01%) | +0.82% | 4,552,400 | $190 million |

*Date of stock price decline in parentheses when different from date of disclosure.

601. As a result of their acquisition of Inspire common stock during the Class Period and Defendants' material misstatements and omissions, Lead Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws. By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of Inspire's business and prospects. As the true facts about the Company were revealed to the market, the price of Inspire common stock fell significantly. These declines removed the inflation from the price of Inspire common stock, causing real economic loss to investors who had purchased Inspire common stock during the Class Period.

602. The declines in the price of Inspire common stock after the partial disclosures came to light were a direct result of Defendants' fraudulent misrepresentations being revealed to investors and the market. The timing and magnitude of the price declines in Inspire common stock negate any inference that the losses suffered by Lead Plaintiff and the other Class members were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

603. The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and the other Class members was the proximate cause of Defendants' fraudulent scheme to artificially inflate the price of Inspire common stock and the subsequent significant decline in the value of Inspire common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## IX. ADDITIONAL SCIENTER ALLEGATIONS

604. The following allegations, viewed collectively, support a strong inference that Defendants acted with scienter in that they knew or were severely reckless in disregarding that the public statements issued by them were materially false and/or misleading; they knew that such statements would be disseminated to the investing public; and they knowingly and substantially participated in the issuance and dissemination of those statements.

605. As detailed above and summarized below, Defendants' intent to deceive and/or severely reckless disregard for the truth may be strongly inferred from the following facts and circumstances.

606. The scienter of Defendants Herbert, Buchholz, and Weatherby, and of other management-level executives at Inspire identified below, is imputable to the Company.

### A. Multiple Facts Support a Strong Inference of Scienter for Defendants' Misstatements about SleepSync

607. Defendants Herbert, Buchholz, and Weatherby had direct knowledge of and access to contemporaneous data and information that contradicted their public statements about SleepSync (including the Company's guidance, which was false and misleading as a result of both the SleepSync and reimbursement and coding issues). As confirmed by multiple former employees, the Individual Defendants knew or had access to the true facts regarding SleepSync's deficiencies and information security vulnerabilities as well as providers' widespread hesitancy to install SleepSync—facts that were directly at odds with Defendants' statements about SleepSync, all of which were made by Defendant Herbert, and the Company's guidance.

608. ***Reports to the Individual Defendants, including Defendant Herbert, from Inspire's Vice President of Quality on SleepSync Security Issues.*** FE 2 (a principal software design assurance engineer at the Company from October 2024 to February 2025) confirmed that the Inspire V had a lot of quality issues that his team highlighted. FE 2 explained that the SleepSync software was not fully validated upon his departure from the Company (in February 2025). There were bugs, deficiencies, and software anomalies. FE 2 confirmed that these problems were reported to the Company's VP of Quality, Andrea Rasmussen, and ultimately Inspire's then-CTO, John Rondoni.

609. The SleepSync software's bugs, deficiencies, and anomalies were critical quality defects with an essential component of Inspire's only product. Under medical device industry standards, including ISO 13485, with which Inspire represented that it complied, quality issues of this magnitude were required to be, and were, escalated to Inspire's "top management," a group that includes Defendants Herbert, Buchholz, and Weatherby.

610. Before and during the Class Period, Inspire repeatedly represented that its quality

system complied with ISO 13485, which is an international standard published by the International Standards Organization ("ISO"), titled "*Medical devices – Quality management systems – Requirements for regulatory purposes*." For example:

- Inspire represented in its 2023 Sustainability Report dated May 8, 2024 that: "Our QMS [Quality Management System] seeks to ensure we meet or exceed international regulatory requirements and standards, and maintains an International Organization for Standardization (ISO) 13485 certification for medical device companies." That Sustainability Report was reviewed and approved by Defendant Herbert, whose picture and signature appear on p. 3 under the heading "A Message from our CEO."

- Inspire represented in its Annual Report on Form 10-K dated February 10, 2025, which was signed by Defendants Herbert and Buchholz, that "our quality system is currently designed to comply with ISO standards[,]" including ISO 13485.

- Inspire represented in its 2024 Sustainability Report dated May 6, 2025: "Our QMS meets international regulatory requirements and standards by maintaining an International Organization for Standardization (ISO) 13485 certification for medical device companies." That Sustainability Report was reviewed and approved by Defendant Herbert, whose picture and signature appear on p. 4 under the heading "A Message from our CEO."

- Inspire represented its 10-K dated February 13, 2026, signed by Defendant Herbert, that "our quality management system is designed to comply with ISO 13485."

611. ISO 13485 defines "software" as part of a medical device. ISO 13485 § 3.11, requires that "software applications shall be validated prior to initial use and, as appropriate, after changes to such software or its application," and that a medical device manufacturer must "document procedures for the validation of the application of computer software used in the quality management system." ISO 13485 § 4.1.6; *see also* ISO 13485 §§ 7.5.6, 7.6.

612. A central feature of ISO 13485 is "management responsibility," which imposes a variety of obligations on "top management" and imposes obligations on others to inform top management of certain facts. For example, top management is required to appoint a "management representative," who is required to "report[] to top management on the effectiveness of the quality management system and any need for improvement." ISO 13485 § 5.5.2. ISO 13485 defines "top

management" as the "person or group of people who directs and controls an organization at the highest level." *See* ISO 9000. Inspire's top management included Defendants Herbert, Buchholz, and Weatherby.

613. Andrea Rasmussen, Vice President of Quality, was Inspire's "management representative." FE 8 was a senior labelling specialist at Inspire for years before the Class Period until September 2025. FE 8 worked with engineers and project managers to make all the labels and Instructions for Use (IFUs) for each component of the devices. FE 8 also worked with the regulatory and quality teams. FE 8's supervisor was Nick Mairs, Director, Systems Engineering and User Experience. FE 8 was familiar with the FDA QSR rule and he identified Andrea Rasmussen, Vice President of Quality, as Inspire's "management representative"—an identification that is corroborated by Rasmussen's title.

614. According to FE 2, the SleepSync software bugs, deficiencies, and anomalies were escalated to Rasmussen. Those deficiencies and vulnerabilities were quality issues of the highest importance, with severe implications for the effectiveness of Inspire's quality management system.

615. Under ISO 13485, Rasmussen was required to report those deficiencies and vulnerabilities to top management, including Defendants Herbert, Buchholz, and Weatherby.

616. As noted above, Inspire represented that its quality system was designed to comply with (or exceed) the requirements of ISO 13485.

617. Further, Inspire represented, for example, in its 2023 and 2024 Sustainability Reports, that its quality management system included "[c]ontinuous monitoring of product performance."

618. Inspire's 2025 Sustainability Report similarly assured that its quality management system included "[r]eal-world monitoring of product performance," and that Inspire "maintain[s]

established procedures for investigating complaints and adverse events" whereby "[s]enior management receives regular updates on quality performance and assessments."

619. The fact that Rasmussen was informed of SleepSync's deficiencies and vulnerabilities, and required to report them to Defendants Herbert, Buchholz and Weatherby under ISO 13485, a standard which Defendants stated they followed, supports a strong inference of scienter.

620. ***Regular (and at Least Quarterly) Management Reviews by Individual Defendants.*** ISO 13485 further requires top management to "conduct[] management reviews," *i.e.*, to "review the organization's quality management system at documented planned intervals to ensure its continuing suitability, adequacy and effectiveness." ISO 13485 §§ 5.1(d), 5.6.

621. SleepSync was a part of Inspire's quality system. Prior to 2025, FE 8 wrote a manual for the clinicians' software used to program the Inspire V and updated an IT flyer for salespersons to distribute to their accounts. According to FE 8, the flyer detailed the requirements for the new software upgrade for Inspire V and reflected the differences between Inspire IV and V. FE 8 confirmed that the flyer was inputted into Inspire's quality management system and would have required approval from Andrea Rasmussen, Vice President of Quality, and John Rondoni, then-CTO.

622. Inspire represented in its 2024 Sustainability Report, dated May 8, 2025, that its quality management system was "evaluated and improved through internal and external audits, analysis of data, quality inspection and … product surveillance" about which "[s]enior management receives updates . . . in quarterly meetings and more often, as needed."

623. Similarly, Inspire's 2023 Sustainability Report, published in May 2024, states these same inputs as "evaluated by senior management as needed, but at a minimum, in quarterly

meetings."

624. More than one quarter elapsed between when the Company first started implanting and activating Inspire V devices with the SleepSync programmer in the Singapore trial (which started on July 25, 2024) and the start of the Class Period (November 4, 2024).

625. The fact that Defendants Herbert, Buchholz, and Weatherby conducted at least one management review between the time when the SleepSync software deficiencies and information security vulnerabilities were identified and the start of the Class Period supports a strong inference of scienter.

626. ***Widespread, Documented Reports to Inspire of Concerns from Providers.*** Defendant Herbert (and Defendants Buchholz and Weatherby, who reviewed and approved the guidance) also had knowledge of and access to providers' hesitancy to install SleepSync due to concerns about information security vulnerabilities and HIPAA compliance. Multiple former employees interviewed in Lead Counsel's investigation confirmed that these concerns were widespread, well-documented, and widely known within Inspire. As described by FE 1 and FE 3, providers across multiple territories refused to install SleepSync for months on end. FE 1 and FE 5 both confirmed that, by their departures in May 2025, none of their accounts had installed SleepSync.

627. FE 3 explained that his accounts' issues with IT approval were reported up at least to his supervisor (a Regional Sales Manager) and his supervisor's supervisor (an Area Vice President), and that many other territory managers were experiencing these same frustrations.

628. Providers' progress in adopting SleepSync was also tracked in internal company systems. As FE 1 explained, the Company's system routinely checked whether providers signed an IT agreement and if you were not in compliance, the Company would keep sending reminders.

629. Defendant Herbert (and Defendants Buchholz and Weatherby) had access to these systems and to these subordinate executives. Given the cascade of internal reports and the Company's own tracking systems, Herbert (and Buchholz and Weatherby) either knew of providers' hesitancy to install SleepSync or was severely reckless in failing to learn about it before making his reassuring statements to investors.

630. ISO 13485 further imposes on top management (including Defendant Herbert) the obligation to "ensure that customer requirements and applicable regulatory requirements are determined and met." ISO 13485 § 5.2. Further, the management review is required to include "feedback," particularly customer feedback. ISO 13485 §§ 5.6.2, 8.2.1. Those provisions required top management (including Herbert) to review the providers' concerns regarding SleepSync, particularly regarding HIPAA compliance. Inspire represented that it complied with ISO 13485 and further (for example, in the 2023 and 2024 Sustainability Reports) that Inspire's quality management system was focused on "customer expectations."

631. The fact that providers' concerns with SleepSync were widespread, well-documented, reported up to leadership, reflected in internal reports and the Company's database to which Defendants had access, and subject to mandatory review by Defendants under ISO 13485, support a strong inference of scienter.

632. ***Defendants' Affirmative Duty to Monitor Information about SleepSync's Software Deficiencies and Information Security Vulnerabilities and Providers' Concerns about SleepSync.*** Under the ISO 13485 provisions cited above—including ISO 13485 §§ 3.11, 4.1.6, 7.5.6, and 7.6, which define software as part of a medical device and require software to be validated within the manufacturer's quality system (¶611), and §§ 5.2, 5.6.2, and 8.2.1, which require top management to include customer feedback within their quality reviews and to ensure

that customer requirements are met (¶¶612, 630)—Defendants, as members of "top management," were obligated to monitor quality issues and to review customer feedback, including the quality issues presented by SleepSync's software deficiencies and information security vulnerabilities, and providers' feedback regarding the same.

633. Additionally, Defendants Herbert, Buchholz, and Weatherby had a duty to monitor that information as members of "management with executive responsibility" under the FDA's Quality System Regulation (QSR) rule in effect during 2024 and 2025. 21 C.F.R. Part 820.[8] The QSR rule defines "management with executive responsibility" as "those senior employees of a manufacturer who have the authority to establish or make changes to the manufacturer's quality policy and quality system." 21 C.F.R. § 820.3.

634. Inspire's management with executive responsibility included Defendants Herbert, Buchholz, and Weatherby. The QSR rule required management with executive responsibility, among other things, to "ensure that the quality policy is understood, implemented, and maintained at all levels of the organization"; to "review the suitability and effectiveness of the quality system at defined intervals and with sufficient frequency … to ensure that the quality system satisfies the requirements of this part and the manufacturer's established quality policy and objectives"; and to appoint a "management representative" responsible for reporting to management with executive responsibility. 21 C.F.R. § 820.20(a), (b)(3), (c).

635. As with ISO 13485, the QSR rule treated software such as SleepSync "as part of … the quality system." 21 C.F.R. § 820.70(i).

[8] The FDA amended 21 C.F.R. Part 820 in January 2024, with the amendments effective February 2026. The pre-amendment version, in effect at the time of Defendants' misstatements related to SleepSync, was called the QSR rule. The post-amendment version is called the QMSR rule. The amendments incorporate ISO 13485.

636. The fact that Defendants had a duty to monitor information about SleepSync's software deficiencies and information security vulnerabilities and providers' concerns regarding SleepSync under both ISO 13485 and the QSR rule supports a strong inference of scienter.

637. ***Defendant Herbert Touted His Personal Knowledge of SleepSync Feedback and the Importance of Provider Approvals***. Herbert's statements about "feedback" for SleepSync on November 4, 2024 and January 13, 2025 indicated to investors that Herbert knew about the actual feedback for SleepSync, including the negative feedback that SleepSync was beset by software deficiencies and information security vulnerabilities. FE 1's account set forth in ¶¶136-37 confirms that HIPAA or information security concerns about SleepSync were widespread.

638. Similarly, Defendant Herbert's May 5, 2025, June 13, 2025, and June 17, 2025 statements represented that Herbert knew whether centers had adopted SleepSync (and that it was a "majority" of the "top" or "high volume" centers), that Herbert knew whether the centers that had not yet adopted SleepSync were "ready to take" it, and that Herbert knew how long it was taking to get approval from providers' IT departments to install SleepSync. Herbert made each of these statements in response to an analyst question, as opposed to as part of prepared remarks.

639. Herbert's statements corroborate FE 1's statement that Inspire tracked providers' SleepSync adoption status in internal databases and confirm that Herbert had access to that information.

640. During the Truist Securities MedTech Conference on June 17, 2025, Herbert discussed the "three steps to bring a center onboard," including to "get the new program" (*i.e.*, SleepSync) "in place," and stated that "when we did the guidance, we kind of had that knowledge." Following questioning by an analyst, Herbert continued to discuss (and attempted to minimize the importance of) the need for providers to obtain approvals from "IT" to install SleepSync and stated:

"We knew all of this when we set out the guide at the last earnings call." Inspire's "last earnings call" was on May 13, 2025 (before Defendant Herbert's June 13 and 17, 2025 misstatements regarding SleepSync), and "when we did the guidance" was prior to January 13, 2025, the date Inspire's guidance for 2025 was announced (*i.e.*, before Defendant Herbert's January 13, May 5, June 13 and 17 misstatements regarding SleepSync).

641. The fact that Defendant Herbert touted his personal knowledge of SleepSync feedback and provider approvals—while the actual feedback included widespread concerns about software deficiencies and information security vulnerabilities that Herbert knew about or was severely reckless in disregarding—supports a strong inference of scienter.

**B. Multiple Facts Support a Strong Inference of Scienter for Defendants' Statements about Insurance Coverage and CPT Coding**

642. Defendants also had direct knowledge of and access to contemporaneous facts that contradicted their public statements about insurance coverage and CPT coding (including the Company's guidance, which was false and misleading as a result of both the reimbursement and coding and SleepSync issues). The Individual Defendants knew the insurers' actual coverage policies, knew the correct CPT coding for Inspire V, and were aware of providers' and payors' widespread objections to Inspire's use of CPT code 64568—yet they continued to make false and misleading statements on each of these subjects throughout the Class Period.

643. ***Defendants Herbert and Weatherby's Personal Knowledge of the Decision to Use Incorrect CPT Code 64568.*** Defendants Herbert and Weatherby (the speakers of the relevant statements regarding coding) were familiar with the coding-relevant facts and with the relevant CPT coding principles that made 64568 incorrect. Both Herbert and Weatherby were experienced medical device executives with specific responsibility for reimbursement.

644. During Herbert's tenure at Medtronic (1996-2007), a large medical device company that (like Inspire) manufactures medical devices for which providers submit claims for device-related procedures, Herbert held a management position with responsibility for reimbursement, which is the function that includes CPT coding.

645. Defendant Weatherby oversaw the relevant division (Market Access and Reimbursement) at Inspire, including during the time period when Defendants decided on the strategy to use CPT code 64568 for Inspire.

646. FE 3 explained that Herbert and Weatherby and Randy Ban (Executive Vice President, Patient Access and Therapy Development) worked closely with the team responsible for reimbursement, which worked directly with the payors.

647. Further, Inspire and Defendant Herbert have a long history with CPT codes 64568 and 64582. Inspire and Herbert were directly involved in the creation of CPT code 64582 in 2020-2022. During that time, Herbert frequently discussed the need to create hypoglossal nerve stimulation-specific CPT codes and personally asserted that CPT code 64568 did not accurately describe or appropriately reflect the work involved in implanting a hypoglossal nerve stimulator.

648. For example, at the Wells Fargo Global Healthcare Conference on September 9, 2020, one month before the CPT Editorial Panel meeting creating CPT code 64582, Defendant Herbert described the need to "move away from a shared code with neural stem to having two codes, one for the vagal nerve stem, one for hypoglossal nerve stem."

649. On Inspire's November 2, 2020 earnings call, after the CPT Editorial Panel meeting, Defendant Herbert stated that CPT code 64568 was "originally developed in the year 2012" and that its reimbursement level was based on a survey "for neurosurgeons doing vagal nerve stimulation." Herbert went on to describe the "partnership that we have with AAO" in

creating the new codes. Herbert's public statements are indicative of his private knowledge, which goes far beyond his public statements. For example, the submissions to and the proceedings before the CPT Editorial Panel are not publicly available, but are available to interested parties such as Inspire. Herbert's public statements reflect his knowledge of that non-public information.

650. Finally, at the J.P. Morgan Healthcare Conference on January 12, 2026, Herbert stated that he knew that "all the way back to 2014" Inspire "always had challenges back then with" 64568, as Defendants later admitted.

651. Like Defendant Herbert, former Inspire employees have stated that CPT code 64568 is reserved for vagus nerve stimulation devices, confirming that this was known within Inspire.

652. For example, following Defendant Herbert's comments in 2020, another Inspire senior executive, Kathy Sherwood (Senior Vice President, Global Market Access and Reimbursement) wrote to the head of CMS on September 13, 2021 that: "CPT code 64568 will continue to be effective, but will only describe vagus nerve stimulation (VNS) implantation procedures."

653. On September 6, 2022, Sherwood wrote again to the head of CMS that "HGNS [hypoglossal nerve stimulation] and VNS procedures will no longer be commingled - the HGNS procedures are reported with CPT code 64582 and the VNS procedures are reported with CPT code 64568."

654. Herbert knew about Sherwood's letters, which he discussed by subject matter at the JPMorgan Healthcare Conference on January 12, 2022, explaining that "[w]e had a little bit of work to do with CMS."

655. Another Inspire executive reporting to Sherwood, Brian Carlson (Inspire's Senior Director of Market Access and Reimbursement from January 2020 to June 2022), confirmed that Inspire's use of CPT code 64568 for Inspire V was incorrect in comments posted on LinkedIn in January 2026, quoted *supra* ¶¶294-95.

656. During Carlson's tenure at Inspire, Defendant Herbert was CEO, Inspire and Herbert were working to create CPT code 64582, and Herbert and Sherwood made the statements quoted in ¶¶648, 652 above that are consistent with Carlson's statements.

657. In May 2026, Inspire's former Director of Research, who was "Inspire former employee 18," told AlphaSense that the use of CPT code 64568 for Inspire V was a "misinterpretation" and "just a strategy."

658. The former Director of Research explained that 64568 was "really intended for vagus nerve stimulation" and that "the whole plan from the very beginning is to separate vagal nerve stimulation" from hypoglossal nerve stimulation with different CPT codes.

659. The consistent statements of Sherwood, Carlson, and the former Director of Research demonstrate that knowledge of the relevant CPT coding principles—including that 64568 was reserved for vagus nerve stimulation—was widespread within Inspire, and support a strong inference of scienter.

660. ***Defendant Herbert Touted Personal Knowledge of Coverage Policies, the Validation of Coding with the MACs, and CPT Coding.*** Defendant Herbert repeatedly spoke about United Healthcare, purporting to have detailed knowledge about United Healthcare's relevant policies.

661. For example, at the Morgan Stanley Healthcare Conference on September 4, 2024, an analyst asked Herbert a question about a specific change to United Healthcare's policy, and

Herbert responded at length:

> United Healthcare is good friends of ours in Minneapolis. They cover the therapy and they're very supportive. They had a third party actually write the procedure for what their coverage is going to be. And they included the oral appliances. They had done that on a regional basis for several years. It was not a barrier in that we would just document that during the prior authorization process. And then United Healthcare does do internal reviews of their coverage policies and they reviewed this one and said, yeah, that's not an appropriate coverage. So they just removed the oral appliance altogether. And then while they're there, they look at the CPAP, they know people don't fail CPAP therapy. They know people are not tolerant to CPAP or flat out refuse it. And so they change their language to say it's okay if patients simply refused to have therapy. And so that's an important change for that policy and for them being supportive of their patients who need treatment for their sleep apnea.

662. Likewise on Inspire's February 10, 2025 earnings call, Defendant Herbert responded to another question about United Healthcare, stating: "I think we're working with United. They've made too many changes over a period of time, so we need to have discussions with them." Herbert's statements reflect his knowledge of the discussions between Inspire and payors (such as United Healthcare), the content of which was not publicly available.

663. It is implausible that Herbert would be aware of changes to specific terms of United Healthcare's written policy while remaining unaware that United Healthcare did not cover Inspire V at all from its approval in August 2024 through the end of 2025 (including on the dates of Herbert's misstatements about insurance coverage on November 4, 2024, January 13, 2025, February 10, 2025, May 5, 2025, August 4, 2025, November 3, 2025, and November 10, 2025).

664. As for Defendant Herbert's statements about "validat[ing] the coding" with the MACs and other payors, giving the MACs and other payors a "fair shake at all the information," and making the MACs and other payors "fully aware," those related to conversations in which Herbert claimed to be personally involved.

665. Herbert stated, for example, that: "***[w]e*** continue to validate the coding scenarios with payers and Medicare contractors"; "***[w]e*** want to make sure that they have a fair shake at all

the information"; and "***we're*** working with the payers and we want to make sure that the Medicare or the MACs, as well as the payer are fully aware of this."

666. Further, consistent with his knowledge of the relevant coding principles and experience as an executive with responsibility for reimbursement, Defendant Herbert held himself out as Inspire's primary spokesperson on CPT coding and made repeated public misstatements about the correct CPT code for Inspire V and the relevant CPT coding principles.

667. For instance, Herbert told investors in May 2025 that he believed "the new CPT code 64568" was integral to enabling Inspire V's "full launch."

668. The fact that Defendant Herbert touted his personal knowledge of the relevant insurance coverage policies, the validation of coding with the MACs, and CPT coding supports a strong inference of scienter.

669. ***Widespread Objections from Providers and Payors to Inspire's Use of CPT Code 64568.*** Defendants Herbert and Weatherby (and Buchholz) were also aware of and had access to the widespread objections from providers and payors to Inspire's use of CPT code 64568.

670. According to FE 1, Inspire management had access to the Microsoft Dynamics CRM database, which tracked all approvals and denials.

671. According to FE 7, a member of Inspire's Market Access and Reimbursement division, providers were debating the coding description from the onset of the limited release, there was pushback on the coding in multiple states, and health systems were pushing back on the use of 64568. The providers and payors' objections to the use of CPT code 64568 for Inspire V were also reported up to Kimberly Konopa, Inspire's Vice President, Market Access and Reimbursement. Konopa was the highest-ranking member of Inspire's Market Access and Reimbursement department, which was responsible for arrangements with Medicare and private

insurers. Konopa's supervisor and the executive responsible for that division was Defendant Weatherby until January 2025, and then Randy Ban, Executive Vice President, Patient Access and Therapy Development.

672. FE 7 confirmed that 64568 did not accurately describe Inspire V, did not match the device, and was not the most appropriate code to use. For example, FE 7 described how one provider (Proliance) associated with a health insurer (Providence Health) said that it would report Inspire's coding to the American Medical Association. Providence Health adopted a written policy rejecting the use of CPT code 64568 in January 2025 after FE 7 confirmed that Proliance privately raised its concerns directly to Inspire (including the Senior Director of Reimbursement and an Area Vice President).

673. Additionally, Defendant Herbert was also familiar with the work of the Market Access and Reimbursement department, having held a management position with responsibility for reimbursement at Medtronic. Konopa departed Inspire in May 2026, following a series of revelations regarding the incorrectness of CPT code 64568 for Inspire V.

674. The fact that the Defendants had access to the Microsoft Dynamics CRM database containing widespread provider and payor objections to the use of CPT code 64568, objections which were reported up to Inspire executives, gives rise to a strong inference of scienter.

675. ***Senior Leadership Team Meetings with Individual Defendants.*** Defendants Herbert and Weatherby, and Randy Ban, also had knowledge of "questions about reimbursement" from their attendance at senior leadership team meetings.

676. The AlphaSense Expert Insights platform published a transcribed interview on February 26, 2026 (interview date February 23, 2026) between an analyst and a former Inspire employee during part of the Class Period who identified himself as a former Inspire Territory

Manager, reporting to an Area Sales Director.

677. When asked about "reimbursement," the former Territory Manager stated:

> This is the hard thing, is that nobody really knows. Even when I was actively working with Inspire, there were questions about reimbursement. … There's just a lot of question marks around it. … Anyone who tells you they know exactly what's going to happen with the reimbursement stuff is lying to you. ***Even high up in the internal side of the company, some of the leadership meetings I attended, it was just a big question mark***.

678. FE 3 confirmed that Defendants Herbert and Weatherby, and Randy Ban were part of every senior leadership team meeting.

679. The fact that Defendants Herbert and Weatherby, and Randy Ban, attended senior leadership team meetings where "questions about reimbursement" and "question marks" were discussed and acknowledged supports a strong inference of scienter.

680. ***The U.S. Attorney for the District of Minnesota Investigates Inspire for False Claims Related to Reimbursement and Defendants Instruct Employees Not to Speak About It.*** On January 17, 2025, Inspire received a civil investigative demand (CID) from the U.S. Attorney's Office for the District of Minnesota "concerning allegations of false claims … submitted to government payors in connection with our implant," including specifically the Company's "reimbursement practices."

681. Defendants Herbert and Weatherby (and Buchholz) were aware of the CID, which was disclosed in Inspire's February 10, 2025 Annual Report on Form 10-K.

682. FE 5, a sales territory manager in the southeastern United States at Inspire for more than one year before the Class Period to May 2025, joined an all-field call in January 2025 with Inspire leadership, territory managers, field clinical representatives, and sleep specialists. According to FE 5, on the call, a member of Inspire leadership told them not to speak to anyone

about the DOJ investigation. FE 5 could not recall who made the comment, but it was either Defendant Herbert, Defendant Weatherby, or Randy Ban.

683. The fact that Inspire is under federal investigation for alleged false claims related to reimbursement and that Defendants instructed employees not to speak to anyone about the DOJ investigation supports a strong inference of scienter.

684. ***Access to Insurance Coverage Tracking Data from Internal Database.*** As for Defendants' statements that Inspire had secured positive coverage policies from "***all***" (or "***nearly all***") large national commercial insurers and from "***all seven***" MACs, Defendants Herbert and Buchholz (who signed the 10-K and 10-Qs) and Defendant Weatherby had access to the Microsoft Dynamics CRM database that Inspire used to track coverage. According to FE 1, Inspire management 100% had access to Dynamics.

685. As of November 4, 2024 and February 10, 2025, Inspire V lacked coverage from several of the very largest national commercial insurers (including Blue Cross Blue Shield, United Healthcare, Aetna, and Cigna), and Defendants overstated the amount of coverage by ***tens of millions*** of covered lives.

686. Inspire's February 10, 2025 Annual Report on Form 10-K specifically identified "Cigna, Blue Cross Blue Shield, and United Healthcare" – some of the very insurers as to whom Defendants' statements about insurance coverage were false and misleading – as examples of the "largest commercial payors in the U.S." (with the only other example identified being "Elevance (formerly Anthem)," an affiliate of Blue Cross Blue Shield).

687. The fact that Defendants had access to the Microsoft Dynamics CRM database that Inspire used to track coverage, particularly in combination with the fact that Inspire lacked coverage from several of the largest national commercial insurers, gives rise to a strong inference

of scienter.

688. ***CMS Identifies Inspire By Name As A Provider Who "Abuses Medicare" and Has "Been a Source of Fraud, Waste and Abuse."*** As a result of Inspire's use of CPT code 64568 for Inspire V, Inspire V and its associated CPT codes were added to CMS's Wasteful and Inappropriate Service Reduction (WISeR) pilot program.

689. WISeR targets providers who "abuse Medicare" and "have been a source of fraud, waste, and abuse."

690. Inspire and Inspire V are the only company and only medical device identified by name in the WISeR Factsheet published by CMS in January 2026.

691. While the list of CPT codes covered by WISeR was not formally finalized until year end 2025, Defendants had advance notice much earlier in 2025 that Inspire V and its associated CPT codes were planned for inclusion.

692. For example, CMS identified "Hypoglossal Nerve Stimulation for Obstructive Sleep Apnea" as a service that it planned to include in WISeR in a June 26, 2025 Request for Applications ("RFA") that was available to Defendants.

693. The WISeR RFA pre-dated Defendants' misstatements about CPT coding, for example, on September 3, 2025, November 10, 2025, December 2, 2025, and January 12, 2026, and 2025 Hospital/ASC Billing Guide posted on Inspire's website between August and October of 2025 (¶¶558, 560-61, 572, 578, 582).

694. The fact that Defendants knew that CMS identified Inspire and Inspire V for inclusion in WISeR as a "source of fraud, waste, and abuse" supports a strong inference of scienter.

695. ***Defendant Herbert's Evasive Answers in Response to Analyst Questions.*** Defendant Herbert behaved evasively and refused to give direct answers when responding to analysts' questions about CPT coding.

696. For example, when asked by an analyst on February 11, 2026 to identify the new factual development that led Inspire to direct providers to change their coding for Medicare claims to 64582-52, Defendant Herbert responded "without getting too specific into the details of who, when, and how, we have got to the point that we know that 64582 will be the code going forward, including with a -52 modifier."

697. Herbert's refusal to identify the new factual development requiring the use of 64582-52 suggests that the facts requiring the use of that coding (for physicians) were previously known by Defendants.

698. Herbert's refusal to give direct answers to the analysts' questions suggests that a direct answer would have been inculpatory.

699. Additionally, on June 17, 2025, Herbert had an exchange with an analyst where, in response to a direct question, he denied that SleepSync was an "unanticipated" "friction[] or bottleneck," "the key challenge," or an unexpected "challenge" to the Inspire V launch.

700. Herbert's refusal to acknowledge SleepSync as a meaningful obstacle, despite being directly asked whether it would be a challenge, suggests that he was attempting to minimize a known problem.

701. That Defendant Herbert gave evasive answers and refused to directly address analysts' questions about CPT coding support a strong inference of scienter.

702. ***Defendants' Motive to Use 64568 as the More Lucrative Code that Facilitated Adoption by Providers.*** While Lead Plaintiff is not required to plead motive, Defendants had a

strong motive to falsely represent that 64568 was the correct CPT code for Inspire V because 64568 was substantially more lucrative than the correct coding of 64999 (for facilities) and 64582-52 (for physicians)—or the alternative of creating a new CPT code, which would not have become available for years.

703. Waiting for a new CPT code before launching would have delayed Inspire V's launch until after FDA approval and market entry of Nyxoah's Genio and LivaNova's aura6000.

704. Defendants' false representations that 64568 was the correct code induced providers to adopt Inspire V and to purchase Inspire V devices.

705. Even though the miscoding was eventually discovered and stopped with respect to Medicare, Defendants' fraud allowed Inspire to complete the Inspire V launch and establish Inspire V as the incumbent device for hypoglossal nerve stimulation prior to the market entries of two competitors: Nyxoah's Genio device and then LivaNova's aura6000 device.

706. As compared to the correct coding of 64999 for facilities and 64582-52 for physicians, 64568 had three distinct advantages: (i) a guaranteed facility reimbursement rate, compared to the unknown facility reimbursement rate for 64999; (ii) an additional payment for ambulatory surgical centers of about $1,000 for claim year 2025; and (iii) a potential upside of a massive increase in the facility reimbursement rate for 64568 due to longstanding cost-to-reimbursement disparities for vagus nerve procedures–an upside which finally arrived in November 2025 for claim year 2026.

707. While the effect on physician reimbursement varied depending on circumstances, reimbursement for physicians with 64568 had a narrower range (thus less uncertain) that is higher at the low end of the range than 64582-52, for which the -52 modifier would reduce physician reimbursement by 10-50%.

708. Guaranteed reimbursement rate. For facilities, the correct CPT code for Inspire V was 64999, the "unlisted" code for nervous system procedures. Unlisted codes have no guaranteed reimbursement rate.

709. To determine reimbursement rates for 64999, providers would be required to submit burdensome additional documentation and wait longer for payors to review that documentation, and risk receiving reimbursement for the procedure at levels even lower than the device price.

710. In contrast, 64568 had high guaranteed reimbursement rates of about $30,473.59 for hospital outpatient departments and about $26,832 for ambulatory surgical centers.

711. Additional Medicare Transitional Pass-Through payments for ambulatory surgical centers. As *The Capitol Forum* reported on December 10, 2025: at the time Inspire started using CPT code 64568 for Inspire V, "64568 reimbursed slightly higher than 64582 when performed at an ambulatory surgical center, which the company likely believed would help drive adoption of the new device."

712. FE 7 confirmed that ambulatory centers that are owned by physicians had a lot more to gain from the 64568 coding.

713. Inspire's choice of CPT code 64568 was motivated by the additional reimbursement for ambulatory surgical centers under 64568.

714. Further corroborating this motive, Defendant Herbert's public statements repeatedly referenced the increased reimbursement for ambulatory surgical centers.

715. For example, at the KeyBanc Healthcare Forum on March 18, 2025, Herbert stated: "And if that surgeon happens to be owner of an ambulatory surgical center, the reimbursement of the new code 64568 is $1,000 higher."

716. At the Bank of America Global Healthcare Conference on May 13, 2025, Herbert stated: "[T]here's an increased payment in ambulatory surgical centers associated with the new code, too, where it increases the payment at ASCs by $1,000."

717. Physician reimbursement. Physician reimbursement varies by the physician's circumstances. Some are salaried. Others own facilities. Others are paid based on the Relative Value Units (RVUs), or Medicare's Physician Fee Schedule, for the procedures that they perform.

718. Because of the varied circumstances of physicians, and because facility reimbursement represents substantially more dollars than physician reimbursement, facility reimbursement provided the greater motive for Defendants' choice of CPT code 64568. FE 7 confirmed that the Company wanted a code to be used that provided good reimbursement of facilities as opposed to physicians, which reduced their payment by about $200. FE 7 further confirmed that the reimbursement incentive for facilities under 64568 to use the Inspire V was much greater than 64582 for the Inspire IV (by about $2,000).

719. Nevertheless, the use of CPT code 64568 had potential advantages for physician reimbursement as compared to the correct coding of 64582-52. The -52 modifier would have reduced the RVUs and Physician Fee Schedule for 64582-52 by 10-50% (relative to 64582). The degree of reduction within that range would have been within the MACs' discretion, thus creating substantial uncertainty for surgeons. The range of the RVUs and Physician Fee Schedule for 64568 was narrower and thus less uncertain than for 64582-52 and higher at the lower end of the range.

720. The fact that Defendants had a strong financial motive to misrepresent the substantially more lucrative 64568 code as the correct CPT code for Inspire V supports a strong inference of scienter.

721. ***The Individual Defendants' Personal Financial Motives.*** Defendants Herbert, Weatherby, and Buchholz, and Randy Ban (Executive Vice President, Patient Access and Therapy Development), each had concrete and personal financial motives to misstate the correct CPT coding for Inspire V in order to increase their personal incentive compensation that was tied to Inspire's performance metrics.

722. Because reimbursement using CPT code 64568 was substantially more lucrative than reimbursement under the correct CPT coding (64999 for facilities or 64582-52 for physicians), Defendants' misstatements that 64568 was the correct CPT code had the foreseeable effect of substantially increasing Inspire's sales and revenue during 2025.

723. As a result, each of Herbert, Weatherby, Buchholz, and Ban received cash bonuses directly tied to performance metrics that were inflated by the fraud.

724. As described in the Company's Schedule 14A Definitive Proxy Statement for Fiscal Year 2025, Herbert, Weatherby, Buchholz, and Ban were eligible for short-term annual cash incentives under the Company's Management Incentive Program ("MIP") with "target opportunities" of 115%, 70%, 60%, and 60% of their base salaries, respectively, which were $750,572, $506,250, $477,989, and $490,794, respectively. Inspire reported MIP achievement of 111.4%, resulting in Herbert, Weatherby, Buchholz, and Ban receiving cash bonuses that were 128%, 78%, 67%, and 67% of their base salaries, respectively.

725. The most important performance metric for Defendants Herbert, Weatherby, and Buchholz, and Ban's cash bonuses was Inspire's Global Revenue, which was weighted at 50% and resulted in "weighted achievement" of 40% for 2025, meaning that this metric was responsible for 36% of the bonuses that each received. The minimum threshold for Global Revenue was $900 million, and Inspire's reported Global Revenue was $912 million.

726. If Global Revenue had been reduced by just about $12 million (or reduced by as little as ***1.3%***), it would have fallen below the $900 million threshold, and this category of incentive compensation would have been erased entirely.

727. Another important performance metric for Defendants Herbert, Weatherby, and Buchholz, and Ban's cash bonuses was Inspire's adjusted Operating Income, which was weighted at 15% and resulted in weighted achievement of 22.2% for 2025, meaning that this metric was responsible for 20% of the bonuses that each received. Inspire's adjusted Operating Income for 2025 was $69.4 million, which fell between the minimum threshold of $40 million and the maximum threshold of $85 million.

728. Any reduction in Inspire's adjusted Operating Income would have reduced this category of their cash bonuses; and any increase (up to the maximum threshold) would have increased this category of their cash bonuses.

729. Given the importance of reimbursement levels to demand for Inspire V, Defendants' misstatements about reimbursement and coding foreseeably had a substantial effect on Inspire's Operating Income and thus substantially inflated this category of their cash bonuses—which was worth an additional $213,465 to Herbert, $95,213 to Weatherby, $70,926 to Buchholz, and $72,826 to Ban.

730. Another important performance metric for Herbert, Weatherby, Buchholz, and Ban's bonuses was Inspire's "Patient Flow," which was measured by "(i) prospective patient calls to the ACP [Advisor Care Program] that result in a scheduled appointment and (ii) prior authorization approvals for patients in the U.S. during fiscal 2025." This metric was weighted at 15% and resulted in weighted achievement of 14.2% for 2025, meaning that this metric was responsible for 12.7% of the bonuses that each received.

731. The results for both measures of Patient Flow fell between the minimum and maximum thresholds. Any reduction in Inspire's Patient Flow would have reduced this category of their cash bonuses; and any increase (up to the maximum threshold) would have increased this category of their cash bonuses.

732. Given the importance of reimbursement levels to demand for Inspire V, Defendants' misstatements about reimbursement and coding foreseeably had a material effect on Inspire's Patient Flow and thus substantially inflated this category of their cash bonuses—which was worth an additional $122,117 to Herbert, $54,469 to Weatherby, $40,587 to Buchholz, and $41,661 to Ban.

733. Ban's scienter is imputable to Inspire. Ban's role as Executive Vice President of Patient Access and Therapy Development placed him at the center of the issues implicated by Defendants' CPT-coding misstatements: as explained by FE 3, Ban worked closely with the team that does reimbursement.

734. FE 3 account is corroborated by the description of Ban's role in a Q4 2024 Earnings Call, which provided that Ban was directly responsible for "enhancing . . . patient access," "leading key . . . medical society relationships," and "assisting patients in obtaining prior authorization coverage decisions from payers."

735. Ban, with the Individual Defendants, made the decision to use CPT code 64568 for Inspire V, meaning he was well positioned to know whether use of CPT code 64568 was materially affecting reimbursement, provider adoption, and patient access, and whether alternative codes would result in lower or less certain payment.

736. The fact that Defendants Herbert, Weatherby, and Buchholz, and Ban received cash bonuses directly tied to performance metrics that were foreseeably and materially inflated by the fraud supports a strong inference of scienter.

737. ***Defendant Herbert's Alleged CPT Coding Scheme at Medtronic.*** During Herbert's tenure at Medtronic, Herbert's Neurological division perpetrated a fraudulent scheme that involved knowingly instructing providers to submit false claims to Medicare (and TRICARE) using an incorrect, but more lucrative, CPT code for device-related procedures. The United States intervened in a *qui tam* action in part in January 2015, and Medtronic agreed to pay the United States $2.8 million to settle the action. *United States ex rel. Nickel v. Medtronic, Inc.*, No. 09-cv-0203 (W.D.N.Y.).

738. One of the allegations as to which the United States intervened was that:

> In discussions with healthcare providers, Medtronic personnel incorrectly identified CPT code 64555 as an appropriate billing code for "SubQ" even though an outside coding expert engaged by Medtronic had warned "Medtronic reps should not be going around saying that [CPT code] 64555 is correct for subq leads." Following this comment, Medtronic representatives continued to identify CPT Code 64555 as an appropriate code for submitting claims for "SubQ" procedures.

739. Defendant Herbert repeated a similar modus operandi at Inspire during the Class Period, incorrectly identifying CPT code 64568 as an appropriate billing code for Inspire V even though providers and payors widely objected and CMS planned to include Inspire in its WISeR program to combat waste, fraud, and abuse. (Notably, while Medtronic used an outside coding expert for SubQ, Inspire has never claimed publicly that an outside coding expert approved the use of CPT code 64568 for Inspire V implantation procedures.)

740. In addition, a recently unsealed *qui tam* action reveals that Inspire perpetrated an additional allegedly fraudulent scheme on Medicare starting in 2022 and continuing at least into 2023.

741. To be eligible for reimbursement, Medicare requires a physician to have performed at least 15 Drug-Induced Sleep Endoscopy ("DISE") procedures—a test to exclude the possibility of complete concentric collapse, which Inspire devices cannot treat—with Inspire agreeing with the results in at least 80% of those procedures.

742. The relator, Patrick Collins, a sales territory manager, alleges that Inspire caused the submission of false claims to Medicare by routinely falsifying evidence regarding the number of DISE procedures that certain physicians had performed. Amended Complaint for Violations of the False Claims Act, Dkt. No. 37, *United States ex rel. Collins v. Inspire Medical Systems*, No. 24-cv-10001 (C.D. Cal. June 26, 2026).

743. Collins further alleges that the number of procedures performed by each physician was documented by videos stored in Inspire's Airway Exam database, and sales representatives, himself included, were directed to "copy videos from one physician's folder and paste them into another's" in order to ensure that quotas were met.

744. The complaint incorporates testimony from several confidential witnesses, sales territory managers at Inspire across the United States, who corroborated Collin's account that Inspire commonly instructed sales representatives to create a "bank of DISE videos that could be reused to falsely certify their new providers as needed."

745. The fact that Defendant Herbert previously participated in a similar scheme at Medtronic, instructing providers to submit claims using an incorrect but more lucrative CPT code, and that Inspire also allegedly defrauded Medicare by routinely falsifying DISE certifications, supports a strong inference of scienter.

**C. Additional Indicia of Scienter that Apply to All Misstatements**

746. ***First***, Defendants' statements concerned "the largest launch in the history of the company" (in Defendant Herbert's words) and "our biggest product launch in the company's history" (in Defendant Weatherby's words).

747. Inspire derived primarily all of its revenue from the sales of a single product, which had only two current versions (Inspire IV and V), and Defendants' statements concerned the two "predominant" "headwinds" to the launch of the newer version (Inspire V), which was intended to replace the older version (Inspire IV).

748. The misstated issues were central to Inspire's business and strategy and to the product launch that Defendants Herbert, Buchholz, and Weatherby were overseeing.

749. The adoption of SleepSync was a critically important issue. Inspire has identified SleepSync as a critical strategic priority, given its purported benefits for providers and patient outcomes.

750. The importance of SleepSync's adoption was illustrated and magnified by the Company's decision to tie Inspire V to the SleepSync programmer, and to tie the SleepSync programmer to the full installation of the SleepSync software.

751. Further, HIPAA and information security issues are particularly important in the context of the healthcare and medical device industries, and the Individual Defendants knew this based on their experience as medical device executives.

752. The choice of CPT code for Inspire V was also a critically important issue because, as discussed above, reimbursement levels were the central driver of demand and pricing for Inspire V.

753. The choice not to create a new CPT code was critical to the timing of the Inspire V launch, and the choice among existing codes was critical to reimbursement levels. FE 7's account, set forth in ¶¶310, 330, 718 above, confirms that the Company was motivated by both factors.

754. Given that Inspire device sales comprised nearly all of Inspire's revenue, and given each of Defendants Herbert, Buchholz, and Weatherby's leadership roles in the Inspire V launch, and the importance of SleepSync and CPT coding to that launch, Herbert, Buchholz, and Weatherby either knew about the SleepSync and CPT coding problems or were severely reckless in not knowing.

755. ***Second***, two Inspire senior executives, Defendant Buchholz and Randy Ban (Executive Vice President, Patient Access and Therapy Development), departed under suspicious circumstances in the same month, August 2025—simultaneously with and/or shortly after the Company slashed its guidance and disclosed that SleepSync and CPT coding were the two predominant headwinds to the Inspire V launch.

756. With responsibility for Patient Access and as the supervisor of the Market Access and Reimbursement team, Ban was the executive most directly responsible for reimbursement, including CPT coding, at the time of his departure. He also had significant responsibility for the Inspire V launch as a whole.

757. Ban's departure was announced on August 4, 2025 (effective January 1, 2026) – the ***same day*** that the Company disclosed the SleepSync and CPT coding headwinds.

758. In a press release, the Company called Ban's departure a "retirement," but that explanation is suspicious because Ban had only recently been promoted from Chief Commercial Officer to Executive Vice President, Patient Access and Therapy Development in January 2025,

and the Inspire V launch (of which he was one of the key leaders) was far from complete in August 2025.

759. As CFO, Defendant Buchholz also had a key role in the Inspire V launch and in developing, reaffirming, and upgrading Inspire's baseless and unrealistic guidance for 2025. Buchholz's retirement was announced August 25, 2025 (effective December 31, 2025) – the same month that Inspire slashed by 78.2% to 81.8% the guidance that Buchholz developed, reaffirmed, and upgraded and disclosed the headwinds to the Inspire V launch.

760. In a press release, Inspire claimed that Defendant Buchholz was leaving "in order to pursue other professional opportunities," but that explanation is suspicious because Buchholz's new role was to be the CFO of a non-public company (Impulse Dynamics) with revenues much less than Inspire's.

761. ***Third***, the magnitude and importance of Defendants' fraud had a serious impact on Inspire's stock price.

762. For example, the increased facility reimbursement levels for CPT code 64568 caused the stock price to spike by 40% on November 24-25, 2025, on the expectation that the increased reimbursement would accelerate adoption of Inspire V and allow the Company to raise the price it charged for the Inspire V device.

763. Meanwhile, the revelation of the fraud caused a series of large stock price drops, including a 40% drop on August 5-6, 2025.

764. In the aggregate, in response to these partial disclosures, Inspire's stock price declined 77.6% from its Class Period high of $215.42 per share, representing a total decline of more than $4 billion in Inspire's market capitalization, and causing devastating losses to the Class.

765. ***Fourth***, Inspire's corporate officers engaged in unusual and suspicious activity with regard to their personally held Inspire shares. As detailed below, Defendant Buchholz sold more than $1 million of Inspire shares in August 2025, with no Rule 10b5-1 plan, avoiding losses in the seven partial disclosures that followed. In December 2024, Defendant Herbert took steps that would allow his heirs to sell tens of millions of dollars of Inspire shares without any public disclosure. And Randy Ban (Executive Vice President, Patient Access and Therapy Development), the head of the division responsible for reimbursement and coding, also sold $5.5 million of Inspire shares during the Class Period and prior to the revelation of the truth regarding Defendants' misstatements about reimbursement and coding.

766. On August 29, 2025, Defendant Buchholz sold 11,000 of his personal Inspire shares–approximately 22% of the shares that he owned and could sell during the Class Period. This sale personally netted Buchholz more than $1.027 million and was not made pursuant to any Rule 10b5-1 trading plan.

767. The sale was unusually and suspiciously timed because it avoided the losses that Buchholz would have incurred by holding through the subsequent partial disclosures on September 3, 2025 (***just five days later***) and then on December 15 and 18, 2025, January 22, February 11, March 17, and May 4, 2026.

768. Buchholz had a Rule 10b5-1 plan in place at the time of the sale (entered into in the first week of the Class Period, on November 13, 2024), but he engaged in unplanned sales because his plan did not permit any sale at that time.

769. During the Class Period, ***0%*** of Buchholz's sales were made pursuant to a Rule 10b5-1 Plan, while during the "control period" (the period prior to the Class Period with an equal

number of trading days), ***100%*** of Buchholz's sales were made pursuant to a Rule 10b5-1 trading plan.

770. On December 20, 2024, Defendant Herbert and his wife transferred 52.5% of the membership interests in TPH 2022 LLC, a limited liability corporation holding approximately 138,500 Inspire shares worth approximately $26,443,805 at the closing price that day.

771. As stated in a footnote on Herbert's Form 4: "Subsequent to the transactions reported herein, [Herbert] is no longer considered the beneficial owner of securities held by TPH 2022 LLC and will no longer report securities held by TPH 2022 LLC on [his] subsequent reports."

772. In addition, the Form 4 states that it "no longer reports securities held by the Timothy P. Herbert 2013 Family Irrevocable GST Trust U/A/D November 27, 2013 because, subsequent to the [his] last Form 4, the Reporting Person is no longer considered the beneficial owner of securities held by such trust."

773. The effect of Herbert's actions—in the second month of the Class Period, and prior to all of the partial disclosures—was to permit the LLC and Trust to sell any and all of the Inspire shares held therein immediately and without public disclosure. The second month of the Class Period was an unusual and suspicious time for Herbert to take that action.

774. Randy Ban (Executive Vice President, Patient Access and Therapy Development), the head of the division responsible for reimbursement and coding, sold 29,531 of his personal Inspires shares during the Class Period–approximately ***97%*** of the total number of shares that he owned and could sell during the Class Period. These sales netted Ban more than ***$5.5 million***. These sales were completed before any of the partial disclosures.

775. While Ban's sales (25,584 shares on February 13, 2025 and 3,947 shares on March 3, 2025) were made pursuant to a Rule 10b5-1 trading plan, the circumstances of Ban's Rule

10b5-1 trading plan are unusual and suspicious. Ban entered into his Rule 10b5-1 trading plan on November 13, 2024—during the first week of the Class Period, after Defendants had made misstatements, and at a time when Inspire's stock price was already inflated by Defendants' fraudulent misstatements.

776. Ban's Rule 10b5-1 trading plan resulted in sales 92 days later, just ***two days more*** than the minimum 90-day "cooling off" period under Rule 10b5-1.

777. Inspire's stock price was essentially flat between the dates of Ban's Rule 10b5-1 trading plan and Ban's sales (closing at $182.18 on November 13, 2024, the date of the plan, and $187.15 and $182.44 on February 13, 2025 and March 3, 2025, the dates of the sales), meaning that Ban's Rule 10b5-1 trading plan called for sales either with no price floor or with a price floor around (or below) Inspire's stock price at the time Ban entered into the plan.

778. At the time Ban entered into the plan, he reasonably could have expected the plan to result in sales before the truth was revealed to investors.

**D. Corporate Scienter**

779. Defendants Herbert, Buchholz, and Weatherby's scienter is imputable to the Company because Herbert, Buchholz, and Weatherby were the Company's most senior executives and were directly responsible for making and disseminating the relevant misstatements on behalf of the Company.

780. In addition, the scienter of non-Defendant management-level executives is also imputable to the Company. These additional management-level executives include Randy Ban, Inspire's Executive Vice President, Patient Access and Therapy Development, who retired and sold stock under unusual and suspicious circumstances; and John Rondoni, Inspire's CTO, and Andrea Rasmussen, Vice President of Quality, who were informed of providers' HIPAA and information security concerns with the SleepSync software and who were required to approve the

IT flier for SleepSync in the Company's quality management system. They also include Kimberly Konopa, Inspire's Vice President, Market Access and Reimbursement, who was informed of providers' and payors' objections to the use of CPT code 64568 for Inspire V.

## X. INAPPLICABILITY OF STATUTORY SAFE HARBOR

781. The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this Complaint. The statements complained of herein: (i) were historical statements or statements of purportedly current facts and conditions at the time the statements were made; (ii) were mixed statements of present and/or historical facts and future intent; and/or (iii) omitted to state material current or historical facts necessary to make the statements not misleading.

782. Further, to the extent that any of the false or misleading statements alleged herein could be construed as forward-looking, the statements were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by the Defendants were not sufficient to insulate them from liability for their materially false and misleading statements.

783. In addition, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, the Defendants are liable for those false and misleading forward-looking statements because at the time each of those statements was made, the speaker knew the statement was false or misleading, did not actually believe the statements, had no reasonable basis for the statements, and/or was aware of undisclosed facts tending to seriously undermine the statements' accuracy.

## XI. THE PRESUMPTION OF RELIANCE

784. The Class is entitled to a presumption of reliance on Defendants' materially false and/or misleading statements and misleading conduct pursuant to the fraud-on-the-market doctrine because, during the Class Period, among other things:

(a) Defendants made public false statements and/or statements that misleadingly failed to disclose material facts and engaged in misleading conduct;

(b) The false and/or misleading statements and misleading conduct were material;

(c) The Company's stock was traded in an efficient market;

(d) The misstatements and misleading conduct alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e) Lead Plaintiff and other members of the Class purchased Inspire common stock between the time Defendants made false and/or misleading statements and engaged in misleading conduct and the time that the true facts were disclosed without knowledge of the misstatements, misleading conduct, or omitted facts.

785. At all relevant times, the market for Inspire common stock was efficient for the following reasons, among others:

(a) Inspire stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, Inspire filed periodic public reports with the SEC; and

(c) Inspire regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

786. As a result of the foregoing, Lead Plaintiff and other members of the Class relied, and are entitled to have relied, upon the integrity of the market prices for Inspire's common stock, and entitled to a presumption of reliance on Defendants' materially false and/or misleading statements and misleading conduct during the Class Period.

787. Lead Plaintiff and the Class are also entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon the misleading omissions of material fact that there was a duty to disclose, including as a result of Defendants' misleading statements and conduct.

## XII. CLASS ACTION ALLEGATIONS

788. Lead Plaintiff brings this action as a class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities who purchased or otherwise acquired the publicly traded common stock of Inspire between November 4, 2024 and May 4, 2026, inclusive (the "Class Period"), in domestic transactions or on U.S. exchanges, and were damaged thereby (the "Class"). Excluded from the Class are Defendants and their immediate families, the officers and directors of the Company at all relevant times, members of their immediate families, and Defendants' legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

789. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of April 28, 2026, there were approximately 28,813,153 shares of Inspire common stock outstanding.

790. Lead Plaintiff's claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws as complained of herein.

791. Lead Plaintiff will fairly and adequately protect Class members' interests and has retained competent counsel experienced in class actions and securities litigation. Lead Plaintiff has no interest that conflicts with the interests of the Class.

792. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of fact and law common to the Class are:

(a) whether Defendants' false and/or misleading statements and misleading conduct as alleged herein violated the federal securities laws;

(b) whether Defendants made false and/or misleading statements and engaged in misleading conduct during the Class Period;

(c) whether Defendants' alleged false and/or misleading statements and misleading conduct were material;

(d) whether Defendants made their alleged false and/or misleading statements and engaged in misleading conduct with scienter;

(e) whether Defendants Herbert, Buchholz, and Weatherby are personally liable for the alleged false and/or misleading statements and misleading conduct described herein;

(f) whether Defendants Herbert, Buchholz, and Weatherby were controlling persons of Inspire and of each other;

(g) whether Defendants' false and/or misleading statements and misleading conduct as alleged herein caused the Class members to suffer a compensable loss; and

(h) whether the members of the Class have sustained damages, and the proper measure of damages.

793. A class action is superior to all other available methods for the fair and efficient adjudication of this action. Joinder of all Class members is impracticable. Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it practically impossible for such members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XIII. CLAIMS FOR RELIEF

**COUNT I:**
**SECTION 10(b) AND RULE 10b-5(b) AGAINST ALL DEFENDANTS**

794. Lead Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

795. This Count is asserted on behalf of all members of the Class against Defendant Inspire and the Individual Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) promulgated thereunder, 17 C.F.R. § 240.10b-5(b).

796. During the Class Period, Defendant Inspire and the Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(b) in that they made false statements of material fact and/or disseminated and/or approved and/or omitted to state material facts necessary to make the misleading statements specified above not misleading. Defendants' actions: (i) deceived the investing public, including Lead Plaintiff and other Class members, as alleged herein; and (ii) caused Lead Plaintiff and other members of the Class to purchase Inspire common stock at artificially inflated prices.

797. Defendant Inspire and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails: made various false and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices and artifices to defraud in connection with the purchase and sale of Inspire common stock, which were intended to, and did: (i) deceive the investing public, including Lead Plaintiff and the Class, regarding the feedback about, and adoption of, SleepSync, the reimbursement and coding for the Inspire V device, and Inspire's baseless and unrealistic guidance; (ii) artificially inflate and maintain the market price of

Inspire common stock; and (iii) cause Lead Plaintiff and other members of the Class to purchase Inspire common stock at artificially inflated prices and suffer losses when the true facts became known.

798. During the Class Period, Defendants made the false and/or misleading statements specified above, which they knew to be false and/or misleading or were severely reckless in disregarding their false and misleading nature in that, in light of the circumstances under which they were made, the statements contained misrepresentations and/or failed to disclose material facts necessary in order to make the statements not misleading.

799. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or were severely reckless in disregarding the true facts that were available to them. The Individual Defendants engaged in this misconduct to conceal Inspire's true condition from the investing public and to support the artificially inflated prices of the Company's common stock. The Individual Defendants' state of mind (and that of other management-level executives, including Randy Ban, Executive Vice President, Patient Access and Therapy Development, John Rondoni, CTO, Andrea Rasmussen, Vice President of Quality, and Kimberly Konopa, Vice President, Market Access and Reimbursement) is imputed to Inspire.

800. Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Inspire's common stock. Lead Plaintiff and the Class would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices for Inspire common stock had been artificially inflated by Defendants' fraudulent course of conduct.

801. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

802. By virtue of the foregoing, Inspire and the Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

**COUNT II:**
**SECTION 10(b) AND RULE 10b-5(a), (c) AGAINST ALL DEFENDANTS**

803. Lead Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

804. This Count is asserted on behalf of all members of the Class against the Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(a) and (c) promulgated thereunder, 17 C.F.R. § 240.10b-5(a), (c).

805. During the Class Period, Defendants "devised a plan and induced [Lead Plaintiff and class members] to [purchase] their shares without disclosing to them material facts that reasonably could have been expected to influence their decisions to" purchase. *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972). As alleged herein, Defendant Inspire and the Individual Defendants violated Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) in that they (1) employed devices, schemes, and artifices to defraud; and (2) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of Inspire common stock during the Class Period; (3) in an effort to maintain artificially high market prices for Inspire common stock.

806. Defendant Inspire and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, employed devices, schemes, and artifices to defraud and engaged and participated in a

continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiff and the Class in connection with the purchase and sale of Inspire common stock, which did: (i) deceive the investing public, including Lead Plaintiff and the Class, regarding, among other things, the feedback about, and adoption of, SleepSync, the reimbursement and coding for the Inspire V device, and Inspire's baseless and unrealistic guidance; (ii) artificially inflate and maintain the market price of Inspire common stock; and (iii) cause Lead Plaintiff and other members of the Class to purchase Inspire common stock at artificially inflated prices and suffer losses when the true facts became known.

807. As part of their scheme to defraud investors in violation of Rule 10b-5(a) and (c), Inspire and the Individual Defendants, individually and in concert, directly and indirectly, orchestrated a strategy to knowingly mislead investors about the feedback and adoption of SleepSync, the reimbursement and coding for the Inspire V device, and Inspire's baseless and unrealistic guidance. *Supra* §§ IV-IX. The Individual Defendants engaged in and orchestrated conduct that deceived investors, including: (i) concealing deficiencies and security vulnerabilities in the SleepSync software; (ii) making misstatements to providers and payors that induced providers to submit and payors to pay false reimbursement claims for Inspire V implantation procedures based on the incorrect CPT code 64568; (iii) engaging in additional conduct that assisted providers in submitting thousands of false reimbursement claims for Inspire V implantation procedures based on the incorrect CPT code 64568; and (iv) causing CMS to "lift" edits made by at least two MACs to their relevant Billing and Coding Articles removing CPT code 64568 from CMS's website, thus concealing those edits from the public.

808. These deceptive acts were part of a course of conduct that operated as a fraud and deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of

Inspire common stock during the Class Period in an effort to maintain artificially high market prices for Inspire common stock.

809. As described above, Inspire and the Individual Defendants acted with scienter throughout the Class Period, in that they either had actual knowledge of the materially false and/or misleading statements and deceptive conduct set forth herein, or acted with severe reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. Inspire and the Individual Defendants engaged in this misconduct to conceal Inspire's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

810. Due to Defendants' scheme, Lead Plaintiff and other Class members were deprived of "material facts that reasonably could have been expected to influence their decisions to" purchase and, as a result, purchased their shares in Inspire common stock at artificially inflated prices, among other things. *See Affiliated Ute Citizens of Utah*, 406 U.S. at 153. Lead Plaintiff and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Inspire common stock, which was removed from the stock when the true facts became known. Lead Plaintiff and the Class would not have purchased Inspire common stock at the prices they paid, or at all, had they been aware that the market prices for Inspire common stock had been artificially inflated by the Individual Defendants' fraudulent course of conduct. It was also foreseeable to Defendants that misrepresenting and concealing material facts from the public would artificially inflate the price of Inspire's common stock and that the revelation of the truth would correct the artificial inflation and cause the price of Inspire common stock to decline.

811. As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages attributable to the fraud alleged herein in connection with their respective purchases of the Company's common stock.

812. Each and every defendant is sued as a primary participant in the wrongful and illegal conduct charged herein.

813. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c), promulgated thereunder.

**COUNT III:**
**SECTION 20(a) AGAINST THE INDIVIDUAL DEFENDANTS**

814. Lead Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

815. This Count is asserted on behalf of all members of the Class against the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

816. During the Class Period, the Individual Defendants acted as controlling persons of Inspire and each other within the meaning of Section 20(a) of the Exchange Act. By virtue of their positions and their power to control public statements about Inspire, the Individual Defendants had the power and ability to control the actions of Inspire and its employees. Inspire and the Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5, as set forth above. By reason of such conduct and their control, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## XIV. PRAYER FOR RELIEF

817. WHEREFORE, Lead Plaintiff prays for judgment as follows:

(a) determining that this action is a proper class action, certifying Lead Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Counsel as Class Counsel;

(b) awarding compensatory damages in favor of Lead Plaintiff and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest;

(c) awarding Lead Plaintiff reasonable costs and expenses incurred in this action, including attorneys' fees and expenses; and

(d) awarding such equitable, injunctive or other relief as the Court may deem just and proper.

Dated: July 30, 2026
New York, NY

Respectfully submitted,

**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**

By: *<u>/s/ Gregg. M. Fishbein</u>*
Gregg M. Fishbein (MN #202009)
100 Washington Avenue South Suite 2200
Minneapolis, MN 55401-2179
Tel: (612) 339-6900
Fax: (612) 339-0981
gmfishbein@locklaw.com

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

By: *<u>/s/ Rebecca E. Boon</u>*
Salvatore Graziano
(NY Bar No. 2470714, *admitted pro hac vice*)
Rebecca E. Boon
(NY Bar No. 4602728, *admitted pro hac vice*)
Shane D. Avidan
(NY Bar No. 5144076, *admitted pro hac vice*)
1251 Avenue of the Americas, 44th Floor
New York, New York 10020
Tel: (212) 554-1400
Fax: (212) 554-1444

*Counsel for Lead Plaintiff Indiana Public Retirement System and Lead Counsel for the Class*